IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

APPEAL NO. 20-13494-CC

UNITED STATES OF AMERICA,

Appellant,

v.

EDGAR DIAZ-COLON,

Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA

APPENDIX

JAMES T. SKUTHAN
**Acting Federal Defender**

KATHERINE G. HOWARD
**Research and Writing Attorney**
**Appellate Division**
**201 South Orange Ave., Suite 300**
**Orlando, Florida 32801**
**Telephone: (407) 648-6338**
**Email: Katherine_Howard@fd.org**

# INDEX

Criminal Docket Sheet ................................................................ Dkt Sheet

Indictment ....................................................................................... 1

Change of Plea Minutes ............................................................... 33

Change of Plea Transcript .......................................................... 64

United States Sentencing Memorandum ............................... 45

Mitigation Appendix..................................................................... 46

Defendant's Exhibit List (with Exhibits)............................... 52

Sentencing Transcript.................................................................. 67

Judgment........................................................................................... 53

Notice of Appeal ............................................................................ 57

Certificate of Service


**FILED SEPERATELY UNDER SEAL**

Presentence Investigation Report

# DOCKET SHEET

APPEAL, CLOSED, INTERPRETER, PLED, SL DOC

## U.S. District Court
## Middle District of Florida (Orlando)
## CRIMINAL DOCKET FOR CASE #: 6:19–cr–00260–CEM–DCI All Defendants

Case title: USA v. Diaz–Colon

Date Filed: 12/18/2019
Date Terminated: 09/03/2020

Assigned to: Judge Carlos E.
Mendoza
Referred to: Magistrate Judge
Daniel C. Irick

Appeals court case number:
20–13494–C 11CCA

**Defendant (1)**

**Edgar Johan Diaz–Colon**
*TERMINATED: 09/03/2020*

represented by **Ali Kamalzadeh**
Federal Public Defender's Office
201 S Orange Ave., Ste 300
Orlando, FL 32801–3417
407/648–6338
Fax: 407/648–6095
Email: ali_kamalzadeh@fd.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Public Defender or Community
Defender Appointment*

**Jenna N. Kelly**
Federal Public Defender's Office
201 S Orange Ave., Ste 300
Orlando, FL 32801–3417
407/648–6338
Fax: 407/648–6095
Email: jenna_kelly@fd.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Public Defender or Community
Defender Appointment*

**Martin Der Ovanesian**
Federal Public Defender's Office
2075 W Main St Ste 300
Ft Myers, FL 33901
239–334–0397
Email: martin_derovanesian@fd.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Public Defender or Community
Defender Appointment*

**Katherine G. Howard**
Federal Public Defender's Office
201 S Orange Ave., Ste 300
Orlando, FL 32801–3417
407–648–6338
Email: katherine_howard@fd.org
*ATTORNEY TO BE NOTICED*

**Pending Counts**

**Disposition**

| | |
|---|---|
| 18:2251.F SEXUAL EXPLOITATION OF CHILDREN (1) | IMPRISONMENT– 1800 Months. This term consists of a 360–month term as to each of Counts One, Two, Three, Four, and Five, all such terms to run consecutively.; SUPERVISED RELEASE: 5 years. This term consists of a 5–year term as to Counts One, Two, Three, Four, and Five, all such terms to run concurrently.; FINE: Waived; SPECIAL ASSESSMENT: $500.00 |
| 18:2251.F SEXUAL EXPLOITATION OF CHILDREN (2) | IMPRISONMENT– 1800 Months. This term consists of a 360–month term as to each of Counts One, Two, Three, Four, and Five, all such terms to run consecutively.; SUPERVISED RELEASE: 5 years. This term consists of a 5–year term as to Counts One, Two, Three, Four, and Five, all such terms to run concurrently.; FINE: Waived; SPECIAL ASSESSMENT: $500.00 |
| 18:2251.F SEXUAL EXPLOITATION OF CHILDREN (3) | IMPRISONMENT– 1800 Months. This term consists of a 360–month term as to each of Counts One, Two, Three, Four, and Five, all such terms to run consecutively.; SUPERVISED RELEASE: 5 years. This term consists of a 5–year term as to Counts One, Two, Three, Four, and Five, all such terms to run concurrently.; FINE: Waived; SPECIAL ASSESSMENT: $500.00 |
| 18:2251.F SEXUAL EXPLOITATION OF CHILDREN (4) | IMPRISONMENT– 1800 Months. This term consists of a 360–month term as to each of Counts One, Two, Three, Four, and Five, all such terms to run consecutively.; SUPERVISED RELEASE: 5 years. This term consists of a 5–year term as to Counts One, Two, Three, Four, and Five, all such terms to run concurrently.; FINE: Waived; SPECIAL ASSESSMENT: $500.00 |
| 18:2251.F SEXUAL EXPLOITATION OF CHILDREN (5) | IMPRISONMENT– 1800 Months. This term consists of a 360–month term as to each of Counts One, Two, Three, Four, and Five, all such terms to run consecutively.; SUPERVISED RELEASE: 5 years. This term consists of a 5–year term as to Counts One, Two, Three, Four, and Five, all such terms to run concurrently.; FINE: Waived; SPECIAL ASSESSMENT: $500.00 |

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
|---|---|
| None | |

**Highest Offense Level (Terminated)**

None

| **Complaints** | **Disposition** |
|---|---|
| None | |

**Plaintiff**

| **USA** | represented by |
|---|---|

**Emily C. L. Chang**
US Attorney's Office – FLM*
Suite 3100
400 W Washington St
Orlando, FL 32801
407/648–7537
Fax: 407/648–7643
Email: emily.chang@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Nicole M. Andrejko**
US Attorney's Office – FLM
Suite 3100
400 W Washington St
Orlando, FL 32801
407/648–7560
Fax: 407/648–7643
Email: nicole.andrejko@usdoj.gov
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 12/18/2019 | 1 | INDICTMENT returned in open court as to Edgar Johan Diaz–Colon (1) count(s) 1–5. (SPM) (Entered: 01/07/2020) |
| 12/18/2019 | 2 | MOTION to Seal Indictment and Related Documents by USA as to Edgar Johan Diaz–Colon. (SPM) Motions referred to Magistrate Judge Daniel C. Irick. (Entered: 01/07/2020) |
| 12/18/2019 | 3 | **ORDER granting 2 Motion to Seal as to Edgar Johan Diaz–Colon (1). The Clerk is further ordered to unseal all documents relating to the Indictment without further Order of the Court when any named defendant is taken into custody. Signed by Magistrate Judge Leslie R. Hoffman on 12/18/2019. (SPM)** (Entered: 01/07/2020) |
| 12/19/2019 | 5 | MOTION for Writ of Habeas Corpus ad prosequendum by USA as to Edgar Johan Diaz–Colon. (SPM) Motions referred to Magistrate Judge Daniel C. Irick. (Entered: 01/07/2020) |
| 12/23/2019 | 6 | **ORDER granting 5 Motion for Writ of Habeas Corpus ad prosequendum WRIT ISSUED as to Edgar Johan Diaz–Colon (1). Signed by Magistrate Judge Daniel C. Irick on 12/23/2019. (SPM)** (Entered: 01/07/2020) |
| 01/07/2020 | 7 | NOTICE OF HEARING as to Edgar Johan Diaz–Colon: Initial Appearance and Arraignment set for 1/7/2020 at 02:00 PM in Orlando Courtroom 5 C before Magistrate Judge Daniel C. Irick.(RN) (Entered: 01/07/2020) |
| 01/07/2020 | | Arrest of Edgar Johan Diaz–Colon on 1/7/2020. (RN) (Entered: 01/07/2020) |
| 01/07/2020 | 8 | Minute Entry for proceedings held before Magistrate Judge Daniel C. Irick: Initial Appearance and ARRAIGNMENT as to Edgar Johan Diaz–Colon (1) Counts 1–5 held on 1/7/2020 Defendant pled not guilty. (Digital) (Interpreter/Language: Etienne Van Hissenhoven/Spanish) (RN) (Entered: 01/07/2020) |
| 01/07/2020 | 9 | **ORDER appointing Spanish interpreter in this case for all further proceedings as to Edgar Johan Diaz–Colon. Signed by Magistrate Judge Daniel C. Irick on 1/7/2020. ctp(RN)** (Entered: 01/07/2020) |
| 01/07/2020 | 10 | ***CJA 23 Financial Affidavit by Edgar Johan Diaz–Colon. (RN) (Entered: 01/07/2020) |
| 01/07/2020 | 11 | **ORDER APPOINTING FEDERAL PUBLIC DEFENDER as to Edgar Johan Diaz–Colon. Signed by Magistrate Judge Daniel C. Irick on 1/7/2020. ctp(RN)** (Entered: 01/07/2020) |

| 01/07/2020 | 12 | **SCHEDULING ORDER as to Edgar Johan Diaz–Colon Status Conference set for 2/20/2020 at 09:30 AM in Orlando Courtroom 5 B before Judge Carlos E. Mendoza, Jury Trial set for 3/10/2020 at 08:30 AM in Orlando Courtroom 5 B before Judge Carlos E. Mendoza. Signed by Magistrate Judge Daniel C. Irick on 1/7/2020. ctp(RN)** (Entered: 01/07/2020) |
|---|---|---|
| 01/07/2020 | 13 | Ore Tenus MOTION for detention by USA as to Edgar Johan Diaz–Colon. (RN) (Entered: 01/07/2020) |
| 01/07/2020 | 14 | **ORDER OF DETENTION re 13 Ore Tenus Motion for detention as to Edgar Johan Diaz–Colon (1). Signed by Magistrate Judge Daniel C. Irick on 1/7/2020. ctp (RN)** (Entered: 01/07/2020) |
| 01/07/2020 | 16 | Arrest Warrant Returned Executed on 1/2/2020 as to Edgar Johan Diaz–Colon. (SPM) (Entered: 01/07/2020) |
| 01/14/2020 | 17 | NOTICE OF ATTORNEY APPEARANCE Emily C. L. Chang appearing for USA. (Chang, Emily) (Entered: 01/14/2020) |
| 01/14/2020 | 18 | NOTICE of possible conflict of interest by USA as to Edgar Johan Diaz–Colon No conflict of interest. (Chang, Emily) (Entered: 01/14/2020) |
| 01/14/2020 | 19 | NOTICE of pendency of related cases re order of compliance to Local Rule as to Edgar Johan Diaz–Colon by USA. Related case(s): no (Chang, Emily) (Entered: 01/14/2020) |
| 01/14/2020 | 20 | NOTICE of estimated length of trial by USA. Estimated trial length: three days. (Chang, Emily) (Entered: 01/14/2020) |
| 01/14/2020 | 21 | CERTIFICATE of interested persons and corporate disclosure statement by USA (Chang, Emily) (Entered: 01/14/2020) |
| 01/14/2020 | 22 | NOTICE OF ATTORNEY APPEARANCE: Jenna N. Kelly appearing for Edgar Johan Diaz–Colon *and Substitution of Counsel* (Kelly, Jenna) (Entered: 01/14/2020) |
| 01/17/2020 | 23 | NOTICE OF ATTORNEY APPEARANCE: Ali Kamalzadeh appearing for Edgar Johan Diaz–Colon *as Co–Counsel* (Kamalzadeh, Ali) (Entered: 01/17/2020) |
| 02/19/2020 | 25 | Minute Entry for proceedings held before Judge Carlos E. Mendoza: STATUS Conference as to Edgar Johan Diaz–Colon held on 2/19/2020. Court Reporter: Suzanne L. Trimble (MEH) ctp (MEH). Modified on 3/3/2020 (MEH). (Entered: 02/21/2020) |
| 02/20/2020 | 24 | WAIVER of speedy trial through June 30, 2020 by Edgar Johan Diaz–Colon (Kelly, Jenna) (Entered: 02/20/2020) |
| 02/20/2020 | 26 | ORE TENUS MOTION to Continue trial by Edgar Johan Diaz–Colon. (MEH) (Entered: 02/21/2020) |
| 02/20/2020 | 27 | **ENDORSED ORDER granting 26 Motion to Continue as to Edgar Johan Diaz–Colon (1). After considering all the factors, including those set forth in 18 U.S.C. § 3161(h)(7)(B), and for the reasons stated on the record at the status conference, the Court finds that the ends of justice served by granting such a continuance outweigh the best interest of the public and the defendant in a speedy trial. The Court, therefore, determines that the time from today 2/20/2020 until and including April 30, 2020 shall be "excludable time" pursuant to 18 U.S.C. § 3161(h). Jury Trial set for trial term commencing 5/1/2020 at 8:30 AM in Orlando Courtroom 5B before Judge Carlos E. Mendoza. Status Conference set for 4/16/2020 at 9:30 AM in Orlando Courtroom 5B before Judge Carlos E. Mendoza.Signed by Judge Carlos E. Mendoza on 2/20/2020. (MEH) ctp** (Entered: 02/21/2020) |
| 03/19/2020 | 28 | NOTICE of maximum penalty, elements of offense, personalization of elements and factual basis by USA as to Edgar Johan Diaz–Colon (Chang, Emily) (Entered: 03/19/2020) |
| 04/07/2020 | 29 | NOTICE OF RESCHEDULING HEARING: The Status Conference hearing previously scheduled for 04/16/2020 is rescheduled as to Edgar Johan Diaz–Colon. New hearing date and time: Telephone Status Conference set for 4/16/2020 at 9:30 |

| | | |
|---|---|---|
| | | AM in Orlando Courtroom 5B before Judge Carlos E. Mendoza. The parties shall call 866–434–5269 ten minutes before the hearing is scheduled to begin. Access Code: 4420602. Security Code: 041620. (MEH) ctp (Entered: 04/07/2020) |
| 04/08/2020 | 30 | NOTICE canceling Telephonic Status Conference hearing scheduled for 04/16/2020 as to Edgar Johan Diaz–Colon. (MEH)ctp (Entered: 04/08/2020) |
| 04/08/2020 | 31 | NOTICE OF HEARING as to Edgar Johan Diaz–Colon: Change of Plea Hearing set for 4/22/2020 at 10:00 AM in Orlando Courtroom 5B before Judge Carlos E. Mendoza. Defendant's presence is required. (MEH) ctp (Entered: 04/08/2020) |
| 04/21/2020 | 32 | NOTICE of maximum penalty, elements of offense, personalization of elements and factual basis by Edgar Johan Diaz–Colon (Kelly, Jenna) (Entered: 04/21/2020) |
| 04/22/2020 | 33 | Minute Entry for proceedings held before Judge Carlos E. Mendoza: Change of Plea Hearing as to Edgar Johan Diaz–Colon held on 4/22/2020. Court Reporter: Suzanne L. Trimble (MEH) ctp (Entered: 04/22/2020) |
| 04/22/2020 | 34 | NOTICE OF HEARING as to Edgar Johan Diaz–Colon: Sentencing set for 7/21/2020 at 10:00AM in Orlando Courtroom 5B before Judge Carlos E. Mendoza. Defendant's presence is required. All motions and/or memorandums the parties would like the Court to consider, shall be filed no later than (seven days prior to sentencing). Counsel is to notify the Courtroom Deputy Clerk as soon as possible if they believe the sentencing will be longer than 15 minutes. (MEH) ctp (Entered: 04/22/2020) |
| 04/22/2020 | 35 | NOTICE canceling Jury Trial hearing scheduled for 05/01/2020 as to Edgar Johan Diaz–Colon. The Defendant has entered a plea of guilty in this matter. (MEH) ctp (Entered: 04/22/2020) |
| 06/25/2020 | 37 | MOTION for entry of preliminary order of forfeiture by USA as to Edgar Johan Diaz–Colon. (Andrejko, Nicole) Modified on 6/25/2020 (SPM). (Entered: 06/25/2020) |
| 06/26/2020 | 38 | **ORDER granting 37 Motion For Entry of Preliminary Order of Forfeiture by USA as to Edgar Johan Diaz–Colon (1). Signed by Judge Carlos E. Mendoza on 6/26/2020. (MEH) ctp** (Entered: 06/26/2020) |
| 06/29/2020 | 39 | Unopposed MOTION to Continue Sentencing Hearing by Edgar Johan Diaz–Colon. (Kelly, Jenna) (Entered: 06/29/2020) |
| 06/30/2020 | 40 | **ENDORSED ORDER granting 39 Motion to Continue Sentencing as to Edgar Johan Diaz–Colon (1). Hearing to be set by separate notice. Signed by Judge Carlos E. Mendoza on 6/30/2020. (MEH) ctp** (Entered: 06/30/2020) |
| 06/30/2020 | 41 | NOTICE OF RESCHEDULING HEARING: The Sentencing hearing previously scheduled for 07/21/2020 is rescheduled as to Edgar Johan Diaz–Colon. New hearing date and time:Sentencing set for 9/3/2020 at 10:00AM in Orlando Courtroom 5B before Judge Carlos E. Mendoza. The Court has allotted 90 Minutes for this hearing. Defendant's presence is required. All motions and/or memorandums the parties would like the Court to consider, shall be filed no later than August 27, 2020. (MEH) ctp Modified on 8/21/2020 (MEH). (Entered: 06/30/2020) |
| 07/31/2020 | 42 | PROOF OF PUBLICATION as to Edgar Johan Diaz–Colon newspaper: an official government internet site, (www.forfeiture.gov) dates of publication: for at least 30 consecutive days, beginning on June 30, 2020 and ending on July 29, 2020. (Attachments: # 1 Attachment 1)(Andrejko, Nicole) (Entered: 07/31/2020) |
| 08/19/2020 | 43 | Unopposed MOTION to Seal *Government's Unredacted Sentencing Memorandum and Exhibits* by USA as to Edgar Johan Diaz–Colon. (Chang, Emily) Motions referred to Magistrate Judge Daniel C. Irick. (Entered: 08/19/2020) |
| 08/20/2020 | 44 | **ENDORSED ORDER granting 43 Unopposed Motion to File Under Seal. Pursuant to Local Rule 1.09, the government may file under seal the exhibits described in the Motion, which exhibits shall remain under seal until further order of the Court. Signed by Magistrate Judge Daniel C. Irick on 8/20/2020. (Irick, Daniel)** (Entered: 08/20/2020) |
| 08/27/2020 | 45 | SENTENCING MEMORANDUM by USA as to Edgar Johan Diaz–Colon (Chang, Emily) (Entered: 08/27/2020) |

| 08/27/2020 | 46 | MITIGATION APPENDIX by Edgar Johan Diaz–Colon (Kamalzadeh, Ali) Modified on 8/28/2020 (RDO). (Entered: 08/27/2020) |
| 08/27/2020 | | Sealed Document S–49. (KNC) (Entered: 08/27/2020) |
| 09/03/2020 | 50 | Minute Entry for proceedings held before Judge Carlos E. Mendoza: SENTENCING held on 9/3/2020 for Edgar Johan Diaz–Colon (1), Count(s) 1–5, IMPRISONMENT– 1800 Months. This term consists of a 360–month term as to each of Counts One, Two, Three, Four, and Five, all such terms to run consecutively.; SUPERVISED RELEASE: 5 years. This term consists of a 5–year term as to Counts One, Two, Three, Four, and Five, all such terms to run concurrently.; FINE: Waived; SPECIAL ASSESSMENT: $500.00. Court Reporter: Nikki L. Peters (MEH) ctp . (Entered: 09/03/2020) |
| 09/03/2020 | 51 | EXHIBIT LIST (Sentencing) by USA as to Edgar Johan Diaz–Colon. (MEH) (Additional attachment(s) added on 9/9/2020: # 1 Exhibit 1A– CD not scanned, # 2 Exhibit 1B, # 3 Exhibit 2A– CD not scanned, # 4 Exhibit 2B, # 5 Exhibit 3) (MEH). (Entered: 09/03/2020) |
| 09/03/2020 | 52 | EXHIBIT LIST (Sentencing) by Edgar Johan Diaz–Colon. (MEH) (Additional attachment(s) added on 9/9/2020: # 1 Exhibit 1, # 2 Exhibit 2 Part 1, # 3 Exhibit 2– Part 2) (MEH). (Entered: 09/03/2020) |
| 09/03/2020 | 53 | **JUDGMENT as to Edgar Johan Diaz–Colon (1). Count(s) 1–5, IMPRISONMENT– 1800 Months. This term consists of a 360–month term as to each of Counts One, Two, Three, Four, and Five, all such terms to run consecutively.; SUPERVISED RELEASE: 5 years. This term consists of a 5–year term as to Counts One, Two, Three, Four, and Five, all such terms to run concurrently.; FINE: Waived; SPECIAL ASSESSMENT: $500.00. Signed by Judge Carlos E. Mendoza on 9/3/2020. (MEH) ctp** (Entered: 09/03/2020) |
| 09/04/2020 | 55 | MOTION for final judgment of forfeiture by USA as to Edgar Johan Diaz–Colon. (Andrejko, Nicole) Modified on 9/4/2020 (SPM). (Entered: 09/04/2020) |
| 09/08/2020 | 56 | **ORDER granting 55 Motion for Final Judgment of Forfeiture as to Edgar Johan Diaz–Colon (1). Signed by Judge Carlos E. Mendoza on 9/8/2020. (MEH) ctp** (Entered: 09/08/2020) |
| 09/16/2020 | 57 | NOTICE OF APPEAL by Edgar Johan Diaz–Colon re 53 Judgment. Filing fee not paid (Kelly, Jenna) (Entered: 09/16/2020) |
| 09/16/2020 | 58 | TRANSMITTAL of initial appeal package as to Edgar Johan Diaz–Colon to USCA consisting of copies of notice of appeal, docket sheet, order/judgment being appealed, and motion, if applicable to USCA re 57 Notice of Appeal. Eleventh Circuit Transcript information form forwarded to pro se litigants and available to counsel at www.flmd.uscourts.gov under Forms and Publications/General. (SPM) (Entered: 09/16/2020) |
| 09/21/2020 | 59 | NOTICE OF ATTORNEY APPEARANCE: Martin Der Ovanesian appearing for Edgar Johan Diaz–Colon (Der Ovanesian, Martin) (Entered: 09/21/2020) |
| 09/22/2020 | | USCA Case Number as to Edgar Johan Diaz–Colon. USCA Number: 20–13494–C for 57 Notice of Appeal filed by Edgar Johan Diaz–Colon. (MAA) (Entered: 09/22/2020) |
| 09/30/2020 | 60 | TRANSCRIPT information form filed by Edgar Johan Diaz–Colon for proceedings held on 9/3/2020 before Judge Carlos E. Mendoza re 57 Notice of Appeal. USCA number: 20–13494 (Der Ovanesian, Martin) (Entered: 09/30/2020) |
| 09/30/2020 | 61 | TRANSCRIPT information form filed by Edgar Johan Diaz–Colon for proceedings held on 4/22/2020 before Judge Carlos E. Mendoza re 57 Notice of Appeal. USCA number: 20–13494 (Der Ovanesian, Martin) (Entered: 09/30/2020) |
| 10/01/2020 | 62 | COURT REPORTER ACKNOWLEDGMENT by Suzanne L. Trimble re 57 Notice of Appeal as to Edgar Johan Diaz–Colon. Estimated transcript filing date: 10/30/20. USCA number: 20–13494. (SLT) (Entered: 10/01/2020) |
| 10/01/2020 | 63 | COURT REPORTER ACKNOWLEDGMENT by Nikki Peters re 57 Notice of Appeal as to Edgar Johan Diaz–Colon. Estimated transcript filing date: October 30, 2020. USCA number: 20–13494. (NLP) (Entered: 10/01/2020) |

| 10/16/2020 | 64 | TRANSCRIPT of Change of Plea dated 4/22/20 held before Judge Carlos E. Mendoza, re: 57 Notice of Appeal as to Edgar Johan Diaz–Colon. Court Reporter Suzanne L. Trimble, trimblecourtreporter@gmail.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 11/6/2020, Redacted Transcript Deadline set for 11/16/2020, Release of Transcript Restriction set for 1/14/2021. (SLT) (Entered: 10/16/2020) |
| 10/16/2020 | 65 | NOTICE to counsel of filing of OFFICIAL TRANSCRIPT. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may purchase a copy from the court reporter or view the document at the clerk's office public terminal as to Edgar Johan Diaz–Colon. Court Reporter: Suzanne L. Trimble (SLT) (Entered: 10/16/2020) |
| 10/16/2020 | 66 | NOTIFICATION that transcript has been filed by Suzanne L. Trimble re: 57 Notice of Appeal as to Edgar Johan Diaz–Colon USCA number: 20–13494 (SLT) (Entered: 10/16/2020) |
| 10/30/2020 | 67 | TRANSCRIPT of Sentencing for dates of September 3, 2020 held before Judge Carlos E. Mendoza, re: 57 Notice of Appeal as to Edgar Johan Diaz–Colon. Court Reporter/Transcriber Nikki Peters, RPR, CRR, CRC, Telephone number courttranscripts@outlook.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 11/20/2020, Redacted Transcript Deadline set for 11/30/2020, Release of Transcript Restriction set for 1/28/2021. (NLP) (Entered: 10/30/2020) |
| 10/30/2020 | 68 | NOTIFICATION that transcript has been filed by Nikki Peters re: 57 Notice of Appeal as to Edgar Johan Diaz–Colon USCA number: 20–13494 (NLP) (Entered: 10/30/2020) |
| 10/30/2020 | 69 | NOTICE to counsel of filing of OFFICIAL TRANSCRIPT. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may purchase a copy from the court reporter or view the document at the clerk's office public terminal as to Edgar Johan Diaz–Colon. Court Reporter: Nikki L. Peters (NLP) (Entered: 10/30/2020) |
| 12/29/2020 | 70 | NOTICE OF ATTORNEY APPEARANCE: Katherine G. Howard appearing for Edgar Johan Diaz–Colon *for Appellate Purposes Only* (Howard, Katherine) (Entered: 12/29/2020) |

# Doc. 1



UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA

v.

EDGAR JOHAN DIAZ-COLON

CASE NO. 6:19-cr-260-ORL-41 DCI

18 U.S.C. § 2251(a)

unSEALED

## INDICTMENT

The Grand Jury charges:

### COUNT ONE

On or about July 8, 2018, in the Middle District of Florida, and

elsewhere, the defendant,

### EDGAR JOHAN DIAZ-COLON

did employ, use, persuade, induce, entice, and coerce a minor to engage in

any sexually explicit conduct for the purpose of producing a visual depiction

of such conduct, that is, a file titled "VID-20180427-WA0185," and the visual

depiction was produced using materials that had been mailed, shipped, and

transported in and affecting interstate and foreign commerce by any means,

including by computer.

In violation of 18 U.S.C. § 2251(a) and (e).

## COUNT TWO

On or about July 8, 2018, in the Middle District of Florida, and elsewhere, the defendant,

### EDGAR JOHAN DIAZ-COLON

did employ, use, persuade, induce, entice, and coerce a minor to engage in any sexually explicit conduct for the purpose of producing a visual depiction of such conduct, that is, a file titled "VID-20180427-WA0184," and the visual depiction was produced using materials that had been mailed, shipped, and transported in and affecting interstate and foreign commerce by any means, including by computer.

In violation of 18 U.S.C. § 2251(a) and (e).

## COUNT THREE

On or about July 8, 2018, in the Middle District of Florida, and elsewhere, the defendant,

### EDGAR JOHAN DIAZ-COLON

did employ, use, persuade, induce, entice, and coerce a minor to engage in any sexually explicit conduct for the purpose of producing a visual depiction of such conduct, that is, a file titled "VID-20180427-WA0183," and the visual depiction was produced using materials that had been mailed, shipped, and

transported in and affecting interstate and foreign commerce by any means, including by computer.

In violation of 18 U.S.C. § 2251(a) and (e).

## COUNT FOUR

On or about July 20, 2019, in the Middle District of Florida, and elsewhere, the defendant,

### EDGAR JOHAN DIAZ-COLON

did employ, use, persuade, induce, entice, and coerce a minor to engage in any sexually explicit conduct for the purpose of producing a visual depiction of such conduct, that is, a file titled "FullSizeRender.mov," and the visual depiction was produced using materials that had been mailed, shipped, and transported in and affecting interstate and foreign commerce by any means, including by computer.

In violation of 18 U.S.C. § 2251(a) and (e).

## COUNT FIVE

On or about July 27, 2019, in the Middle District of Florida, and elsewhere, the defendant,

### EDGAR JOHAN DIAZ-COLON

did employ, use, persuade, induce, entice, and coerce a minor to engage in any sexually explicit conduct for the purpose of producing a visual depiction

of such conduct, that is, a file titled "IMG_0074.MOV," and the visual depiction was produced using materials that had been mailed, shipped, and transported in and affecting interstate and foreign commerce by any means, including by computer.

In violation of 18 U.S.C. § 2251(a) and (e).

## FORFEITURE

1.    The allegations contained in Counts One through Five are incorporated by reference for the purpose of alleging forfeiture pursuant to the provisions of 18 U.S.C. § 2253.

2.    Upon conviction of a violation of 18 U.S.C. § 2251(a), the defendant shall forfeit to the United States, pursuant to 18 U.S.C. § 2253:

    a.    Any visual depiction described in 18 U.S.C. § 2251, 2251A, or 2252, 2252A, 2252B, or 2260 of chapter 110 of Title 18, or any book, magazine, periodical, film, videotape, or other matter which contains any such visual depiction, which was produced, transported, mailed, shipped, or received in violation of chapter 110;

    b.    Any property, real or personal, constituting or traceable to gross profits or other proceeds obtained from such offense; and

4

       c.     Any property, real or personal, used or intended to be used to commit or to promote the commission of such offense or any property traceable to such property.

     3.     The property to be forfeited includes, but is not limited to, the following:

       a.     Apple iPad mini, serial no. F9FRM1B9GHMG; and

       b.     Black, 16-gigabyte, SanDisk micro SD card.

     4.     If any of the property described above, as a result of any act or omission of the defendant:

       a.     cannot be located upon the exercise of due diligence;

       b.     has been transferred or sold to, or deposited with, a third person;

       c.     has been placed beyond the jurisdiction of the Court;

       d.     has been substantially diminished in value; or

       e.     has been commingled with other property which cannot be subdivided without difficulty;

the United States shall be entitled to forfeiture of substitute property pursuant

to 21 U.S.C. § 853(p), as incorporated by 18 U.S.C. § 2253(b).

A TRUE BILL.

_____
Foreperson

MARIA CHAPA LOPEZ
United States Attorney

By: _____
Emily C. L. Chang
Assistant United States Attorney

By: _____
Sara C. Sweeney
Assistant United States Attorney
Deputy Chief, Orlando Division

# UNITED STATES DISTRICT COURT
Middle District of Florida
Orlando Division

## THE UNITED STATES OF AMERICA

vs.

## EDGAR JOHAN DIAZ-COLON

### INDICTMENT

Violation:

18 U.S.C. § 2251(a)

A true bill,

_____
Foreperson

Filed in open court this 18th day of December, 2019.

_____
Clerk

Bail   $_____

# Doc. 33

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**UNITED STATES OF AMERICA**

**v.**                                                    **Case No: 6:19-cr-260-Orl-41DCI**

**EDGAR JOHAN DIAZ-COLON**

**AUSA: Emily Chang**
**Defense Atty.: Ali Kamalzadeh, Federal Public Defender**

| JUDGE | Carlos E. Mendoza<br>United States District Judge | DATE AND TIME | April 22, 2020<br>10:00 A.M – 10:19 A.M. |
|---|---|---|---|
| DEPUTY CLERK | **Maria Hernandez** | REPORTER | **Suzanne Trimble**<br>**trimblecourtreporter@gmail.com** |
| INTERPRETER | **Agustin de la Mora** | PRETRIAL/PROB | **No Appearance** |
| TOTAL TIME | **19 Minutes** | | |

### CLERK'S CHANGE OF PLEA MINUTES

Interpreter placed under oath.

Defendant placed under oath.

Court inquired with defendant and advised of rights.

Defendant proffered a plea of guilty to Counts One, Two, Three, Four, and Five of the Indictment; The Court accepts the plea and adjudicates Defendant guilty.

Sentencing set for July 21, 2020 at 10:00 AM.  (1 hour has been reserved for Sentencing.)

The Defendant remains in custody pending Sentencing.

Court is adjourned.

# DOC. 64

1

```
 1                  UNITED STATES DISTRICT COURT
 2                   MIDDLE DISTRICT OF FLORIDA
                          ORLANDO DIVISION
 3   - - - - - - - - - - - - - - -X
     UNITED STATES OF AMERICA,    :
 4                                :
                                  :  Case No.:
 5           Plaintiff,           :  6:19-cr-260-Orl-41DCI
                                  :
 6   vs.                          :
                                  :  Orlando, Florida
 7   EDGAR JOHAN DIAZ-COLON,      :  April 22, 2020
                                  :  10:00 a.m.
 8                                :
             Defendant.           :
 9   - - - - - - - - - - - - - - -X
10
                 TRANSCRIPT OF CHANGE OF PLEA
11        BEFORE THE HONORABLE CARLOS E. MENDOZA
                 UNITED STATES DISTRICT JUDGE
12

13   APPEARANCES:
14
     Counsel for Plaintiff:       Emily C.L. Chang
15
     Counsel for Defendant:       Ali Kamalzadeh
16

17

18

19

20   Proceedings recorded by mechanical stenography.
     Transcript produced by computer-aided transcription.
21

22   Court Reporter:   Suzanne L. Trimble, CCR, CRR, RPR
                        Federal Official Court Reporter
23                      401 West Central Boulevard, Suite 4600
                        Orlando, Florida 32801
24                      e-mail: trimblecourtreporter@gmail.com

25
```

2

```
 1             P R O C E E D I N G S
 2        THE COURTROOM DEPUTY:  United States of America v.
 3   Edgar Johan Diaz-Colon, Case No. 6:19-cr-260.
 4        Counsel, please state your appearances for the
 5   record.
 6        MS. CHANG:  Good morning, Your Honor.  Emily Chang
 7   on behalf of the United States.  With me is Special Agent
 8   Kevin Kaufman of the F.B.I.
 9        THE COURT:  Good morning.
10        MR. KAMALZADEH:  Good morning, Your Honor, Ali
11   Kamalzadeh on behalf of the Federal Defenders Office and
12   Mr. Edgar Diaz-Colon.
13        THE COURT:  All right.  Good morning,
14   Mr. Kamalzadeh.  You can just stay there at counsel table,
15   stand there with your client.  We'll get started.
16        And while his client is standing, if our interpreter
17   would be kind enough to raise his right hand, he's going to be
18   placed under oath.
19        (Interpreter sworn.)
20        INTERPRETER:  I do.  My name is Augustin de la Mora
21   federally certified court interpreter, Spanish.
22        Good morning, Your Honor.
23        THE COURT:  Good morning.
24        If the defendant would be kind enough to raise his
25   right hand, he's going to be placed under oath.
```

3

1          (Edgar Johan Diaz-Colon sworn.)

2          THE DEFENDANT:  I do so swear.

3          THE COURT:  All right.  Sir, you can put your hand

4   down.  Please state your full name for the record.

5          THE DEFENDANT:  Edgar Johan Diaz-Colon.

6          THE COURT:  All right.  Sir, we're here today

7   because I've been informed by counsel that you intend on

8   entering a plea of guilty without the benefit of a plea

9   agreement.  Is that your intent here today?

10          THE DEFENDANT:  Yes, sir.

11          THE COURT:  All right.  I'm going to go over a lot

12   of information with you.  If at any time you need me to slow

13   down or repeat myself or you would just like an opportunity to

14   speak to your attorney, please let me know, and I will offer

15   you that opportunity.  Do you understand?

16          THE DEFENDANT:  Yes, sir.

17          THE COURT:  All right.  You are going to be entering

18   a plea of guilty as to Counts 1 through 5 of the indictment.

19   They all charge you with the same thing, and they're different

20   counts of the same misconduct the Government is alleging.

21   Counts 1 through 5 charge you with production of child

22   pornography in violation of 18 U.S. Code, Section 2251.

23          If you were to proceed to trial, the United States

24   would have to prove the following three elements beyond a

25   reasonable doubt for you to be found guilty, and these are

4

1   each of the elements that apply to all five counts.  The first

2   element, an actual minor, that is a real person who was less

3   than 18 years old was being depicted; second element, that you

4   employed, used, persuaded, induced, or enticed the minor to

5   engage in sexually explicit conduct for the purpose of

6   producing a visual depiction of the conduct; and, third, that

7   the visual depiction was produced using materials that were

8   transmitted or that you knew or had reason to know would be

9   transmitted using any means or facility of interstate or

10   foreign commerce by any means or had been produced using a

11   facility of interstate commerce, including by computer or

12   cellular telephone.

13          MS. CHANG:  Your Honor, may I?

14          THE COURT:  Yes.

15          MS. CHANG:  As to element three specifically, this

16   indictment charges that the visual depiction was produced

17   using materials that had been mailed, shipped, or transported

18   in or affecting interstate or foreign commerce by any means,

19   including by a computer, Your Honor, and that's important

20   because the two that you named I don't believe apply to this

21   case.

22          THE COURT:  All right.  So the Government asked for

23   that amendment.  Did you hear and understand the amendment to

24   that third element?

25          THE DEFENDANT:  Yes, I did hear it, yeah.

5

1          THE COURT:  Okay.  Those are the three elements the
2     United States would have to prove beyond a reasonable doubt
3     for you to be found guilty.  If found guilty of each of these
4     offenses, for each offense you would be facing the following
5     penalties:  A mandatory minimum of 15 years in prison up to a
6     maximum penalty of 30 years, a maximum fine of not more than
7     $250,000, a term of supervised release of five years up to
8     life and a $100 special assessment per count, also
9     restitution.
10          Additionally, pursuant to 18 U.S. Code,
11     Section 3014, I am required to impose a $5,000 special
12     assessment on any nonindigent defendant convicted of an
13     offense in violation of certain enumerated statutes involving
14     sexual abuse or the sexual exploitation or abuse of children,
15     and this one qualifies.  So unless I find you indigent, I'm
16     going to have to impose a $5,000 special assessment.  Do you
17     understand that?
18          THE DEFENDANT:  Understood.
19          THE COURT:  Additionally, I may impose an additional
20     financial assessment against you pursuant to 18 U.S. Code,
21     Section 2259A of not more than $50,000 for an offense
22     involving production of child pornography in violation of 18
23     U.S. Code, Section 2251(a).  Do you understand, sir?
24          THE DEFENDANT:  I understand, yes.
25          THE COURT:  All right.  As indicated previously,

6

1     you're entering these pleas without the benefit of a plea
2     agreement.  So I'm going to go over some very important rights
3     that you're potentially waiving with the entry of this plea.
4          You have the right to be represented by counsel at
5     every stage of these proceedings, and you're not waiving that
6     right.  But you do have the right against self-incrimination,
7     that is the right to remain silent.  You have the right to
8     enter a plea of not guilty and require the United States to
9     prove each and every element of each of these offenses beyond
10     a reasonable doubt.
11          You have a right to a jury trial.  At that jury
12     trial, represented by your attorney, you could confront and
13     cross-examine any witnesses testifying against you.  You could
14     even call witnesses on your own behalf.  You could even choose
15     to become a witness in your own defense.
16          By entering these pleas of guilty, you're waiving
17     all of the rights I've just gone over with you.  In other
18     words, there's not going to be a jury trial.  Do you
19     understand that, sir?
20          THE DEFENDANT:  Understood, yes, sir.
21          THE COURT:  All right.  Have you received a copy of
22     the indictment, that's the charging document, and had an
23     opportunity to review it with the advice of your attorney?
24          THE DEFENDANT:  That's correct, sir.
25          THE COURT:  Do you need more time to go over that

7

1  document with your attorney?

2        THE DEFENDANT:  No, sir.

3        THE COURT:  All right.  As to Counts 1 through 5 in

4  the indictment, how do you plead?

5        THE DEFENDANT:  Guilty, sir.

6        THE COURT:  How old are you?

7        THE DEFENDANT:  Thirty-three.

8        THE COURT:  What is the highest level of schooling

9  you've completed?

10        THE DEFENDANT:  One degree in social nursing.

11        THE COURT:  So that's college?

12        THE DEFENDANT:  Yes, sir.

13        THE COURT:  Are you currently employed?

14        THE DEFENDANT:  No, sir.

15        THE COURT:  What was your last job?

16        THE DEFENDANT:  I was a barber at my brother's

17  barber shop.

18        THE COURT:  Are you currently under the influence of

19  alcohol, prescribed medication, or any narcotics that may

20  affect your ability to understand these proceedings?

21        THE DEFENDANT:  No, sir.

22        THE COURT:  Have you ever been determined to be

23  incompetent?

24        THE DEFENDANT:  No, sir.

25        THE COURT:  Have you been threatened or intimidated

8

1  into entering this plea?

2        THE DEFENDANT:  No, sir.

3        THE COURT:  Other than the fact that I've been

4  advised that there is no plea agreement in this case, have you

5  been made any other promises to get you to enter into this

6  plea?

7        THE DEFENDANT:  No, sir.

8        THE COURT:  Are you entering the plea freely and

9  voluntarily because you believe it is in your best interest?

10        THE DEFENDANT:  Yes, sir.

11        THE COURT:  Have you had enough time to talk to your

12  attorney?

13        THE DEFENDANT:  Yes, sir.

14        THE COURT:  Are you satisfied with his

15  representation?

16        THE DEFENDANT:  Yes, sir.

17        THE COURT:  Do you understand that once I accept

18  your plea here today, I could sentence you up to the maximum

19  penalty without allowing you to withdraw your plea?

20        THE DEFENDANT:  Yes, sir.

21        THE COURT:  Have you discussed the federal advisory

22  sentencing guidelines with your attorney?

23        THE DEFENDANT:  Yes, sir.

24        THE COURT:  Do you understand that they will not be

25  calculated until sentencing and that they're not binding on

9

1   the Court?

2           THE DEFENDANT:  Yes, sir.

3           THE COURT:  I further notify you that I am obligated

4   to calculate the applicable sentencing guideline range and to

5   consider that range, possible departures under the sentencing

6   guidelines, and other sentencing factors under 18 U.S. Code,

7   Section 3553(a).  Do you understand that?

8           THE DEFENDANT:  Yes, sir.

9           THE COURT:  If you enter a plea of guilty and you

10  are not a citizen of the United States, you will be subject to

11  deportation, exclusion, voluntary departure, and the plea

12  could prevent you from obtaining United States citizenship.

13  Do you understand that?

14          THE DEFENDANT:  Yes, sir.

15          THE COURT:  Under the Sex Offender Registration and

16  Notification Act you must register and keep your registration

17  current with the location of your residence, with your

18  employer, and if you are a student, with your school.  Failure

19  to comply with these requirements will subject you to criminal

20  prosecution.  Your probation officer will instruct you on the

21  specifics of that compliance later.  Do you understand that,

22  sir?

23          THE DEFENDANT:  Yes, sir.

24          THE COURT:  Would the United States be kind enough

25  to give me a brief proffer of the facts?

10

1           MS. CHANG:  Yes, Your Honor.  If this case were to

2   proceed to trial, the United States would prove that on the

3   dates cited in the indictment, in the Middle District of

4   Florida and elsewhere, the defendant Edgar Johan Diaz-Colon

5   employed, used, persuaded, induced, enticed, and coerced

6   minors to engage in sexually explicit conduct for the purpose

7   of producing visual depictions of such conduct, and those

8   files are specified in the indictment.  And the visual

9   depictions were produced using materials that had been mailed,

10  shipped, and transported in and affecting interstate and

11  foreign commerce by any means, including by computer.

12          The file with respect to Count 1 is a 43-second

13  video showing the defendant forcing child victims two and

14  three to perform oral sex on him multiple times.

15          MR. KAMALZADEH:  Your Honor, I do apologize for the

16  interruption; however, we did file our own notice of maximum

17  penalties.  I do understand the Government filed their own.

18  But we would ask that the factual basis be limited to the

19  factual basis that we included in our maximum penalties.

20          THE COURT:  Well, I'll let her make her proffer, and

21  then you can object to what you disagree with in the proffer,

22  and if there continues to be disagreement at sentencing, then

23  she'll have to establish that by evidence presented to the

24  Court.

25          But I understand that you're not stipulating to

11

1  everything she's proffering, but I would prefer if she was
2  able to make her proffer uninterrupted, and then you can tell
3  me what parts of the proffer you're disagreeing with.

4          MR. KAMALZADEH:  Well, Your Honor, with Mr. -- if I
5  may, Mr. Diaz-Colon is accepting to plead guilty based on the
6  factual basis that meets the elements.  The additional facts
7  the Government is including in their factual basis is outside
8  the necessary needs to meet the elements of the offense.

9          THE COURT:  Right.  I think we're two ships passing
10 in the night.  You don't have to agree to what she's telling
11 me.  She's going to tell me what her version is.  And then you
12 can tell me what you disagree with.  And I will not consider
13 anything that's outside of the realm of what you're
14 stipulating to, unless they prove it at sentencing.

15         So I understand what you're saying, but that's
16 generally what happens.  She makes her proffer, and then I
17 look at you and your client and say, Do you object to the
18 proffer?  I'm sure you're going to object to the proffer.

19         MR. KAMALZADEH:  I understand, Your Honor.  I was
20 just attempting to allow -- for judicial expediency, we're
21 essentially agreeing to the factual basis almost to the --
22 very close to what the Government is asking for, but for us to
23 go through this process of picking out what we object to,
24 those facts, seems unnecessary at this point if, for the most
25 part, the parties are in agreement on the factual basis.

12

1          I mean, what we're basically splitting hairs on are
2  additional terminology that the Government is including in
3  there and that we don't want to burn onto the record at this
4  point.  It's unnecessary at this stage.

5          THE COURT:  Well, the only thing I have to conclude
6  is that there's a factual basis for a knowing and voluntary
7  plea.  So I'm with you on that.  I mean, she probably would
8  have been finished by know, if you're worried about judicial
9  economy.  I'm not going to hold any of this against him.  If
10 you object to it, they have to prove it.  And there's no plea
11 agreement where he's stipulated to any sort of factual basis.
12 So he's not agreeing to anything at this point.

13         If when she finishes you want to tell me, we object
14 to any proffer the United States just made that is outside of
15 the scope of what we agreed to in our notice of maximum
16 penalties, then I'll take that.

17         MR. KAMALZADEH:  Okay.  Thank you, Your Honor.

18         THE COURT:  All right.  Go ahead, Ms. Chang.

19         MS. CHANG:  On or about July 8th, 2018, with respect
20 to Count 2, the defendant produced a file which is titled in
21 the indictment, and that is a video that's almost two minutes
22 long that shows the defendant physically and verbally
23 directing child victim two to spread her legs apart and then
24 the defendant instructs the child to pull her clothing and
25 panties aside to expose her vagina, which she does it multiple

1   times.

2        On or about July 8th, the defendant produced the

3   file named in the indictment Count 3, and that file is about

4   18 seconds long of child victim two.  She's sitting on a couch

5   naked from the waist down and exposing her vagina and anus.

6   He produced the videos that are the -- I'm sorry.  He produced

7   the video that are the subject --

8        [Microphone feedback in courtroom.]

9        THE COURT:  We're causing the problem over here I

10  think.  Go on ahead though.

11       MS. CHANG:  -- that are the subjects of Counts 1, 2,

12  and 3 on a SanDisk micro secure digital card, and that was

13  manufactured outside the United States.

14       For Count 4, on or about July 20th, 2019, the

15  defendant produced the file named in the indictment that is 52

16  seconds long.  It shows the defendant directing child victim

17  three to pose in different positions in front of a camera so

18  that the defendant can manipulate her vagina, which is visible

19  in the video.  That video was produced on an iPad mini, which

20  was also manufactured outside the United States.  Child victim

21  two and child victim three were seven and six years old

22  respectively.

23       The defendant was living with their father in a

24  music studio that was built in the garage adjacent to the

25  house.  That is where the defendant recorded the videos, in

1   their father's garage studio, and that was in the Middle

2   District of Florida.

3        The father had allowed the defendant to stay in the

4   house due to the defendant's financial troubles, and the

5   defendant used his access to the father's children and the

6   main residence to coerce and entice and lure the children to

7   the garage studio where he sexually assaulted them, threatened

8   them with violence, committed acts of violence on them.

9        With respect to Count 5, on or about July 27, 2019,

10  the defendant produced the video named in the indictment in

11  Count 5.  That is about one minute and 20 seconds long.  It

12  shows the defendant with a three-year old victim who is the

13  niece of the defendant's girlfriend at the time.  The niece

14  was wrapped in a blanket lying on a couch and the defendant

15  pulled the victim's underwear to the side to expose her vagina

16  and spread her vagina with his fingers.  He produced that

17  video as well on the iPad mini, which was manufactured outside

18  the United States.

19       THE COURT:  All right.  Are there any defense

20  objections to the proffer?

21       MR. KAMALZADEH:  Yes, Your Honor.

22       THE COURT:  And is it fair to say that you're

23  objecting to any part of that proffer that's outside of the

24  scope of what you have submitted in your notice of maximum

25  penalties?

15

1      MR. KAMALZADEH:  Yes, Your Honor, and that's at
2  doc. 32.
3      THE COURT:  All right.  And, sir, this question is
4  directly for you.  Your attorney has indicated that you are
5  objecting to any part of the proffer that falls outside of the
6  scope of document 32 that your attorney filed on your behalf.
7  Is that your position here this morning?
8      THE DEFENDANT:  Yes, sir.
9      THE COURT:  All right.  The objection is noted.  The
10  Government knows what task is ahead of them should they want
11  to establish this as sentencing, but with the proffer provided
12  by the defense, I think we're where we need to be.
13      Sir, do you still wish to enter these pleas of
14  guilty as to Counts 1 through 5?
15      THE DEFENDANT:  Yes, sir.
16      THE COURT:  I find the defendant intelligently,
17  freely, and voluntarily waived his rights in entering this
18  plea and that there is a factual basis for the plea.  The plea
19  is accepted.  Defendant is hereby adjudicated guilty.
20      Question for Ms. Chang.  Are you going to be seeking
21  to publish these videos?  In other words, do I have to watch
22  them at sentencing?  Is that what you're going to ask for?  I
23  just want to know so I can prepare myself.
24      MS. CHANG:  Well, Your Honor, I guess it depends.
25  When the PSR comes out, depending on which details are

16

1  objected to, it may become necessary for the Court to view at
2  least one or two of the videos.  I think we can get away with
3  not doing them all because of the way the videos are composed.
4      THE COURT:  I understand, and that makes sense.  If
5  they're going to score it a certain way and the defense is
6  going to object, I have to make a decision as to whether or
7  not that satisfies the requirements and then I have to watch.
8      Second question, are you planning at this point to
9  be presenting any witness testimony at sentencing from
10  parents, et cetera?
11      MS. CHANG:  We haven't gotten that far in terms of
12  preparing for sentencing, Your Honor, so I don't know.  It's
13  possible, Your Honor.
14      THE COURT:  All right.  Because I'm going to give
15  you a time frame that presumes that you're not calling anyone.
16  So if that changes, please let Ms. Maria know, and we'll
17  expand if we need to.
18      MS. CHANG:  Yeah, Your Honor.  Given the objections,
19  I would request at least enough time for the agent to testify
20  and to present evidence, you know, with respect to what I just
21  discussed.
22      THE COURT:  Okay.
23      MS. CHANG:  And maybe just a little bit more time in
24  case there's a witness.  I don't expect it will be lengthy.
25      THE COURT:  Okay.  Thank you.  I appreciate that.

17

1          Mr. Kamalzadeh, are you planning at this point on

2    presenting any live testimony in terms of at sentencing?

3          MR. KAMALZADEH:   Not at this point, Your Honor, but

4    we would ask for additional time for mitigation arguments.

5          THE COURT:   All right.   So let me find some calendar

6    space here then.   I would say we do the 21st.   Okay.

7          All right.   July 21st from 10:00 a.m. to 11:00 a.m.,

8    is that date and time acceptable to the United States?

9          MS. CHANG:   Yes, Your Honor.

10         THE COURT:   Is that date and time acceptable to the

11   defense?

12         MR. KAMALZADEH:   Yes, Your Honor.

13         THE COURT:   All right.   Thank you both.   Have a good

14   morning.

15         MS. CHANG:   Thank you, Your Honor.

16     (WHEREUPON, this matter was concluded at 10:19 a.m.)

17                          *   *   *

18                 CERTIFICATE OF REPORTER

19
     I certify that the foregoing is a correct transcript of the
20   record of proceedings in the above-entitled matter.

21
      /s/ Suzanne L. Trimble_____          10/16/20
22    Suzanne L. Trimble, CCR, CRR, RPR           Date
      Official Court Reporter

23

24

25

# Doc. 45

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA

     v.                               CASE NO. 6:19-cr-260-Orl-41DCI

EDGAR JOHAN DIAZ-COLON

## UNITED STATES' SENTENCING MEMORANDUM

The Oxford English Dictionary defines "predator" as "a person who plunders or pillages; a ruthlessly exploitative or rapacious individual."   In repeatedly and violently sexually abusing multiple young children, the defendant has proven that he truly is a predator.

He plundered and pillaged the innocence of a three-year-old and two sisters, aged six and seven.   With both threats and actual acts of violence, he ruthlessly exploited these children, for his own sadistic pleasure.   He also produced multiple videos of some of the children's darkest moments—nightmares of his own creation.

The defendant's offense level under the Sentencing Guidelines is 48, and his Guidelines range is 150 years.   Given the gravity of the defendant's conduct, the maximum sentence of 150 years is warranted.

# BACKGROUND[1]

The defendant has been convicted of five counts of sexual exploitation of a child, in violation of 18 U.S.C. § 2251(a).   (PSR ¶¶ 1-8.)   The convictions arise from five different video recordings that the defendant produced.

### *Child Victim Two (then age 7) and Child Victim Two (then age 6)*

The first video is approximately 43 seconds long.   It shows the defendant forcing a seven-year-old (Child Victim-2, or "CV-2") and her six-year-old sister (Child Victim-3, or "CV-3") to perform oral sex on him.   (*Id.* ¶¶ 19-20.)

The second video is approximately 1 minute and 53 seconds long.   It depicts the defendant physically and verbally directing CV-2 to spread her legs apart and expose her vagina, multiple times, so he could film it.   (*Id.* ¶¶ 21-22.)   In the third video, which is approximately 18 seconds long, the defendant recorded CV-2 exposing her vagina and anus.   (*Id.* ¶¶ 23-25.)

The fourth video is approximately 52 seconds long.   It shows the defendant directing CV-3 to pose in various positions in front of the camera so

---

[1] At sentencing, the United States will present evidence of events or facts referenced herein that are not already included and not disputed in the Presentence Report (Initial PSR, at Doc. 36).

the defendant could manipulate her exposed vagina, which was visible in the video.  (*Id.* ¶¶ 26-27.)

The four aforementioned videos—in combination—are less than four minutes long.   They do not depict bondage.   They do not depict rape.   As such, they severely underrepresent the true nature, circumstances, and extent of the defendant's sexual abuse of CV-2 and CV-3.



The defendant knew CV-2 and CV-3 through ████████—an acquaintance.  (PSR ¶ 16.)   The defendant ████████ lure CV-2 and CV-3 to his place of shelter, where he sexually abused them both multiple times, on numerous occasions. (Ex. 1A at 5-8, 15, 20.[2])

He repeatedly forced CV-2 to perform oral sex on him, and ejaculated in her mouth.  (*Id.* at 5, 15.)   The defendant also anally and vaginally raped

---

[2] After the defendant's crimes against CV-2 and CV-3 were discovered, both children were forensically interviewed.   The video recordings of their interviews are filed under seal as Exhibits 1A and 2A, and the transcripts of those recordings are filed under seal as Exhibits 1B and 2B.   Although only specific transcript pages are referenced herein, the United States encourages the Court to review both video recordings in their entirety (one is 55 minutes long, and the other is approximately 35 minutes long), as the children's body language and overall presentation is further evidence of the effect of the defendant's abuse on the victims.

CV-2 multiple times, causing her tremendous pain.   (*Id*. at 7-8, 14.)   CV-2 stated, "It hurt because it didn't fit.   And it still hurts."   (*Id*. at 14.)

The defendant also had a rule that CV-2 could not cry out for help.   At times, in the midst of the defendant's sexual abuse, CV-2 begged him to stop: "Can you stop, please, please?"   He responded by telling her to shut up, spanking her (at times with a belt), and taping her mouth shut.   (*Id*. at 5-6, 13-15, 20-21.)

At one point, the defendant showed CV-2 a video of himself vaginally raping what appeared to be a three-year-old.   CV-2 asked the defendant, "Why did you did that?"   He responded, "I don't care; she deserved it," and again referenced his "rules."   (*Id*. at 24.)

CV-2 was also present when the defendant sexually abused her six-year-old sister, CV-3.   CV-2 witnessed the defendant vaginally and anally rape CV-3.   CV-2 told the defendant to stop abusing her little sister, but how can a seven-year-old child compete with a grown man?   He was relentless, and ignored CV-2's pleas for mercy on behalf of her sister.   (*Id*. at 16-20.)

Despite the horrors that she experienced because of the defendant, CV-2 suffered this abuse in silence because the defendant said he would kill her if she told her parents.   (*Id*. at 8, 10, 25.)   She specifically recalled him whispering, "If you talk to your family, then I will kill you."   (*Id*. at 25.)

CV-3 corroborated much of CV-2's account concerning her own (i.e. CV-3's) abuse, recalling that the defendant anally raped her and forced her to perform oral sex on him.   (Ex. 2A at 10-12.)   She also stated that the defendant penetrated her vagina with his finger.   (*Id*. at 17.)   The defendant also beat CV-3, and commanded her not to tell her parents about the abuse. (*Id*. at 8.)

Both children displayed shame, humiliation, sadness, and grief during their forensic interviews.   (*See generally* Exs. 1A and 2A.)   They also expressed a strong desire to escape their memories and experiences of the defendant's horrific abuse.   CV-3 asked, "Can I, like, not remember this? Can I forget this?"   (Ex. 2A at 7.)   Perhaps more hauntingly, CV-2 murmured, "I just want to be with him in heaven.   Up in the sky and not be with him." (Ex. 1A at 26.)

### Child Victim One (then age 3)

The defendant was also convicted of Count Five of the Indictment, for producing an approximately 80-second video of himself sexually abusing Child Victim-3 ("CV-3") by pulling her underwear to the side and spreading her vagina with his fingers.   The defendant produced this video at the home where he was residing at the time.   CV-3 was three years old.   (PSR ¶¶ 28-29.)

5

CV-3 knew the defendant through a relative.   (*Id.* ¶ 29; Ex. 3 at 2.[3])

The defendant touched CV-3's buttocks and kissed them "all the time."   (Ex.

3 at 2-3.)   He also kissed her vaginal area.   (*Id.* at 2-4.)   And he hit her.   (*Id.*

at 2.)   Due to the child's age and limited ability (or desire) to communicate

about the sexual abuse, CV-3 did not disclose much more.   (*See generally* Ex.

3.)

## **ARGUMENT**

### A.    **Nature and Circumstances of the Offenses**

The nature and circumstances of the defendant's offenses truly shock

the conscience.   He gained the trust of certain adults in his life, then exploited

that trust to gain access to young children in their care.   Then he sexually,

physically, and emotionally abused the children, over and over again.

Vaginal rape.

Anal rape.

Forced oral sex.

Digital penetration.

He did all of these things, multiple times, against multiple children.   The

defendant ignored their cries for help, and secured their silence through threats

---

[3] CV-3 was interviewed by the Florida Health Child Protection Team, but the interview was not recorded, in accordance with that agency's policy.   A copy of the interview report is filed under seal as Exhibit 3.

of violence.   At times he forced CV-2 to be quiet by taping her mouth shut.
He hit all three children, sometimes with a belt.   In light of this, it is
unsurprising that the applicable Guidelines offense level is 48 and his
Guidelines range is 150 years.

**B.   History and Characteristics of the Defendant**

The defendant is only 34 years old, yet he has a criminal record riddled
with various convictions from throughout the last decade.   (PSR ¶¶ 96-102.)
His criminal history includes a 10-month sentence in 2012 for domestic
violence.   (*Id*. ¶ 98.)

More critically, the defendant's sexual interest in children is palpable.
Hundreds—if not thousands—of child sex abuse videos were found on the
defendant's cell phone.

The defendant also kept scores of child sex abuse videos on various
digital storage devices that his live-in partner turned over to the police.   The
videos depict the sexual abuse of infants, 12-year-olds, and children of
virtually every age in between.

Moreover, the defendant's expansive collection of child sex abuse
media featured bestiality, bondage, and a wide range of sex acts.   The
following describes just three of the videos:

- *Video 1* (approximately 56 seconds long):   The video depicts a female
  child who is approximately two to three years old.   The child is

positioned on her knees, on top of a bed.   The child's pants are pulled down, exposing her anus and vagina.   An adult male sexually abuses the child by performing oral sex on her.   As the video continues, the adult male vaginally and anally rapes the child.

- *Video 2* (approximately 11 seconds long):   The video depicts a female child who is approximately four to five years old.   The child is naked and lying on a bed, pinned down by two adult males.   One of the adult males places his erect penis inside the child's mouth, causing the child to gag, and the second male holds his penis next to the child's face.   The first adult male continues to force the child to perform oral sex as the child tries to resist.

- *Video 3* (approximately two minutes long):   The video depicts an adult male and a female child who is approximately two or three years old.   The female child is clothed and on a bed.   The adult male pulls the child's pants down and forcibly rapes the child as the child tries to resist.

Each of these videos depicts a crime scene involving the sexual abuse of children.   Although the defendant collected videos of such crime scenes, he clearly was not content to live vicariously through other individuals who exploit children; the defendant had to victimize children himself.   The depth of the defendant's depravity—as evidenced by his history and characteristics, and considered together with the nature and circumstances of the offenses— weighs heavily in favor of the weighty sentence that the United States seeks.

**C.      Just Punishment, Adequate Deterrence, Respect for the Law, and Protection of the Public**

A Guidelines sentence of 150 years also meets the sentencing goals of adequate deterrence, respect for the law, protection of the public, and just punishment in this case.   *See* 18 U.S.C. § 3553(a).

The defendant has demonstrated that he is a danger to the public.   No child is safe in his presence.   The defendant has mastered the repulsive art of manipulating trusting adults in order to gain access to and corner their vulnerable young children.   And his crimes against CV-1, CV-2, and CV-3 were violent and merciless.   All of these facts underscore the risk that the defendant poses to children in the future. "Congress [has] explicitly recognized the high rate of recidivism in convicted sex offenders, especially child sex offenders." *United States v. Allison,* 447 F.3d 402, 405-06 (5th Cir. 2006); *see also United States v. Pugh,* 515 F.3d 1179, 1201 (11th Cir. 2008) ("As Congress has found and as we have discussed, child sex offenders have appalling rates of recidivism and their crimes are under-reported.").   A Guidelines sentence will protect children from further crimes of the defendant.

Moreover, deterrence and protection of the public are particularly weighty factors in this case.   "The more serious the crime and the greater the defendant's role in it, the more important it is to send a strong and clear

message that will deter others." *United States v. Irey,* 612 F.3d 1160, 1212 (11th

Cir. 2010).   A 150-year sentence in this case will accomplish those goals.

## **CONCLUSION**

In light of the serious nature of the defendant's offenses, his personal

characteristics, the need to protect children from his further crimes, just

punishment, deterrence, and the need to promote respect for the law,

the United States respectfully requests the Court to sentence the defendant to a

custodial sentence of 150 years.

Respectfully submitted,

MARIA CHAPA LOPEZ
United States Attorney

By:   */s/ Emily C. L. Chang*
      EMILY C. L. CHANG
      Assistant United States Attorney
      USA No. 166
      400 W. Washington Street, Suite 3100
      Orlando, Florida 32801
      Telephone:   (407) 648-7500
      Facsimile:    (407) 648-7643
      E-mail:        emily.chang@usdoj.gov

**U.S. v. DIAZ-COLON**                    **Case No. 6:19-cr-260-Orl-41DCI**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 27, 2020, I electronically filed the

foregoing with the Clerk of the Court by using the CM/ECF system which

will send a notice of electronic filing to the following:

Jenna Kelly, Esq.
Assistant Federal Defender

*/s/ Emily C. L. Chang*
EMILY C. L. CHANG
Assistant United States Attorney
USA No. 166
400 W. Washington Street, Suite 3100
Orlando, Florida 32801
Telephone:   (407) 648-7500
Facsimile:   (407) 648-7643
E-mail:      emily.chang@usdoj.gov

# DOC. 46

# UNITED STATES OF AMERICA

## VS.

## EDGAR JOHAN DIAZ- COLON
### Case No: 6:19-CR-00260-CEM-DCI

<sub></sub>

## MITIGATION APPENDIX

**A. Psychological Report from Dr. Ruiz**
*Report included as an addendum to the Pre-Sentence Report*

**B. Letters of Support & Photographs**

Carmen Guevarra- Estrella, *Grandmother*. ................................................. B-1
Translation Attached

Collage of Childhood Photographs. ......................................................... B-2

Melinda Colon, *Mother* .......................................................................... B-3

Rubmelia Agostini, *Friend* ...................................................................... B-4

**C. Transcript from EDIC College**

**D. Civil Air Patrol**

Cadet Personnel Information. ................................................................... D-1

Certificates of completion & appreciation. ................................................ D-2

Photograph ............................................................................................. D-3

**E. Employment Verification**

Letter from *BOSLEY* .................................................................................. E-2

JAMES T. SKUTHAN ACTING
FEDERAL DEFENDER

*/s/ Ali Kamalzadeh*
Ali Kamalzadeh
Assistant Federal Defender
201 S. Orange Ave., suite 300
Orlando, Florida 32801
FL Bar # 0115995

August 21, 2020


Dear Judge Mendoza:

My name is Carmen Guevara-Estrella. I am Edgar Johan Diaz-Colon's grandmother. I am 75 years old and live with my husband in Punto Santiago, Puerto Rico.

I wanted to write to you about my grandson, Edgar.  I raised my grandson since he was three months old. My husband at the time, Mr. William Rodriguez, and I, legally adopted him. Edgar's mother had two other children from another marriage and we asked her to give him to us and she gave in. Edgar was my first grandchild and was the Apple of my husband's eye. Sadly, after our separation, he took his life. Edgar was about five years old. I think that my husband's death affected him. After he died, Edgar asked about him a lot.

Edgar's mother lived 15 minutes away from us, but she never visited him.  Edgar saw his mother very few times in his life. He was always sad and asked about her. I gave him love, but noticed that there was a sadness in him. He would ask why his siblings lived with her and he did not. Edgar and I love each other very much. We were always together. He was an intelligent and good boy, but as I said, he was always sad.

When he was young, he entered an academy called Civil Air Patrol. There, he helped the community with natural disasters.  He liked to help others and to be a volunteer when there were hurricanes or floods. Edgar had a good heart. When he saw an elderly person, he would help them carry their bags or to cross [the street].

When he was 15 or 16 years old, he suffered from depression and was hospitalized.  It is my understanding that he had taken some pills to take his life. I remember that afterwards, he took antidepressant pills.

He went to school at Edic [sic] College and studied to be an operating room technician. He did very well. He also studied Culinary Arts in Caguas, Puerto Rico. He liked to cook.

Judge, I do not know many details of what my grandson has done. I have only been told that it has to do with inappropriate images of children on his computer. All of this has me in a bad way. I have suffered very much. Sometimes, I do not sleep because I am thinking of him. I am very concerned about him and his future. I am worried about the depression. Judge, I ask for mercy for him, because he is a good boy.


Sincerely,

{*Signature*}

Carmen Guevara-Estrella

Translator:   Maria Lucero Lando
Date:          08/24/2020

21 de Agosto 2020

Querido Juez Mendoza,

Mi nombre es Carmen Guevara-Estrella soy la abuela (madre) de Edgar Johan Diaz-Colon.
Yo vivo en Punto Santiago, Puerto Rico tengo 75 anos y vivo con mi esposo.

Le queria escribir acerca de mi nieto Edgar.  Yo crie a mi nieto desde que tiene 3 meses de
nacido.  Yo y mi esposo, en ese entonce el senor William Rodriguez, lo adoptamos
legalmente.  La madre de Edgar tenia dos ninos mas de otro matrimonio y nosotros le
pedimos que nos lo diera y ella sedio.  Edgar fue mi primer nieto.  Edgar era la luz de los
ojos de mi esposo.  Pero lamentablemente, mi esposo despues de nuestra separacion,
cuando Edgar tenia como 5 anos, el se quito la vida.  Pienso que la muerte de mi esposo lo
affecto.  Despues que el murio Edgar preguntaba mucho por el.

La mama de Edgar vivia a 15 minutos de nosotros pero ella nunca lo visito.  Edgar vio a su
mama muy poca veces en su vida.  El siempre estaba triste y preguntaba por ella. Yo
siempre le di amor pero notaba que habia una tristeza en el.  El preguntaba que porque sus
hermanos vivian con ella y el no.  Yo y Edgar nos queremos muchisimo.  Siempre
estuvimos juntos. El fue un nino inteligente y bueno pero como dije siempre con tristeza.

Cuando era joven ingreso en una academia llamada civil air patrol. Ahi ayuda a la
communidad con desastres naturales.   A el le gustaba ayudar a los demas y ser voluntaries
cuando sucedian huracanes or inundaciones.  Edgar tenia un buen corazon, cuando el veia
un persona de edad iba y lo ayudaba a carga sus bolsas o a cruzar.

Cuando tenia como 15 or 16 anos el esta sufriendo de depression y tuvo hospitalizado. Entiendo que se habia tomado unas pastilla en contra de su vida.  Recuerdo que despues de eso el tomo pastille para la depression.

El fue a la escuela y estudia technico de sala de operation en Edic College y hizo muy bien. Tambien estudio arte culinaria en Caguas, Puerto Rico. Le gustaba cocinar.

Senor juez no se mucho detalle de lo que mi nieto ha hecho.  Solo me han dicho que teine que ver con imagenes inappropriada de ninos en su computadora.  Todo esto me tiene mal. He sufrido muchisimo.  Aveces no puedo dormir pensando en el. Estoy muy preocupada por el y su futuro.  Me preocupo por la depression.  Senor Juez le pido pieda por el porque el es un buen muchacho.


Attentamente,


Carmen Guevara-Estrella

August 24, 2020


Dear Judge Mendoza:

My name is Melinda Colon. I am Edgar Diaz Colon's mother. What little I can say

is that I know that I was not in my son's life. His grandmother raised him since he

was very young. When Johan was young, I was pregnant with my fourth child and

I already had two before Johan. Afterwards, I had two more. I had a total of six

sons. I know that my son missed me a lot and I know it might had affected his life.

I never visited him, but I always stayed in contact.

I do not know how to explain how my son has come to this. The accusations are

very serious and I do not condone this. I only ask for mercy for my son. I

understand that he is facing a severe sentence. I would like him to find help and for

him to get out some day.

I would like to take this opportunity to ask for my son to forgive me.

Sincerely,

[Signature]




Translator:      Maria Lucero Lando
Date:            08/25/2020

agosto 24 / 2020

Querido Juez Mendoza

Mi Nombre es Melinda Colón
Madre de EdgarJ Diaz colon
lo poco que puedo decir es
que entiendo que No estuve
en la vida de Mi hijo.
Su abuela lo Crio desde muy
pequeño Cuando Johan estaba
pequeño yo estaba embarazado
Cuarto hijo y ya tenia 2 mas
antes de Johan. despues tuve 2
mas. tuve 6 hijos Varones en total
Se que le hize mucha falta a mi
hijo y se que le pudo ver afectado
en su vida. nunca lo visite pero
Siempre mantuve Comunicaón nose
Como explicar Como hijo ha llegado
a eso.

(2)

Las acusaciones son bien
fuertes. y yo esto no lo apoyo
Solo le pido pieda por mi hijo
entiendo que esta mirando una
penalidad severa quiesiera
que buscara ayuda y que pudiera
Salir algun dia quisiera tomar
esta oportinidad para pedirle
perdon a mi hijo

Julita Culú

## U.S. vs Edgar Johan Diaz-Colon




**Above:** Mr. Diaz-Colon at 3 months old when grandmother Carmen adopted him with her husband William.

**Below:** Mr. Diaz-Colon at age 3, with his grandfather William that he called "*Atu*". William loved Edgar and was always with him.  William commited suicide when Edgar was about 4 to 5 years old.  Edgar states his recalls his grandmother crying in her room.



## U.S. vs Edgar Johan Diaz-Colon



**Above:** In photograph, Edgar and his grandmother Carmen, whom he calls, "mom".  Edgar saw his bioligical mother very few times in his life.  He never had a relationship with her.  He would see his brothers  more often.  He recalls while growing up, his brothers resented him as he lived in a better home and use to be spoiled by his grandparents.  Meanwhile Edgar resented them for living with his mother, something Edgar wanted.  To this day Edgar cries about his mother not wanting him.

**Below**: Edgar, Carmen and a neighbor.



<u>U.S. vs Edgar Johan Diaz-Colon</u>



Edgar at age 5 while he attended headstart program at Juquito, Puerto Rico.
Grandmother work in food service at a school in Juguito and she placed Edgar in a
head start program where she was able to pick him up.

Later on that year is when his father commits suicide.

<u>U.S. vs Edgar Johan Diaz-Colon</u>



Mr. Diaz-Colon about the age of 7.  It was during this time, that he states his older brother, age 13 or 14 at the time, molested him on two occasions.    On both occasions there was penetration.  He recalls his brother being 13 or 14 years old at the time.  Edgar never disclosed this to anyone.  The instances occurred in his home where he lived with his grandmother.

May 4, 2020

Honorable Judge Carlos Mendoza,

United States Court for the Middle District of Florida

401 W Central Blvd

Orlando, FL 32801

<div align="right">

RE: *Edgar J Diaz- Colon*

*Case # 6:19-cr-260-Orl-41 DCI*

</div>

This is a character letter regarding Edgar J Diaz- Colon.

My name is Rubnelia Agostini, I am a Personal Assistant for *Hand in Hand Together Home Care* in 329 East 149th street, 3rd floor Bronx, New York 10457. I have been a friend of Mr. Diaz-Colon for about 10 years. Diaz- Colon and I have remained close friends after he moved out to Florida with his daughter and Ex-wife.

I met Diaz- Colon at a Barber Shop where he became my son's barber and also my daughter's hair stylist, therefore him and I became closet friends. The first thing that I always have appreciated from Edgar was his honesty I was able to observe and learn a lot from his present and past life experiences and struggles. I was a witness of how hard working he was and the type of head of household he was to support and maintain his family and how much he was struggling with the relationship he was in. Edgar was the one to cook, wash clothes, clean the house, work to pay the bills, took care of his daughter and his ex- wife's son. Unfortunately, I was also a witness to how he used percocet and marihuana to cope with stress and anger. I have witnessed him become so angry and punch the wall many times in attempt to hurt himself. I saw him struggle emotionally in his relationship with his ex. I recall when he went to Florida, he learned she was unfaithful to him and then she kicked him out of the home. Edgar continue working as a barber and an Uber driver but that was not enough to make ends meet. He was homeless for a few months. Many times he will have to go up to parks to shower in public bathrooms and times not even a hot plate of food to eat.

He completely lost everything after his break up with his wife. I recalled he attempted to take his life by crashing a car he was driving.

I know Edgar Diaz- Colon was abandoned when he was 3 months old by his mother and was given to his father side grandmother Carmen "Yuyita" she raise him and educated him as best as possible Edgar parents never care or looked for him, as a young adult despite the fact he was educated and raise correctly he started having bad association with the wrong friends. He shared having witnessed his cousin murdered in front of him.

I know him to be an industrious, hardworking, family man who is community-minded and other-centered.

I am aware of the charges Diaz-Colon's has plead guilty of and the severity of the case. I truly truly believe that Diaz- Colon could not have been in his right state of mind. I have seen him under the influence and I have seen the transformation. I feel certain he was on some drugs. This is not like the person that I have come to know. I have been in communication with him since his incarceration for this case and he is beyond regretful, remorseful, ashamed, and horrified over his actions. He is very depressed. I know given the charges it may be hard to believe that he is a good family man but he is.

Your honor I can only ask for you to sentence Edgar Colon-Diaz to the least time possible. I am worried about his depression and mental health. He will be paying for this for the rest of life no matter how much time he is given. The guilt and pain he is carrying will burden him for the rest of his life.

Thank you for your consideration.

Sincerely,

Rubmelia Agostini

Page: 58 of 212     Date: 11/01/2021     Document 329     USCA Case: 3494     Case:

# EDIC COLLEGE

P O BOX 9120

CAGUAS PR  00726

## TRANSCRIPCION DE CREDITOS

## CERTIFICADO CONFERIDO EN :

## TECNICO QUIRURGICO

DIAZ COLON  EDGAR J.
P.O. BOX 472

PUNTA SANTIAGO     PR 00741

No. Est.:   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

FECHA COMIENZO:     06-Sep-2006

FECHA GRADUACION:   27-Feb-2008

PROMEDIO GENERAL :     3.12

CR. REQUERIDOS:   51.0

CR. APROBADOS:   51.0

| NO. | CURSO | CR | PH | NOTA |
|-----|-------|----|----|------|
| **SEMESTRE PRINCIPAL:**  06-Sep-2006 @ 18-Ene-2007 | | | | |
| **1. TÉRMINO :**   06-Sep-2006 @ 30-Oct-2006 | | | | |
| COMP 1007 | INTRODUCCION A LAS COMPUTADORAS | 1.0 | 3.0 | B |
| REHU 1005 | RELACIONES HUMANAS | 2.0 | 4.0 | C |
| TQS 1900 | DESARROLLO VOCACIONAL DEL TECNICO QUIRUGICO, ASPECTOS ETICOS LEGALES | 2.0 | 6.0 | B |
| TQS 1901 | ANATOMIA Y FISIOLOGIA HUMANA | 4.0 | 12.0 | B |
| TQS 1904 | ORGANIZACION DE LA SALA DE OPERACIONES | 2.0 | 6.0 | B |
| **2. TÉRMINO :**   31-Oct-2006 @ 18-Ene-2007 | | | | |
| TQS 1902 | MICROBIOLOGIA APLICADA A LA PRACTICA EN SALA DE OPERACIONES | 2.0 | 6.0 | B |
| TQS 1903 | FUNDAMENTOS DEL TECNICO QUIRURGICO | 4.0 | 8.0 | C |
| TQS 1907 | PRINCIPIOS BASICOS DE ANESTESIA | 2.0 | 6.0 | B |
| | P.A. POR PERIODO:   2.68 | 19.0 | 51.0 | |
| **SEMESTRE PRINCIPAL:**  22-Ene-2007 @ 16-May-2007 | | | | |
| **1. TÉRMINO :**   22-Ene-2007 @ 14-Mar-2007 | | | | |
| TQS 1905 | PRINCIPIOS Y METODOS DE DESINFECCION Y ESTERILIZACION | 4.0 | 12.0 | B |
| TQS 1908 | INSTRUMENTACION Y COLOCACION DE LOS CAMPOS QUIRURGICOS | 4.0 | 12.0 | B |
| **2. TÉRMINO :**   15-Mar-2007 @ 16-May-2007 | | | | |
| TQS 1906 | CLASIFICACION DE CIRUGIA Y EQUIPO ESPECIALIZADO | 4.0 | 8.0 | C |
| TQS 1918 | TECNICAS ESPECIALES | 4.0 | 16.0 | A |
| TRAB 1010 | EL MUNDO DEL TRABAJO | 2.0 | 8.0 | A |

| A | EXCELENTE | B | BUENO | IB | INCOMPLETO | C | SATISFACTORIO | IC | INCOMPLETO |
|---|-----------|---|-------|----|-----------|---|---------------|----|-----------|
| D | DEFICIENTE | ID | INCOMPLETO | F | FRACASADO | IF | INCOMPLETO | R | REPETICION |
| I | INCOMPLETO | P | APROBADA | * | NO REPORTADO | T | TRANSFERENCIA | WF | BAJA ADMINISTR |
| WP | BAJA PARCIAL | WT | BAJA TOTAL | | | | | | |

OFFICIAL

REMARKS

REGISTRADOR

SELLO OFICIAL

## ACCREDITATION

EDIC College is institutionally accredited by the Accrediting Bureau of Health Education Schools (ABHES) to award Diplomas, Associate and Bachelor Degrees. It is licensed by the Puerto Rico Council of Education.

## COURSE NUMBERING SYSTEM

- The courses are identified by a code that consists of four letters followed by a three-digit number.
- The letters identify the name of the program or course in English language; the numbers identify the level, area or program and the sequence of the course within the area or program.
- The assignment of numerical codes takes into account the sequence of courses within the program, as well as the level of complexity of the course within the program.
- Online Programs courses that are also offered in residential mode are identified by a four-letter code followed by a four-digit number in order to identify them according to their modality.

Following are the different Academic Levels:

| Academic Level | Codification |
|---|---|
| Diploma or Certificate Programs | 100 |
| Associate Degree Courses (freshman and sophomore year) | 200 |
| Bachelor Degree Courses | 200 - 400 |
| Online Program Courses | 2000 - 4000 |

## CREDIT UNIT

EDIC College is an institution that offers programs in credits. The programs offered are based on semesters and credit hours. Breaks are established according to the criteria of the Federal Education Department. One credit equals 15 hours of lecture, 30 hours of laboratory, and 45 hours of practice for diploma programs. Beginning September 2019 one credit will equal 30 hours of lecture, 30 hours of laboratory and 45 hours of practice for diploma programs, this will only apply for new enrollments after this date. One credit equals 15 hours of lecture, 30 hours of laboratory, and 45 hours of practice for associate and bachelor degree programs. One contact hour has a lapse of 50 minutes in the diploma programs and 60 minutes in the degree programs. Students accumulate the credit value officially assigned to each course.

## ACADEMIC CREDIT

A full-time class schedule for an Associate Degree is when a student is enrolled in 12 or more credits per semester. Diploma programs normally comprise between 12 and 24 credits. For each course, the student accumulates the value of credits officially assigned to the course.

## GRADE POINT AVERAGE

To determine the general point average, the equivalent in honor points for each grade is multiplied by the number of credits of each course, and the result is divided by the total number of credits considered. Grades from the courses approved at other institutions and accepted as transfers will not be considered when calculating the general average or other averages.

### GRADE SYSTEM

| Grade | Equivalency | Value | Scale | Percentages |
|---|---|---|---|---|
| A | Excellent | 4 | 4.00 - 3.50 | 100 - 90 |
| B | Good | 3 | 3.49 - 2.50 | 89 - 80 |
| C | Satisfactory | 2 | 2.49 - 1.60 | 79 - 70 |
| D | Poor | 1 | 1.59 - 0.80 | 69 - 60 |
| F | Failing | 0 | 0.79 - 0.00 | 59 - 0 |

In addition, EDIC College has established alternate grades used as symbols for specific situations. These grades are shown below:

| Symbol | Equivalency |
|---|---|
| W | Withdrawal |
| R* | Indicates Retaken Override |
| P | Approved |
| L | Laboratory |
| T | Transfer |
| # | Indicates Pass/Fail Course |
| ** | Indicates Retaken Course |
| ♦ | Indicates Associated Course |
| IP | In Progress |
| TW | Tuition Waiver |

The symbols included in the previous chart are used in certain circumstances, but they are not included when determining students' accumulative academic average. However, they are considered when computing attempted credits vs. approved credits, which can affect the students' Satisfactory Academic Progress.

# EDIC COLLEGE

P O BOX 9120

CAGUAS PR  00726

## TRANSCRIPCION DE CREDITOS

## CERTIFICADO CONFERIDO EN :

## TECNICO QUIRURGICO

DIAZ COLON  EDGAR J.

P.O. BOX 472

PUNTA SANTIAGO    PR 00741

No. Est.:   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

FECHA COMIENZO:    06-Sep-2006

FECHA GRADUACION:   27-Feb-2008

PROMEDIO GENERAL :    3.12

CR. REQUERIDOS:    51.0

CR. APROBADOS:    51.0

| NO. | CURSO | | CR | PH | NOTA |
|---|---|---|---|---|---|
| | | P.A. POR PERIODO:   3.11 | 18.0 | 56.0 | |

SEMESTRE PRINCIPAL:   09-Oct-2007 @ 27-Feb-2008

### 1. TÉRMINO :    09-Oct-2007 @ 27-Feb-2008

| NO. | CURSO | CR | PH | NOTA |
|---|---|---|---|---|
| TQS 1910 | CIRUGIA GENERAL | 2.0 | 8.0 | A |
| TQS 1911 | GINECOLOGIA Y OBSTETRICIA | 2.0 | 6.0 | B |
| TQS 1912 | CIRUGIA UROLOGENITAL | 2.0 | 8.0 | A |
| TQS 1913 | CIRUGIA OTORINOLARINGOLOGICA | 2.0 | 6.0 | B |
| TQS 1914 | CIRUGIA ORTOPEDICA | 2.0 | 8.0 | A |
| TQS 1915 | CIRUGIA NEUROLOGICA | 2.0 | 8.0 | A |
| TQS 1917 | CIRUGIA CARDIOVASCULAR Y TORAXICA | 2.0 | 8.0 | A |
| | P.A. POR PERIODO:   3.71 | 14.0 | 52.0 | |
| | | 51.0 | 159.0 | |

CONFIDENTIAL RECORD FOR YOUR EXCLUSIVE USE NOT TO BE GIVEN TO THE STUDENT UNDER ANY CIRCUMSTANCES

NO RECORD BELOW TIS LINE

| A EXCELENTE | B BUENO | IB INCOMPLETO | C SATISFACTORIO | IC INCOMPLETO |
|---|---|---|---|---|
| D DEFICIENTE | ID INCOMPLETO | F FRACASADO | IF INCOMPLETO | R REPETICION |
| I INCOMPLETO | P APROBADA | * NO REPORTADO | T TRANSFERENCIA | WF BAJA ADMINISTR |
| WP BAJA PARCIAL | WT BAJA TOTAL | | | |

REMARKS

REGISTRADOR

SELLO OFICIAL

## ACCREDITATION

EDIC College is institutionally accredited by the Accrediting Bureau of Health Education Schools (ABHES) to award Diplomas, Associate and Bachelor Degrees. It is licensed by the Puerto Rico Council of Education.

## COURSE NUMBERING SYSTEM

The courses are identified by a code that consists of four letters followed by a three-digit number.

- The letters identify the name of the program or course in English language; the numbers identify the level, area or program and the sequence of the course within the area or program.
- The assignment of numerical codes takes into account the sequence of courses within the program, as well as the level of complexity of the course within the program.
- Online Programs courses that are also offered in residential mode are identified by a four-letter code followed by a four-digit number in order to identify them according to their modality.

Following are the different Academic Levels:

| Academic Level | Codification |
|---|---|
| Diploma or Certificate Programs | 100 |
| Associate Degree Courses (freshman and sophomore year) | 200 |
| Bachelor Degree Courses | 200 - 400 |
| Online Program Courses | 2000 - 4000 |

## CREDIT UNIT

EDIC College is an institution that offers programs in credits. The programs offered are based on semesters and credit hours. Breaks are established according to the criteria of the Federal Education Department. One credit equals 15 hours of lecture, 30 hours of laboratory, and 45 hours of practice for diploma programs. Beginning September 2019 one credit will equal 30 hours of lecture, 30 hours of laboratory and 45 hours of practice for diploma programs, this will only apply for new enrollments after this date. One credit equals 15 hours of lecture, 30 hours of laboratory, and 45 hours of practice for associate and bachelor degree programs. One contact hour has a lapse of 50 minutes in the diploma programs and 60 minutes in the degree programs. Students accumulate the credit value officially assigned to each course.

## ACADEMIC CREDIT

A full-time class schedule for an Associate Degree is when a student is enrolled in 12 or more credits per semester. Diploma programs normally comprise between 12 and 24 credits. For each course, the student accumulates the value of credits officially assigned to the course.

## GRADE POINT AVERAGE

To determine the general point average, the equivalent in honor points for each grade is multiplied by the number of credits of each course, and the result is divided by the total number of credits considered. Grades from the courses approved at other institutions and accepted as transfers will not be considered when calculating the general average or other averages.

### GRADE SYSTEM

| Grade | Equivalency | Value | Scale | Percentages |
|---|---|---|---|---|
| A | Excellent | 4 | 4.00 - 3.50 | 100 - 90 |
| B | Good | 3 | 3.49 - 2.50 | 89 - 80 |
| C | Satisfactory | 2 | 2.49 - 1.60 | 79 - 70 |
| D | Poor | 1 | 1.59 - 0.80 | 69 - 60 |
| F | Failing | 0 | 0.79 - 0.00 | 59 - 0 |

In addition, EDIC College has established alternate grades used as symbols for specific situations. These grades are shown below:

| Symbol | Equivalency |
|---|---|
| W | Withdrawal |
| R* | Indicates Retaken Override |
| P | Approved |
| L | Laboratory |
| T | Transfer |
| # | Indicates Pass/Fail Course |
| ** | Indicates Retaken Course |
| ♦ | Indicates Associated Course |
| IP | In Progress |
| TW | Tuition Waiver |

The symbols included in the previous chart are used in certain circumstances, but they are not included when determining students' accumulative academic average. However, they are considered when computing attempted credits vs. approved credits, which can affect the students' Satisfactory Academic Progress.

**Personnel Information For:** CADET Edgar Diaz  291704   **LSCode:**
**Location:** PUNTA SANTIAGO, PR 00741

## General Info

**Organization**

SER-PR-138

| Gender | Type | Rank | Date of Rank | Joined | Expires | Profession |
|---|---|---|---|---|---|---|
| MALE | CADET | CADET | | 26 Jan 2000 | 31 Jan 2003 | |

| Height | Weight | Eye Color | Hair Color | Date of Birth |
|---|---|---|---|---|
| 0 | 0 | | | ████ 1986 |

| CAP Driver's License | Branch of Service | Military Dependant |
|---|---|---|
| | | false |

| Emergency Contact | Emergency Phone |
|---|---|
| | |

## Contacts

| Type | Priority | Contact |
|---|---|---|
| HOME PHONE | PRIMARY | (████████ |

## Encampments

| Location | Date Completed |
|---|---|
| CECADER , Aguadilla, PR | 17 Jul 2000 |

## Promotions

| Rank | Date of Rank | Criteria |
|---|---|---|
| CDT | 26 Jan 2000 | |





# United States Air Force Auxiliary
## Civil Air Patrol

### Certificate of Accomplishment

This is to certify that

*Edgar Diaz*

PR138

Has completed the PR Wing Cadet Program Summer Encampment 2000
Held in Aguadilla, PR.
Given this 21st day of July 2000

Col. Gerald P. Irons
Wing Commander

1st. Lt Jorge E. Lopez
Encampment Commander

From: juan diaz    Fax: 16106454514    To:    Fax: (407) 648-6096    Page: 2 of 8    03/17/2020 10:24 AM

Case 6:19-cr-00260-CEM-DCI   Document 46   Filed 08/27/20   Page 21 of 23 PageID 144
USCA11 Case: 20-13494   Document: 20   Date Filed: 02/01/2021   Page: 64 of 212



# CIVIL AIR PATROL

## CERTIFICATE OF APPRECIATION

AWARDED TO

TYPE B EMCAMMPMENT



C / DIAZ EDGAR

## IN RECOGNITION OF OUTSTANDING ASSISTANCE TO CIVIL AIR PATROL

Given This JULY    Day of    21    2000



Commander



Mr. Diaz-Colon during his participation with the United States Air Force Auxiliary *Civil Air Patrol.* Mr. Diaz Colon joined in January 26, 2000 to January 31, 2003 (ages 14 to 17) with the unit in Aguadilla, Puerto Rico.



# BOSLEY

05/18/2020

Middle District of Florida Defender's Office,

This is to verify you that Edgar J. Diaz Colon's employment status with Bosley as a Medical Assistant is Terminated. He was active from 11/29/2011 – 12/05/2011. Termination was involuntary (protocol failure). Rate was at $13.00 at termination.

Sincerely,

*Kevin Mercurio*



**Kevin Mercurio** | *HR Analyst*
9100 Wilshire Blvd, East Tower Penthouse, Beverly Hills, CA 90212
**P:** 310.288.4435 | **F:** 323.861.1809 | **E:** kevinm@bosley.com

Cc: File

# Doc. 52



# EXHIBIT LIST

___ PLAINTIFF          _X_ DEFENDANT          _____ JOINT

___ GOVERNMENT ___ COURT

CASE NO.       6:19-cr-00260-CEM-DCI_____

STYLE:          USA v. DIAZ-COLON_____

| EXHIBIT NO. | DATE IDENTIFIED | DATE ADMITTED | SPONSORING WITNESSES | OBJECTIONS / STIPULATED ADMISSIONS[1] | DESCRIPTION OF EXHIBIT |
|---|---|---|---|---|---|
|  |  |  |  |  |  |
| 1 | 9/3 | 9/3 | NA | NO OBJ | POWER POINT PRESENTATION |
| 2 | 9/3 | 9/3 | NA | NO OBJ | SENTENCING RESOURCES A-F |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |

[1]  Use a code (e.g. AA@or A*@) in this column to identify exhibits to be received in evidence by agreement without objection. Otherwise, specifically state each objection to each opposed exhibit. Please note that each date box on the left must be one inch wide to accommodate the Clerks date stamp.

# PSR Objections

# Pattern Enhancement

# USSG § 5K2.22

Case 6:19-cr-00260-CEM-DCI Document 52-1 Filed 09/03/20 Page 1 of 17 PageID 341
USCA11 Case: 20-13494 Document: 20 Date Filed: 02/01/2021 Page: 69 of 212

# Guideline Provisions: 360

## Government Seeks: 1800

## U.S. Probation Recommendation: 1800



## Nature and Circumstances of the Offenses

Seized six computers. On a hard drive they found a collection of more than 1,200 images of Irey sexually violating young girls. The agents sent those 1,200 plus images to the National Center for Missing and Exploited Children, which in turn provided an extensive report about where the images had been seen before. More than 100 separate law enforcement agencies reported to the National Center that they had previously turned up some of those images of Irey's sexual abuse of underage girls in their investigations of child pornography. The graphic images Irey had produced and distributed were already widely known as the infamous "pink wall series," so named because of the pink walls that could be seen in the background of some of the photos and videos. The series included images of some of the worst child sexual abuse the agents had ever seen. And, as the Assistant United States Attorney pointed out at the sentence hearing: the pictures of these children, some of whom are "four or five, six years old ... will forever be out there online." As the record of their abuse continues to circulate, "[t]hey will be victimized over and over again."

*United States v. Irey*, 612 F.3d 1160, 1168 (11th Cir. 2010).

At a change of plea hearing on July 2, 2007, Irey pleaded guilty to one count of violating 18 U.S.C. § 2251(c). When asked to tell the court what he had done, Irey replied: "Went to— overseas, visited numerous brothels where they had underage children and photographed them, had sex with them, and had them on my laptop when I entered the United States." He added that it happened over a period of four years, the last time being in 2006. Irey agreed with the government's statement at the hearing that he had admitted to the agents that while overseas he had sex with children he knew were minors, had produced pornographic images of that, and had then transported those images back into this country.

*United States v. Irey*, 612 F.3d 1160, 1169 (11th Cir. 2010)

Dr. Berlin stated that Irey was capable of relating intimately to an adult woman, but he found that Irey "experienced intense sexual cravings for female children as well." Irey was "highly sexualized" and admitted to having "engaged in other forms of sexually disordered behavior with prostitutes (e.g. sadomasochistic acts), and ... having viewed images involving bestiality on the Internet."

*United States v. Irey*, 612 F.3d 1160, 1171 (11th Cir. 2010)

Irey admitted to Dr. Shaw that he had used prostitutes in this country and in doing so had contracted a venereal disease, which he passed along to his wife. . . . " Irey admitted that he had visited child brothels in Cambodia "for the past five years." He did, however, lie to Dr. Shaw about some of the details of his sexual abuse of children.

*United States v. Irey*, 612 F.3d 1160, 1172 (11th Cir. 2010)

USCA11 Case: 20-13494   Document: 20   Date Filed: 02/01/2021   Page: 75 of 212

| Defendant | Sent. Date | District Judge | Conviction(s) | Sentence | GL Range |
|---|---|---|---|---|---|
| Edgar Diaz-Colon | 9/3/2020 | Hn. Mendoza | Production x5 | | 360-1800 |
| Justin Richard Testani | 8/6/2020 | Hn. Mendoza | Production x2 | 720 | 720-720 |
| Carlos A. Rodriguez Fernandez | 9/5/2019 | Hn. Mendoza | Production x2, Possession | 480 | U |
| Deepak Deshpande | 4/10/2019 | Hn. Mendoza | Online Enticement, Production | LIFE | LIFE |
| Keneon Fitzroy Isaac | 3/28/2019 | Hn. Mendoza | Production x2, Possession | 960 | 960-960 |
| David Hardman | 9/19/2018 | Hn. Mendoza | Production | 360 | 292-365 |
| Oscar Luis Burgos | 6/7/2018 | Hn. Mendoza | Production, Receipt x4 | 300 | 188-235 |
| Jeremy Craig Traylor | 12/21/2017 | Hn. Mendoza | Production x2 | 720 | 720-720 |
| Jerry Hall | 2/16/2017 | Hn. Mendoza | Production | 360 | 360-360 |
| Thomas Samborski, II | 10/12/2016 | Hn. Mendoza | Production | 240 | 360-360 |
| Paul Joseph Robinson | 5/13/2016 | Hn. Mendoza | Production | 210 | 180-210 |
| Douglas Scheels | 11/16/2015 | Hn. Mendoza | Production x2, Possession x2 | 600 | 600-600 |

# History and Characteristics of the Defendant

  

USCA11 Case: 20-13494  Document: 20  Date Filed: 02/01/2021  Page: 77 of 212

I spoke to his grandmother, Mrs. Guerrera. She tells me that his birth and development were normal. The mother allowed them to have the child when he was only three months old. Her husband, William, was madly in love with him. He would go every weekend to pick him up until finally they had custody of the child. However, when Edgar was about 6 years of age, William hung himself. This greatly affected the defendant. Edgar was his grandfather's "light". He was smart in class although he was hyperactive. His mother never inquired about him nor does she do so at this time. The rest of the family does not support him. She believes the mother would smoke marijuana. She tells me that as a child he was extremely hyperactive and they had placed him on medication but she didn't really want him to take them. He would take them occasionally and they did not really do much for him. When his common law wife did not allow him to see his daughter, this affected him tremendously. At about the age of 18 he began to use drugs. He had never been problematic or gotten into fights. He was not aggressive. He never told her about auditory or visual hallucinations but she always saw him as sad and depressed. She was "his everything".

The New York Times, Section C, Page 1, *Sad Legacy Of Abuse: The Search For Remedies*, (January 24, 1989), available at https://www.nytimes.com/1989/01/24/science/sad-legacy-of-abuse-the-search-for-remedies.html.

**U.S. Department of Justice**
**Office of Justice Programs**
*National Institute of Justice*



# National Institute of Justice

## R e s e a r c h    i n    B r i e f

Jeremy Travis, Director

*March 1995*

**GAO**

United States General Accounting Office

Report to the Chairman, Subcommittee on Crime, Committee on the Judiciary, House of Representatives

September 1996

# CYCLE OF SEXUAL ABUSE

## Research Inconclusive About Whether Child Victims Become Adult Abusers



All men

Men who commit sexual abuse

Men who were sexually abused (1 in 6 of all men)

Case 6:19-cr-00260-CEM-DCI Document 52-1 Filed 09/03/20 Page 12 of 17 PageID 352
USCA11 Case: 20-13494 Document: 20 Date Filed: 02/01/2021 Page: 80 of 212

Dube, S.R., Anda, R.F., Whitfield, C.L., et al. (2005). Long-term consequences of childhood sexual abuse by gender of victim. American Journal of Preventive Medicine, 28, 430-438.

Briere, J. & Elliot, D.M. (2003). Prevalence and psychological sequelae of self-reported childhood physical and sexual abuse in a general population sample of men and women. Child Abuse & Neglect, 27, 1205-1222.

Holmes, W.C., & Slap, G.B. (1998). Sexual abuse of boys: Definition, prevalence, correlates, sequelae, and management. Journal of the American Medical Association (JAMA), 280, 1855-1862.

Lisak, D., Hopper, J. & Song, P. (1996). Factors in the cycle of violence: Gender rigidity and emotional constriction. Journal of Traumatic Stress, 9, 721-743.

Finkelhor, D., Hotaling, G., Lewis, I. A., & Smith, C. (1990). Sexual abuse in a national survey of adult men and women: Prevalence, characteristics, and risk factors. Child Abuse & Neglect, 14, 19-28.

Holmes, G.R., Offen, L., & Waller, G. (1997). See no evil, hear no evil, speak no evil: Why do relatively few male victims of childhood sexual abuse receive help for abuse-related issues in adulthood? Clinical Psychology Review, 17, 69-88.

Widom, C.S. & Morris, S. (1997). Accuracy of adult recollections of childhood victimization part 2. Childhood sexual abuse. Psychological Assessment, 9, 34-46.

Widom (1999). Posttraumatic stress disorder in abused and neglected children grown up. American Journal of Psychiatry, 156, 1223-1229.

Felitti, V.J., Anda, R.F., Nordenberg, D., Williamson, D.F., Spitz, A.M., et al. (1998). Relationship of childhood abuse and household dysfunction to many of the leading causes of death in adults. American Journal of Preventive Medicine, 14, 245-258.

Lisak, D. & Luster, L. (1994). Educational, occupational and relationship histories of men who were sexually and/or physically abused as children. Journal of Traumatic Stress, 7, 507-523.

**SUMMARY AND CONCLUSIONS:** The defendant presented with signs and symptoms of a depressive disorder that was untreated. As a youth he suffered from Attention Deficit Hyperactivity Disorder and was treated with Ritalin and Adderall. Unfortunately, that treatment was not followed through. As an adult he tried to self-medicate with the Adderall and progressed to other drugs. It appears that he was self-medicating his depressed state. He has always had abandonment issues that have not been resolved. He was sad, tearful and cried throughout the interview. He has difficulty with sleep and has nightmares with some symptoms of post-traumatic stress disorder that are still active. However, he has never received psychiatric care and treatment and has never been in a substance abuse rehabilitation program.





There is a history of suicidal attempts starting at age 15 in which he overdosed. His stomach had to be pumped.   He developed a history of depression and anxiety.  Signs of depression were evident. Lack of sleep, loss of energy, crying spells, nightmares and frequent awakenings, anxiety, waking up sweaty and recollection of painful events. This would all lead to self-medicate with illegal drugs. There is a high interaction between depression and self-medicating with drugs. Some of these are also signs of post-traumatic stress disorder as he would relive stressful and emotional episodes in his life such as his grandfather's suicide, his mother's abandonment, and separation from significant others. There was also a family history of mental disorder and substance abuse with his mother, father and paternal uncle all being substance abusers.

**Just Punishment, Adequate Deterrence, Respect for the Law, and Protection of the Public**

**To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner**

**The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct**



Notre Dame Journal of International & Comparative Law

Zunkel, Erica (2019) "18 U.S.C. § 3553(a)'s Undervalued Sentencing Command: Providing a Federal Criminal Defendant with Rehabilitation, Training, and Treatment in "the Most Effective Manner"," *Notre Dame Journal of International & Comparative Law*: Vol. 9 : Iss. 1 , Article 5.



Case 6:19-cr-00260-CEM-DCI   Document 52-1   Filed 09/03/20   Page 17 of 17 PageID 357
USCA11 Case: 20-13494   Document: 20   Date Filed: 02/01/2021   Page: 85 of 212

# UNITED STATES OF AMERICA
## VS.
# EDGAR JOHAN DIAZ- COLON

## Case No: 6:19-CR-00260-CEM-DCI

A





**Dep't of Just. Manual Comment. 9-27.710G**

Aspen Publishers    4th Edition 2020-3 Supplement

**Department of Justice Manual**
United States Department of Justice

Copyright © 2020 CCH Incorporated. All Rights Reserved.

**Commentary**

**Title 9 Criminal**

# § [9-27.710G] U.S. SENTENCING COMMISSION PRIMER: DEPARTURE AND VARIANCE

**PRIMER**

**DEPARTURES AND VARIANCES**

February 2019

*Prepared by the Office of General Counsel, U.S. Sentencing Commission*

*Disclaimer: This document is intended to assist in understanding and applying the sentencing guidelines. The information in this document should not be considered definitive or comprehensive. In addition, the information in this document does not represent an official Commission position on any particular issue or case, and it is not binding on the Commission, the courts, or the parties in any case. To the extent this document includes unpublished cases, practitioners should be cognizant of Fed. R. App. P. 32.1, as well as any corresponding rules in their jurisdictions.*

## I. INTRODUCTION

This primer contains a summary of guideline provisions and annotations to judicial opinions addressing some of the most commonly applied grounds for departure. It also addresses issues relating to variances outside the guideline range. Although this primer identifies some of the issues and cases related to sentencing departures and variances, it is not intended to be comprehensive or a substitute for independent research, including reading and interpreting the *Guidelines Manual*, statutes, and case law.

## II. GENERAL PRINCIPLES

Unless otherwise prohibited by law, a sentencing court may consider, without limitation, any information concerning the background, character, and conduct of a defendant.[1] Such information may be considered when imposing a sentence within the

applicable guideline range and when determining whether, and to what extent, to sentence outside the guideline range.[2] A court may impose a sentence outside the otherwise-properly-calculated guideline range through either a "departure" or a "variance."

A departure is: (i) the imposition of a sentence outside the guideline range, (ii) a sentence that is otherwise different from the guideline sentence or, (iii) for purposes of §4A1.3 (Departures Based on Inadequacy of Criminal History Category), assignment of a criminal history category other than the otherwise applicable criminal history category, in order to effect a sentence outside the applicable guideline range.[3]

A variance is a sentence imposed outside the applicable guideline range based upon the statutory sentencing factors found at 18 U.S.C. § 3553(a). As explained by the Ninth Circuit:
A "departure" is typically a change from the final sentencing range computed by examining the provisions of the Guidelines themselves. It is frequently triggered by a prosecution request to reward cooperation . . . or by other factors that take the case "outside the heartland" contemplated by the Sentencing Commission when it drafted the Guidelines for a typical offense. A "'variance," by contrast, occurs when a judge imposes a sentence above or below the otherwise properly calculated final sentencing range based on application of the other statutory factors in 18 U.S.C. § 3553(a).[4]

As discussed below, it is important to understand the differences between departures and variances. Courts have observed that a sentence imposed pursuant to a departure, rather than a variance, is technically a within-guidelines sentence, i.e. one "imposed pursuant to the departure provisions of the policy statements in the [g]uidelines."[5] A sentence that is "neither within the applicable [g]uidelines range nor imposed pursuant to the departure authority in the Commission's policy statements" is a non-guidelines sentence imposed through a variance.[6] Though one may question the need to distinguish between the two types of sentences, the distinction can become important for, among other reasons, appellate review of the sentence.[7]

## A. PROCEDURE OF THE SENTENCING COURT

A sentencing court must follow the three-step process set forth by the Supreme Court in *Gall v. United States*.[8] First, the court must properly determine the guideline range.[9] Second, the court must determine whether to apply any of the guidelines' departure policy statements to adjust the guideline range.[10] Third, the court must consider all the factors set forth in 18 U.S.C. § 3553(a) as a whole, including whether a variance is warranted.[11]

## B. NOTICE REQUIREMENTS

Basic notions of due process underlie the procedural requirements in federal sentencing.[12] For example, before departing from an otherwise-appropriately-calculated guideline range, the court must give reasonable notice to the parties of the nature of the departure, unless the grounds have already been identified in the presentence report or a party's prehearing submission.[13] In contrast, the Supreme Court has held that no advance notice of a variance is required.[14] However,
[s]ound practice dictates that judges in all cases should make sure that the information provided to the parties in advance of the hearing, and in the hearing itself, has given them an adequate opportunity to confront and debate the relevant issues. We recognize that there will be some cases in which the factual basis for a particular sentence will come as a surprise to a defendant or the Government. The more appropriate response to such a problem is not to extend the reach of Rule 32(h)'s notice requirement categorically, but rather for a district judge to consider granting a continuance when a party has a legitimate basis for claiming that the surprise was prejudicial.[15]

## C. REVIEW OF SENTENCES ON APPEAL

Appellate courts use a 2-step process to review federal sentences.[16] First, they ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the guideline range. Second, they consider

§ [9-27.710G] U.S. SENTENCING COMMISSION PRIMER:..., DOJML COMMENT...

the substantive reasonableness of the sentence imposed under an abuse-of-discretion standard, taking into account the totality of the circumstances, including the extent of any variance from the guideline range. The appellate court's role, therefore, is to determine whether the sentence is both: (i) procedurally sound (the procedural reasonableness requirement) and (ii) falls within a broad range of reasonable sentences (the substantive reasonableness requirement). [17]

As in pre-*Booker* appeals, the district court's decision to deny a guideline departure is not reviewable so long as the district court "was aware of and understood its discretion to make such a [g]uideline-based departure." [18] After *Booker*, however, calculation of the guideline sentence, including any decisions regarding guideline-based departures, "is only the first step in sentencing decisions under *Booker*, for the court must also consider the § 3553(a) factors before making its ultimate decision" that the defendant's sentence is reasonable. [19] While district courts must continue to base departures on guideline factors, "many of the very factors that used to be grounds for a departure under the Guidelines are now considered by the district court--with greater latitude--under section 3553(a)." [20]

According to the Supreme Court, courts of appeals may, but are not required to, apply a presumption of reasonableness to a within-guideline sentence that reflects a proper application of the sentencing guidelines. [21] Some circuits have adopted an explicit presumption of reasonableness for within-guideline sentences while other circuits have rejected it. [22]

## III. DEPARTURES

Departures provide authorized adjustments to a sentencing range within the guideline system. [23] As Congress acknowledged in the Sentencing Reform Act, and as the *Guidelines Manual* itself explicitly states, "it is difficult to prescribe a single set of guidelines that encompasses the broad range of human conduct potentially relevant to a sentencing decision." [24] Departures, therefore, perform "an integral function in the sentencing guideline system." [25] Departures help provide courts with a way to impose an appropriate sentence in exceptional circumstances. They also maintain the statutorily mandated "flexibility to permit individualized sentences when warranted by mitigating or aggravating factors not taken into account in the establishment of general sentencing practices." [26] Running against this flexibility are admonishments, such as in the PROTECT Act, [27] that departures should be rare. [28] The *Guidelines Manual* cautions they should apply only in the "atypical" case lying outside the "heartland" of conduct covered by the guidelines. [29]

## A. CHAPTER FOUR, PART A - CRIMINAL HISTORY

### §4A1.3. Departures Based on Inadequacy of Criminal History Category (Policy Statement)

In recognition that "the criminal history score is unlikely to take into account all the variations in the seriousness of criminal history that may occur," [30] §4A1.3 provides for both upward and downward departures based on the inadequacy of the otherwise applicable criminal history category. [31]

### 1. Upward Departures

An upward departure may be warranted "[i]f reliable information indicates that the defendant's criminal history category substantially under-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes." [32]

The court may use the following information as the basis for an upward departure regarding the defendant's criminal history: (A) Prior sentence(s) not used in computing the criminal history category (for example, sentences for foreign and tribal offenses). [33]

(B) Prior sentence(s) of substantially more than one year imposed as a result of independent crimes committed on different occasions. [34]

(C) Prior similar misconduct established by a civil adjudication or by a failure to comply with an administrative order.[35]

(D) Whether the defendant was pending trial or sentencing on another charge at the time of the instant offense.[36]

(E) Prior similar adult criminal conduct not resulting in a criminal conviction.[37]

However, "[a] prior arrest record itself shall not be considered for purposes of an upward departure under this policy statement."[38]

Section 4A1.3 also provides guidance for the extent of an upward departure. In general, the court should use, as a reference, "the criminal history category applicable to defendants whose criminal history or likelihood to recidivate most closely resembles that of the defendant's.'D'[39]

When applying an upward departure from Category VI, "the court should structure the departure by moving incrementally down the sentencing table to the next higher offense level in Criminal History Category VI until it finds a guideline range appropriate to the case." When determining whether an upward departure from Criminal History Category VI is warranted, the court should "consider that the nature of the prior offenses rather than simply their number is often more indicative of the seriousness of the defendant's criminal record."[40]

*2. Downward Departures*

The policy statement also provides that a downward departure may be warranted ""[i]f reliable information indicates that the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes."[41] Such a departure may be warranted "if, for example, the defendant had two minor misdemeanor convictions close to ten years prior to the instant offense and no other evidence of prior criminal behavior in the intervening period."[42]

Section 4A1.3 prohibits "[a] departure below the lower limit of the applicable guideline range for Criminal History Category I."[43] The guideline also prohibits a downward departure of any amount for "(i) an armed career criminal within the meaning of §4B1.4 (Armed Career Criminal); and (ii) a repeat and dangerous sex offender against minors within the meaning of §4B1.5 (Repeat and Dangerous Sex Offender Against Minors)."[44]

For career offenders within the meaning of §4B1.1 (Career Offender), the guideline limits the extent of a downward departure to one criminal history category.[45]

Section 4A1.3 also provides that a "defendant whose criminal history category is Category I after receipt of a downward departure under this subsection does not meet the criterion of subsection (a)(1) of §5C1.2 (Limitation on Applicability of Statutory Maximum Sentences in Certain Cases) if, before receipt of the downward departure, the defendant had more than one criminal history point under §4A1.1 (Criminal History Category)."[46]

*3. Written Reasons*

With respect to both upward and downward departures under §4A1.3, the court is required to specify in writing the reasons for departure, as described below. Furthermore, remand is appropriate when the district court fails to adequately explain the basis for its departure.[47]

§ [9-27.710G] U.S. SENTENCING COMMISSION PRIMER:..., DOJML COMMENT...

(1) For an upward departure: the court must specify the reasons why the applicable criminal history category substantially under-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes. [48]

(2) For a downward departure: the court must specify the reasons why the applicable criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes. [49]

Regarding the degree and level of explanation a sentencing court must provide when departing from the otherwise applicable guideline range, the circuit requirements vary. For example, the Second Circuit has held that where the reasons for departure are fully explained, "a mechanistic, step-by-step procedure is not required." [50] The Eighth Circuit allows the sentencing court to choose any method so long as it is not inconsistent with the guidelines, while the Tenth Circuit requires a "reasonable methodology hitched to the Sentencing Guidelines . . . ." [51]

### 4. Criminal History Departures Post-Booker

It is important to keep in mind that since the 2005 *Booker* decision, courts may *vary*, rather than *depart*, from the guidelines and thus avoid the strict requirements of §4A1.3 altogether in imposing an outside-the-guidelines sentence based on the inadequacy of the defendant's criminal history category. [52] However, as discussed above, the sentencing court must still adequately explain the variant sentence being imposed pursuant to the instructions set forth in *Gall* concerning § 3553(a). [53]

### B. CHAPTER FIVE, PART K - DEPARTURES: SUBSTANTIAL ASSISTANCE TO AUTHORITIES

### §5K1.1. Substantial Assistance to Authorities (Policy Statement)

A defendant's assistance to authorities in the investigation of criminal activities has long been recognized, in practice and by statute, as a mitigating sentencing factor. [54] Section 5K1.1 provides for a downward departure from the guidelines if the government files a motion "stating that the defendant has provided substantial assistance in the investigation or prosecution of another person who has committed an offense." The amount of the reduction "shall be determined by the court for reasons stated that may include, but are not limited to, consideration of the following":
(1) the court's evaluation of the significance and usefulness of the defendant's assistance, taking into consideration the government's evaluation of the assistance rendered; [55]

(2) the truthfulness, completeness, and reliability of any information or testimony provided by the defendant; [56]

(3) the extent of the defendant's assistance; [57]

(4) any injury suffered, or any danger or risk of injury to the defendant or his family resulting from his assistance; [58]

(5) the timeliness of the defendant's assistance. [59]

Under circumstances set forth in 18 U.S.C. § 3553(e) and 28 U.S.C. § 994(n), as amended, substantial assistance in the investigation or prosecution of another person who has committed an offense may justify a sentence below a statutory mandatory minimum. [60]

A reduction under this policy statement must "be considered independently of any reduction for acceptance of responsibility." [61]

*1. Statement of Reasons*

While the court is afforded "latitude" in reducing a defendant's sentence based upon "variable relevant factors," the court must "state the reasons for reducing a sentence" for substantial assistance under §5K1.1.[62] This can be done *in camera* or under seal to protect the safety of the defendant or to avoid disclosure of an ongoing investigation.[63]

*2. Motion Requirement*

If the government wishes to sponsor a departure from the guideline range based on the defendant's cooperation, it must make a motion under §5K1.1. A departure from a statutory mandatory minimum penalty for cooperation requires a motion under 18 U.S.C. § 3553(e).[64] The motion can be made after remand for resentencing.[65] Where the mandatory minimum exceeds the guidelines range, courts have unanimously found that the statutory mandatory minimum is the required starting point for a §5K1.1 departure.[66]

*3. District Court Review*

The Supreme Court explained in *Wade v. United States* that the government has the power, but not the duty, to file a motion under section 3553(e) or §5K1.1 when the defendant has provided substantial assistance.[67] Although the district court's authority to grant a departure for substantial assistance is conditioned on the government's motion, a district court may review the government's refusal to make a substantial assistance motion, if such refusal was (1) prompted by an unconstitutional motive, such as the defendant's race or religion; or (2) not rationally related to a legitimate government interest.[68] To obtain an evidentiary hearing, the defendant must make a "'substantial threshold showing' that the government's refusal to make a substantial assistance motion was premised on an improper motive."[69] Some circuits have held that it is unconstitutional for the government to withhold a substantial assistance motion to penalize a cooperating defendant for taking his own case to trial.[70] Other decisions hold that substantial assistance plea agreements create a quasi-contractual obligation for the government to act in good faith, even in circumstances that would not meet *Wade* requirements.[71]

*4. Post-Booker Issues*

Since *Booker*, the procedure for granting a substantial assistance motion has remained largely unchanged. The Sentencing Reform Act and the guidelines still require a government motion as a precondition for a departure based on substantial assistance. A departure under §5K1.1 and 18 U.S.C. § 3553(e) can be based only on substantial assistance, not on other § 3553(a) factors.[72] Although a district court's decision not to depart is not reviewable on appeal unless the court was unaware of its power to do so, the sentence as a whole is reviewed for reasonableness.[73]

*§5K1.2. Refusal to Assist (Policy Statement)*

A defendant's refusal to assist authorities in the investigation of other persons may not be considered as an aggravating sentencing factor. However, a defendant's refusal to assist authorities may be considered in sentencing *within* the guideline range.[74]

## C. CHAPTER FIVE, PART K - DEPARTURES: OTHER GROUNDS FOR DEPARTURE

*§5K2.0. Grounds for Departure (Policy Statement)*

*1. Introduction*

Case 6:19-cr-00260-CEM-DCI   Document 52-2   Filed 09/03/20   Page 9 of 69 PageID 366
USCA11 Case: 20-13494   Document: 20   Date Filed: 02/01/2021   Page: 94 of 212

§ [9-27.710G] U.S. SENTENCING COMMISSION PRIMER:..., DOJML COMMENT...

A court may depart from the applicable guideline range if it finds an aggravating or mitigating circumstance "of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that . . . should result in a sentence different from that described." As discussed in Chapter 1, Part A of the *Guidelines Manual*:

The Commission intends the sentencing courts to treat each guideline as carving out a "heartland," a set of typical cases embodying the conduct that each guideline describes. When a court finds an atypical case, one to which a particular guideline linguistically applies but where conduct significantly differs from the norm, the court may consider whether a departure is warranted.

In cases other than child crimes and sex offenses (discussed below), the court may depart (either up or down) from the guideline range in the following situations:

(1) If there exists in a case circumstances of a *kind* not adequately taken into consideration in determining the applicable guideline range.

This includes the **encouraged departures** (discussed below)-some of which are found in Chapter Five, Part K, Subpart 2 (Other Grounds for Departure), and some of which are found in specific guideline provisions.

This also includes the **exceptional case** in which there is present a circumstance that the Commission has not identified in the guidelines but that nevertheless is relevant to determining the appropriate sentence. Such circumstances are intended to be rare.

(2) If there exists in a case circumstances present to a *degree* not adequately taken into consideration in determining the applicable guideline range.

This includes the exceptional case in which the court determines that a circumstance already taken into account in the guideline is present in the offense to a degree substantially in excess of, or substantially below, that which ordinarily is involved in that kind of offense.

(3) If there exists in a case offender characteristics or other circumstances that are not ordinarily relevant, but are present in an exceptional degree.

This includes the discouraged departures (discussed below), which are found in Chapter Five, Part H (Specific Offender Characteristics).

*2. Prohibited Grounds for Departure*

The guidelines also include several factors (discussed below) that the court cannot take into account as grounds for departure: any circumstance specifically prohibited as a ground for departure in §§5H1.10 (Race, Sex, National Origin, Creed, Religion, and Socio-Economic Status), 5H1.12 (Lack of Guidance as a Youth and Similar Circumstances), the last sentence of 5H1.4 (Physical Condition, Including Drug or Alcohol Dependence or Abuse; Gambling Addiction), the last sentence of 5K2.12 (Coercion and Duress). [75]

*§5H1.10. Race, Sex, National Origin, Creed, Religion, and Socio-Economic Status (Policy Statement)*

The policy statement provides that the factors listed in the title are not relevant in the determination of a sentence. [76]

*§5H1.12. Lack of Guidance as a Youth and Similar Circumstances (Policy Statement)*

Section 5H1.12 provides that "[l]ack of guidance as a youth and similar circumstances indicating a disadvantaged upbringing are not relevant grounds in determining whether a departure is warranted." [77]

*§5H1.4. Physical Condition, Including Drug or Alcohol Dependence or Abuse; Gambling Addiction (Policy Statement)*

Section 5H1.4 provides that drug or alcohol dependence or abuse is not *ordinarily* a reason for downward departure.[78] Further, the policy statement explains that substance abuse is "highly correlated to an increased propensity to commit crime," and recommends "that a defendant who is incarcerated also be sentenced to supervised release with a requirement that the defendant participate in an appropriate substance abuse program (*see* §5D1.3(d)(4))." Similarly, "where a defendant who is a substance abuser is sentenced to probation," the policy statement "strongly recommend[s] that the conditions of probation contain a requirement that the defendant participate in an appropriate substance abuse program (see §5B1.3(d)(4))." In cases where §5C1.1, Application Note 6, is applicable,[79] "a downward departure [from Zone C to Zone B] may be appropriate to accomplish a specific treatment purpose." However, a court may not impose a *longer* sentence solely to make the defendant eligible for drug treatment programs in prison.[80]

*§5K2.12. Coercion and Duress (Policy Statement)*

Section 5K2.12 provides that "personal financial difficulties and economic pressures upon a trade or business do not warrant a downward departure."

*§5K2.22. Specific Offender Characteristics as Grounds for Downward Departure in Child Crimes and Sexual Offenses (Policy Statement)*

Section 5K2.22 provides special rules for offenses involving a minor victim under section 1201 (Kidnapping), an offense under section 1591 (Sex trafficking of children or by force, fraud, or coercion), an offense under chapter 71 (Obscenity), 109A (Sexual abuse), 110 (Sexual exploitation and other abuse of children), or 117 (Transportation for illegal sexual activity and related crimes), of title 18, United States Code.
*Relevant Factors*
(1) Age may be a reason to depart downward only if and to the extent permitted by §5H1.1.

(2) An extraordinary physical impairment may be a reason to depart downward only if and to the extent permitted by §5H1.4.

(3) Drug, alcohol, or gambling dependence or abuse is not a reason to depart downward.

*Prohibited Grounds*
(1) The defendant's acceptance of responsibility for the offense, which may be taken into account only under §3E1.1 (Acceptance of Responsibility) cannot support a departure.

(2) The defendant's aggravating or mitigating role in the offense, which may be taken into account only under §3B1.1 (Aggravating Role) or §3B1.2 (Mitigating Role), respectively.[81]

(3) The defendant's decision, in and of itself, to plead guilty to the offense or to enter a plea agreement with respect to the offense (*i.e.*, a departure may not be based merely on fact that the defendant decided to plead guilty or to enter into a plea agreement, but a departure may be based on justifiable, non-prohibited reasons as part of a sentence that is recommended, or agreed to, in the plea agreement and accepted by the court).

(4) The defendant's fulfillment of restitution obligations only to the extent required by law including the guidelines (*i.e.*, a departure may not be based on unexceptional efforts to remedy the harm caused by the offense).[82]

(5) Any other circumstance specifically prohibited as a ground for departure in the guidelines.

Case 6:19-cr-00260-CEM-DCI   Document 52-2   Filed 09/03/20   Page 11 of 69 PageID 368
USCA11 Case: 20-13494   Document: 20   Date Filed: 02/01/2021   Page: 96 of 212

§ [9-27.710G] U.S. SENTENCING COMMISSION PRIMER:..., DOJML COMMENT...

### 3. Encouraged Grounds for Departure

If a special factor is encouraged, the court may use it as a basis for a departure, but only if the applicable guideline does not already take the factor into account, or if the factor is present to an exceptional degree.

### §5H1.9. Dependence upon Criminal Activity for a Livelihood (Policy Statement)

Section 5H1.9 states that "the degree to which a defendant depends upon criminal activity for a livelihood is relevant in determining the appropriate sentence."

### §5K2.1. Death (Policy Statement)

Under §5K2.1, "[i]f death resulted, the court may increase the sentence above the authorized guideline range." [83] The policy statement provides a number of factors the court should take into consideration when determining the extent of such a departure. The court, for example, "must give consideration to matters that would normally distinguish among levels of homicide, such as the defendant's state of mind and the degree of planning or preparation." [84]

The policy statement also encourages consideration of both the number of fatalities and manner of death. The extent of the increase should depend on ""the dangerousness of the defendant's conduct, the extent to which death or serious injury was intended or knowingly risked, and the extent to which the offense level for the offense of conviction, as determined by the other Chapter Two guidelines, already reflects the risk of personal injury." [85]

### §5K2.2. Physical Injury (Policy Statement)

Section 5K2.2 provides for an increase above the authorized guideline range if *significant* physical injury resulted. [86] The extent of the increase ordinarily should depend on "the extent of the injury, the degree to which it may prove permanent, and the extent to which the injury was intended or knowingly risked." In general, the same considerations apply to this policy statement as in §5K2.1. [87] Section 5K2.2 does not preclude an enhancement under §2A2.2(b)(3)(C) based upon the victim's injury. [88]

### §5K2.3. Extreme Psychological Injury (Policy Statement)

If a victim or victims "suffered psychological injury much more serious than that normally resulting from commission of the offense," §5K2.3 allows the court to increase the sentence above the authorized guideline range. [89] The extent of the increase ordinarily should depend on "the severity of the psychological injury and the extent to which the injury was intended or knowingly risked." Section 5K2.3 states that under normal circumstances, psychological injury would be sufficiently severe to warrant application of this adjustment only "when there is a substantial impairment of the intellectual, psychological, emotional, or behavioral functioning of a victim, when the impairment is likely to be of an extended or continuous duration, and when the impairment manifests itself by physical or psychological symptoms or by changes in behavior patterns."

### §5K2.4. Abduction or Unlawful Restraint (Policy Statement)

The court may upwardly depart if a person was "abducted, taken hostage, or unlawfully restrained to facilitate commission of the offense or to facilitate the escape from the scene of the crime." [90]

### §5K2.5. Property Damage or Loss (Policy Statement)

Section 5K2.5 provides for an upward departure if the "offense caused property damage or loss not taken into account within the guidelines." [91] The extent of increase ordinarily should depend on "the extent to which the harm was intended or knowingly

B

| Defendant | Sent. Date | District Judge | Conviction(s) | Sentence | GL Range |
|---|---|---|---|---|---|
| Edgar Diaz-Colon | 9/3/2020 | Hn. Mendoza | Production x5 | | 360-1800 |
| Justin Richard Testani | 8/6/2020 | Hn. Mendoza | Production x2 | 720 | 720-720 |
| Carlos A. Rodriguez Fernandez | 9/5/2019 | Hn. Mendoza | Production x2, Possession | 480 | U |
| Deepak Deshpande | 4/10/2019 | Hn. Mendoza | Online Enticement, Production | LIFE | LIFE |
| Keneon Fitzroy Isaac | 3/28/2019 | Hn. Mendoza | Production x2, Possession | 960 | 960-960 |
| David Hardman | 9/19/2018 | Hn. Mendoza | Production | 360 | 292-365 |
| Oscar Luis Burgos | 6/7/2018 | Hn. Mendoza | Production, Receipt x4 | 300 | 188-235 |
| Jeremy Craig Traylor | 12/21/2017 | Hn. Mendoza | Production x2 | 720 | 720-720 |
| Jerry Hall | 2/16/2017 | Hn. Mendoza | Production | 360 | 360-360 |
| Thomas Samborski, II | 10/12/2016 | Hn. Mendoza | Production | 240 | 360-360 |
| Paul Joseph Robinson | 5/13/2016 | Hn. Mendoza | Production | 210 | 180-210 |
| Douglas Scheels | 11/16/2015 | Hn. Mendoza | Production x2, Possession x2 | 600 | 600-600 |

USCA11 Case: 20-13494    Document: 20    Date Filed: 02/01/2021    Page: 99 of 212

C

The New York Times | https://nyti.ms/29m3NGR

# Sad Legacy Of Abuse: The Search For Remedies

**By Daniel Goleman**

Jan. 24, 1989



See the article in its original c
January 24, 1989, Section C, Page

**VIEW ON TIMESMACHII**

TimesMachine is an exclusive ben
delivery and digital subscri

### About the Archive

*This is a digitized version of an article from The Times's print archive, before the start of online publication in 1996. To preserve these articles as they originally appeared, The Times does not alter, edit or update them.*

*Occasionally the digitization process introduces transcription errors or other problems; we are continuing to work to improve these archived versions.*

CHILDREN and adults who were victims of child abuse are coming under intensified study by researchers who hope to learn what distinguishes those who go on to become abusers themselves from those who grow up to be good parents.

In the hope of finding ways to break the tragic cycle, the new research is identifying particular experiences in childhood and later in life that allow a great many abused children to overcome their sad legacy.

Studies also now indicate that about one-third of people who are abused in childhood will become abusers themselves. This is a lower percentage than many experts had expected, but obviously poses a major social challenge. The research also confirms that abuse in childhood increases the likelihood in adulthood of problems ranging from depression and alcoholism to sexual maladjustment and multiple personality.

The studies are also uncovering specific factors that help many victims grow into a well-adjusted adulthood, and factors that push others toward perpetuating the pattern of violence. The findings should help therapists improve treatment of abused children or formerly abused adults, helping them recover from their trauma.

"Studies showing that a high proportion of troubled adults were abused in childhood tell only part of the story," said Dr. Richard Krugman, a professor of pediatrics at the University of Colorado Medical School and director of the C. Henry Kempe Center for Prevention and Treatment of Child Abuse and Neglect. "There are substantial numbers of men and women who were abused as children, but who are not themselves child abusers, drug abusers, criminals or mentally disturbed."

Key factors found to worsen the long-term impact of abuse are: abuse that started early, abuse that lasted for a long time, abuse in which the perpetrator had a close relationship to the victim, abuse that the child perceived as particularly harmful, and abuse that occurred within a cold emotional atmosphere in the family. These factors, researchers say, help identify which children need treatment most urgently.

Victims of abuse frequently respond to the trauma by denying that any abuse occurred or by blaming themselves for the abuse, which they often view as justified discipline from adults, the studies show. But many victims can overcome the trauma with the emotional support of a friend or relative or through therapy that makes them

aware that they were not to blame for abuse inflicted by their parents. Victims of abuse can almost always benefit from therapy to deal with the psychological effects of being so terribly treated, such as a damaged sense of self-worth and conflicts between wanting to love their parents while recognizing the abuse that happened.

"Child abuse" refers to a range of maltreatment. In addition to physical harm and sexual abuse, researchers also include serious neglect of a child's emotional and physical needs and forms of emotional abuse such as incessant berating of a child. They are finding that the longlasting effects of all these kinds of abuse share much in common.

In any given year, from 1 percent to 1.5 percent of American children are subject to abuse of some kind, according to Dr. Krugman. By the time they reach adulthood, about one in four men and women will have experienced at least one episode of abuse at some point during childhood. The Abused As Adults Numerous studies have found those who were victims of child abuse to be more troubled as adults than those who were not. There are disproportionate numbers of victims of abuse among prostitutes, violent criminals, alcoholics and drug abusers, and patients in psychiatric hospitals.

The more severe the abuse, the more extreme the later psychiatric symptoms. For instance, a study by Judith Herman, a psychiatrist in Somerville, Mass., found that among women who had been victims of incest, although half seemed to have recovered well by adulthood, those who suffered forceful, prolonged, intrusive abuse, or who were abused by fathers or step-fathers, had the most serious problems later in life.

Virtually all those who suffer from multiple personality, a rare but severe psychiatric disorder, have a history of being severely abused; the disorder is thought to stem from ways some children try to mentally isolate themselves against the horror of unremitting abuse.

A 1985 study of all 15 adolescents in the United States who were condemned murderers found that 13 had been victims of extreme physical or sexual abuse. In nine cases the abuse was so severe - characterized as "murderous" by the researchers

Case 6:19-cr-00260-CEM-DCI   Document 52-2   Filed 09/03/20   Page 17 of 69 PageID 374
Sad Legacy Of Abuse: The Searc... Sad Legacy Of Abuse: The Searc... Sad Legacy Of Abuse: The Search...
Document 2 of   Date Three: 02 On 2022   Page: 102 of 212

-that it led to neurological damage. Similarly, a study of nine women imprisoned for fatal child abuse found that all of them had experienced severe maltreatment themselves.

While all these studies depict an alarming pattern, researchers point out that the statistics do not reflect the large numbers of abused children who do not suffer from these problems.

That abused children need not go on to abuse their own children was shown in a study of more than 1,000 pregnant women, 95 of whom had been abused as children. The report, by William Altemeier, a pediatrician at Vanderbilt University Medical School, and his colleagues, was published in 1986 in the journal Child Abuse and Neglect. Strongest Predictive Factor

The study found that the strongest predicter from childhood of becoming an abusive parent was not having been abused, but rather having felt as a child that one was unloved and unwanted by one's parents - an attitude common, of course, among abused children, but also found in families in which there is no overt abuse.

However, studies in which there have been more careful observations of mothers and their children have found a stronger link between having been abused in childhood and being an abusive parent. In a survey of such studies, Joan Kaufman and Edward Zigler, psychologists at Yale, concluded that 30 percent is the best estimate of the rate at which abuse of one generation is repeated in the next. Responses To Abuse Denial that one has been abused is emerging as a source of trouble later in life. Researchers find that many adults who were abused as children do not think of themselves as having been victimized. For instance, three-quarters of men in one study who described punishments that, by objective standards, constitute abuse -such as being burned for an infraction of a minor household rule - denied that they had been abused.

That phenomenon is common among those who go on to become child abusers, according to Dr. Krugman, and is part of the cycle by which abused children become abusive parents.

"When you ask them if they were ever abused, they tell you, 'No,' " Dr. Krugman said. "But if you ask them to describe what would happen if they broke a rule, they'll say something like, 'I was locked in a closet for a day, then beaten with a belt until I was black and blue.' Then you ask them, was that abuse? and their answer is, 'No, I was a bad kid and my parents had to beat me to make me turn out okay.' "

While there has been much attention by psychotherapists in recent years on women who were sexually abused in childhood, a more recent focus is on men who suffered sexual abuse. Such men are much more reticent than women about admitting what happened to them and dealing with the trauma, according to Mike Lew, co-director of The Next Step Counseling Centre in Newton, Mass., and author of "Victims No Longer," (Nevraumont) about the problem. Treating Abuse Children fare better after abuse, researchers have found, when they have someone in their life - a relative, teacher, minister, friend - who is emotionally nurturing.

In helping a child recover from abuse, "you need to counteract the child's expectations that adults will be deeply uncaring," explained Martha Erickson, a psychologist at the University of Minnesota.

Among adult victims of childhood abuse who are in therapy, a common refrain from patients is that "it just wasn't that bad," said Terry Hunt, a psychologist in Cambridge, Mass., who specializes in their problem. "The key to their treatment is facing the fact that their parents were so cruel to them; they've bought the parent's word that they were bad and deserved it. The damage shows up in their intimate relationships: they're waiting to get hit or used again." The Question of Insight

One of the crucial differences between those abused children who go on to become abusers and those who do not, he said, is whether they have the insight that their parents were wrong to abuse them.

Often, Dr. Hunt finds, the most troubled among his patients are those who were told as children, by adults other than their abusing parent, that the abuse was justified.

"If an abused child thinks, 'that was wrong, they shouldn't have done that to me - I'm not that bad,' then he can still love his parents, but decide not to repeat the abuse when he becomes a parent," said Dr. Krugman. "The child somehow gets the message that what happened is not his fault, that he is not to blame."

When parents are not the abusers, how they react to its discovery is crucial. In a study of children who had been involved in sex rings, those who had fewest lasting problems in later years were the children whose parents had been understanding of the child, according to Ann Burgess, a professor of nursing at the University of Pennsylvania medical school.

"These kids recovered with no symptoms, while those whose parents blamed them had the worst outcome," Dr. Burgess said. Minnesota Study The factors that lead some children to become abusers while others become excellent parents is being revealed in research at the University of Minnesota. Psychologists there are currently studying a group of children born to parents with a high probability of becoming abusers. Not all those in the study were abused as children; they were selected instead because they were poor, single, got pregnant at an early age, and had chaotic households - all factors that correlate highly with child abuse.

In addition to physical and sexual abuse - the two varieties most often studied - the researchers are also studying children whose physical care is neglected, those whose parents constantly berate and criticize them and those whose parents are completely unresponsive to their emotional needs. Followed From Birth

The study, one of the few that has followed children from birth, is finding that there are different emotional effects from each of the different kinds of abuse, and that these effects change from age to age. For instance, children whose mothers were emotionally cold during infancy had emotional and learning problems at the age of six that were as severe as -and sometimes more severe - than those found in children whose mothers had been physically abusive but emotionally responsive during their infancy.

When the same children were studied between the ages of four and six, the most serious problems were found in those whose mothers neglected their physical care.

Sad Legacy Of Abuse: The Searc... Sad Legacy Of Abuse: The Searc... Sad Legacy Of Abuse: The Search...

The study is also finding general effects that come from maltreatment of any kind.

"The earlier the maltreatment occurs, the more severe the consequences," said Martha F. Erickson, a psychologist at the University of Minnesota, who is one of those conducting the study. Dr. Erickson, with Byron Egeland and Robert Pianta, two colleagues, will publish early findings from the study in a chapter to appear in "Child Maltreatment," a book to be published by Cambridge University Press in May.

Many of the lifelong psychological effects of abuse stem from a lack of nurturance, they conclude, a lack that lies behind all the kinds of maltreatment.

The Minnesota researchers report that among those abused children who go on to become abusing parents, there is little repetition of a specific type of abuse.

For instance, of 13 women who had been sexually abused, six were physically abusing their children; of 47 who had been physically abused, 8 were physical abusers by the time their children reached six years, while 8 neglected their children, and 6 had homes where children were being sexually abused, often by a boyfriend of the mother.

D

U.S. Department of Justice
Office of Justice Programs
*National Institute of Justice*



# National Institute of Justice

## R e s e a r c h   i n   B r i e f

*Jeremy Travis, Director*

*March 1995*

## Issues and Findings

*Discussed in the Brief:* Previous research established evidence for a "cycle of violence": people who were abused and neglected in childhood are more likely than those who were not to become involved in criminal behavior, including violent crime, later in life. This Research in Brief, the second in a series on the cycle of violence, examines the criminal consequences in adulthood of a particular type of childhood victimization: sexual abuse. It traces the same individuals studied initially, using official records of arrest and juvenile detention.

### Key issues:

● Whether sexual abuse—more than other forms of childhood victimization—makes people more likely to become involved in delinquent and criminal behavior later in life.

● Whether sexual abuse during childhood makes it more likely that these victims will be charged with a sex crime as an adult.

● Whether there is a "pathway" from being sexually abused as a child, to running away as a juvenile, to being arrested for prostitution as an adult.

*continued on page 2*

# Victims of Childhood Sexual Abuse— Later Criminal Consequences

D

*by Cathy Spatz Widom*

Over the past 25 years, much has been written about the "cycle of violence" or the "intergenerational transmission of violence." These terms refer to the possible negative consequences later in life for children who are sexually or physically abused or neglected. These consequences include an increased potential for violent behavior. In earlier work the researcher examined criminal records on more than 1,500 individuals to determine whether the experience of abuse or neglect during childhood increased the likelihood of arrest as a juvenile or young adult. The research clearly revealed that a childhood history of physical abuse predisposes the survivor to violence in later years, and that victims of neglect are more likely to engage in later violent criminal behavior as well.

Of all types of childhood maltreatment, physical abuse was the most likely to be associated with arrest for a violent crime later in life. The group next most likely to be arrested for a violent offense were those who had experienced neglect in childhood, a finding of particular interest. Though a more "passive" form of maltreatment, neglect has been associated with an array of developmental problems, and the finding extended that array to include greater risk of later criminal violence.[1]

## Focus on sexual abuse

This Research in Brief reports the findings from an analysis of a specific type of maltreatment—childhood sexual abuse—and its possible association with criminal behavior later in life.[2] Using the same cases of individuals studied previously, the researcher sought to find out whether those who had been sexually abused were more likely to engage in later delinquent and criminal behavior than those who had experienced the other types of abuse. Is there an "inevitable" or likely progression from being sexually victimized in childhood to being charged with an offense in adulthood, particularly sex offenses.

This examination is part of a two-phase study of the long-term consequences of childhood abuse and neglect. The findings reported here are from the first phase, which used the arrest records of juveniles and adults to measure the criminal consequences of being maltreated. In the second phase, now underway, interviews are being conducted in an attempt to draw a more complete picture of such consequences. The researcher is looking at criminal behavior that may not have been included in official records and at other negative outcomes, including mental health, educational, substance abuse, and other

R e s e a r c h   i n   B r i e f

## Issues and Findings

*continued . . .*

### Key findings:

● People who were sexually victimized during childhood are at higher risk of arrest for committing crimes as adults, including sex crimes, than are people who did not suffer sexual or physical abuse or neglect during childhood. However, the risk of arrest for childhood sexual abuse victims as adults is no higher than for victims of other types of childhood abuse and neglect.

● The vast majority of childhood sexual abuse victims are not arrested for sex crimes or any other crimes as adults.

● Compared to victims of childhood physical abuse and neglect, victims of childhood sexual abuse are at greater risk of being arrested for one type of sex crime: prostitution.

● For the specific sex crimes of rape and sodomy, victims of physical abuse tended to be at greater risk for committing those crimes than were sexual abuse victims and people who had not been victimized.

● What might seem to be a logical progression from childhood sexual abuse to running away to prostitution was not borne out. The adults arrested for prostitution were not the runaways identified in this study.

*Target audience:* Law enforcement officials, child protection service professionals, researchers, judges, family counselors, and victim service organizations and agencies.

problems. (See "Preview of Work in Progress.")

### Evidence from other studies

The link between childhood sexual abuse and negative consequences for the victims later in life has been examined in clinical reports and research studies in the past two decades. Frequently reported consequences include acting-out behaviors, such as running away, truancy, conduct disorder, delinquency, promiscuity, and inappropriate sexual behavior. Studies of prostitutes have also revealed an association between sexual abuse during childhood and deviant and criminal behavior.

These and other findings have been the basis for theories linking childhood sexual abuse to the development of deviant and criminal behavior later in life. Among researchers as well as clinicians, acceptance of this link is fairly widespread. However, as a review of research into the impact of childhood sexual abuse has indicated, the empirical evidence may not be sufficient to justify this acceptance.[3] And, a recent review of the long-term effects of childhood sexual abuse—which cited sexual disturbance, depression, suicide, revictimization, and postsexual abuse syndrome—noted criminal consequences only in passing.[4]

### The need for a new approach

The methods used to conduct these studies make interpretation difficult. For one thing, most used retrospective self-reports of adults who had been sexually abused as children; that is, they relied on the subjects' own recall. Retrospective accounts of sexual abuse may be subject to bias or error. For example, unconscious denial (or repression of traumatic events in childhood) may prevent recollection of severe cases of childhood

sexual abuse. It is also possible that people forget or redefine their behaviors in accordance with later life circumstances and their current situation.

Another difficulty with these methods lies with their reliance on correlation. They involve data collection at only one point in time. In examining the relationship between sexual abuse and later delinquent behavior or adult criminality, it is important to ensure the correct temporal sequence of events; that is, to make certain that the incident of childhood sexual abuse clearly *preceded* (not followed) delinquency. Thus, multiple data collection points are needed. The few studies that do not rely on retrospection have investigated consequences only over relatively short periods of time.

Perhaps the most serious methodological shortcoming is the frequent lack of appropriate control or comparison groups. Childhood sexual abuse often occurs in the context of multiproblem homes, and sexual victimization of children may be only one of these problems. Without control groups, the effects of other family characteristics, such as poverty, unemployment, parental alcoholism or drug problems, or other inadequate social and family functioning, cannot be easily disentangled from the specific effects of sexual abuse.

### The present study

The study posed three questions designed to shed light on the possible long-term criminal consequences of childhood sexual abuse:

● **Is there a higher risk of criminal behavior later in life?** Compared to early childhood experiences of physical abuse and neglect (and also compared to children who did not experience maltreatment, at least as documented by official records), does sexual abuse in early

R e s e a r c h   i n   B r i e f

childhood increase the risk of delinquent and criminal behavior?

● **Is there a higher risk of committing sex crimes?** Are childhood sexual abuse victims more likely to commit such crimes as prostitution, rape, and sodomy?

● **Is there a link between sexual abuse, running away, and prostitution?** Is there a significant and direct relationship between early childhood sexual abuse, being arrested as a runaway as an adolescent, and, in turn, being arrested for prostitution as an adult?

## How the study was conducted[5]

The study examined the official criminal histories of a large number of people whose sexual victimization during childhood had been validated. These victims of sexual abuse were compared to cases of physical abuse and neglect and to a control group of individuals who were closely matched in age, race, sex, and approximate family socioeconomic status.

**The groups selected for study.** The subjects were 908 individuals who had been subjected as children to abuse (physical or sexual) or neglect, and whose cases

were processed through the courts between 1967 and 1971. All were 11 years of age or younger at the time of the incident(s).

The research used a "matched cohorts" design. Such studies involve selecting groups of subjects who are similar (matched) to each other but who differ in the characteristic being studied. The "cohort" of children who had been abused or neglected was matched with the control group, which consisted of children who had not been abused or neglected.

Both groups were followed into adolescence and young adulthood to determine if they had engaged in delinquent behavior or had committed crimes as adults. At the time they were chosen for the study, none of them had as yet engaged in delinquent or criminal behavior. The major aim of this analysis was to determine whether sexual abuse during childhood puts victims at greater risk for criminal behavior later in life than do the other types of maltreatment.

**Sources of information about maltreatment.** Because it was important to use substantiated cases of physical and sexual abuse and neglect, the study relied on the official records of agencies that handled these cases. Detailed information about the abuse and/or neglect incident and family composition and characteristics of study subjects was obtained from the files of the juvenile court and probation department. The records of the sexual abuse cases were obtained from the juvenile court and from the adult criminal court of a metropolitan area in the Midwest.[6]

Like all sources of information, official records have certain limitations. Some incidents are not reported to law enforcement or social service agencies.

---

## Preview of Work in Progress

I f someone commits a crime but is not apprehended, the crime will not appear in official arrest records. For this reason, in studying the link between childhood victimization and negative consequences in adulthood, including criminal behavior, it is important to examine evidence from other sources. In addition, victims of childhood abuse and neglect may manifest problems other than criminal behavior later in life, and these too cannot be traced through arrest records.

The first phase of this study relied exclusively on official records to document incidents of delinquency and criminality. Because of the limitations of this type of record, the second phase, begun in 1989, used interviews. An attempt is being made to locate as many as possible of the 1,575 people who were studied during the first phase, for the in-person interviews. Since the abuse and/or neglect incidents took place some 20 years ago, most of these people had become young adults in their early 20's and 30's by the time of the interviews.

Information from the interviews is being used to document a number of long-term consequences of childhood victimization, including social, emotional, cognitive and intellectual, occupational, psychiatric, and general health outcomes. Substance abuse is also being studied. Parental alcohol use has been identified in previous research as a risk factor for child abuse, and recent research considers alcohol use to be a possible consequence of early childhood victimization. In view of these intergenerational links, the study will focus on the connections between child abuse, alcohol abuse, and violence.

In addition, because many victimized children appeared not to exhibit adverse effects of abuse and neglect, the research will examine the influence of "protective" factors that might have buffered them from developing negative outcomes, particularly violent criminal behavior.

Data collection and analysis are projected for completion in 1995, and the findings will be prepared for publication. Support received from the National Institute of Justice has been supplemented by a grant from the National Institute of Mental Health.

---

R e s e a r c h   i n   B r i e f

Moreover, the cases studied were processed before the child abuse reporting laws were passed, when many cases of sexual abuse were not brought to the attention of the authorities. For these reasons, the findings cannot be interpreted as applying to all incidents. It is more likely that they represented only the serious and extreme cases—those brought to the attention of the social service and criminal justice systems.

**Types of maltreatment.** The *sexual abuse* cases represented a variety of charges, from relatively nonspecific ones of "assault and battery with intent to gratify sexual desires" to more specific ones of "fondling or touching in an obscene manner," sodomy, incest, and the like. The *physical abuse* cases included those involving injuries such as bruises, welts, burns, abrasions, lacerations, wounds, cuts, bone and skull fractures. The *neglect cases* reflected the judgment of the court that the parents' deficiencies in child care were beyond those found acceptable by community and professional standards at the time. They represented extreme failure to provide adequate food, clothing, shelter, and medical attention.

**Subgroups created for the study.** A case was identified as involving sexual abuse if there was evidence in the records that the charge had been substantiated. Of these cases, most involved sexual abuse only, but some involved physical abuse and/or neglect in addition. Because exposure to these different types of abuse may have different consequences, distinctions were made. Cases involving only sexual abuse are referrenced as *Sexual Abuse Only.* The others are referred to as *Sexual Abuse Plus* (sexual abuse plus physical abuse or neglect). (table 1.)

**The sources of information for delinquency and crime.** Finding out whether the subjects had become delinquent and/or committed crime as adults required identifying accurate sources of information about these types of behavior. The researcher decided to use official arrest records as the source, for a number of reasons. They are relatively easy to locate and contain reasonably complete information. The source of information about delinquent juveniles was the files of the juvenile probation department.

## Criminal consequences

In general, people who experience *any* type of maltreatment during childhood—whether sexual abuse, physical abuse, or neglect—are more likely than people who were not maltreated to be arrested later in life. This is true for juvenile as well as adult arrests. As the figures in table 2 indicate, 26 percent of the people who were abused and/or neglected were later arrested as juveniles, compared with only 16.8 percent of the people who were not. The figures for adults also indicate a greater likelihood of arrest among people who were maltreated during childhood.

For certain specific offenses, the likelihood of arrest is also greater among people who were abused and/or neglected. (These figures are not presented in tabular format.) For example, 14.3 percent of the people who were abused or neglected as children were later charged with property crimes as juveniles, while this was true for only 8.5 percent of the controls. A similar difference in the rate of property crime arrests was found among adults. Childhood abuse and neglect were also associated with later arrest for drug-related offenses. More than 8 percent

of the individuals abused or neglected as children were arrested for these offenses as adults, compared to only 5.2 percent of the control group.

**Sexual abuse.** All types of abuse and neglect in childhood put people at greater risk for arrest later in life. But an important finding of this study is that, in cases of sexual abuse, the risk is no greater than for other types of maltreatment. (See table 2.) In other words, the victims of sexual abuse are no more likely than other victims to become involved with crime.

A breakdown of the types of offenses reveals one exception. People who were victimized during childhood by either physical abuse or neglect *in addition to* sexual abuse (the Sexual Abuse Plus group) were more likely than those subjected to other types of maltreatment (and also more likely than the controls) to be arrested as runaways during their juvenile years.

## Likelihood of arrest for sex crimes

Could it be that additional breakdowns of types of offenses would reveal greater risk for individuals who were sexually abused in childhood? Previ-

### Table 1: *Types of Child Victimization Cases*

| Type | Number of Cases |
|------|-----------------|
| Physical Abuse and Neglect | 70 |
| Physical Abuse Only | 76 |
| Neglect Only | 609 |
| Sexual Abuse Only | 125 |
| Sexual Abuse Plus (Sexual abuse with physical abuse and/or neglect) | 28 |
| Total | 908 |

R e s e a r c h   i n   B r i e f

**Table 2: *Likelihood of Arrest Depending on Type of Abuse Experienced***

| Type of Abuse Subjects | Number of Arrests | Any Juvenile Arrest % | Any Adult Arrest % |
|---|---|---|---|
| *All Cases of Abuse and Neglect* | 908 | 26.0*** | 28.6*** |
| Any Sexual Abuse | 153 | 22.2 | 20.3 |
| Any Physical Abuse | 146 | 19.9 | 27.4 |
| Any Neglect | 609 | 28.4 | 30.7 |
| *Control Group* | 667 | 16.8 | 21.0 |

Note: the asterisks indicate instances in which the differences between all cases of abuse/neglect and the control groups were statistically significant.

***p<.001 (The probability is less than 1 in 1,000 that the occurrence could have happened by chance.)

ous research indicating that these people are more likely to be arrested for sex crimes suggests this might be the case.

**Sex crimes in general.** Arrest records revealed that, compared to children who had not been victimized, those who had been were more likely to be arrested for sex crimes. Thus, experiencing any type of abuse/neglect in childhood increases the risk for sex crimes. Children who were sexually abused were about as likely as neglect victims to be arrested for any sex crime and less likely than victims of physical abuse. (See table 3.)

Calculating the *odds* that abused and neglected children will subsequently be arrested for sex crimes as adults confirmed the statistics on likelihood of arrest. For abused and neglected children in general, the odds of being arrested as adults for a sex crime were higher than for nonvictims. Among sexually abused children, the odds were 4.7 times higher. Among physically abused children, the odds of arrest as adults for a sex crime were only a bit less—more than four times higher than for the controls. Neglected children were also at in-

creased risk of subsequent arrest for a sex crime (2.2 times the rate for the controls). (See table 3.)

**Specific sex crimes.** The study also looked at various types of sex crimes, and the breakdown revealed more complexity. The differences among the groups in arrest for one particular sex crime, prostitution, were significant. Arrests for this crime were rare, but child sex abuse victims were more likely to be charged with it than were victims of physical abuse and neglect. (Table 4.) The same is true for the odds. Among children who were sexually abused, the odds are 27.7 times higher than for the control group of being arrested for prostitution as an adult.[7] For rape or sodomy, childhood victims of physical abuse were found to be at higher risk of arrest than either other victims or the controls, and the odds of arrest for these crimes were 7.6 times higher than for the controls.

**From sexual abuse to running away to prostitution—Is the path inevitable?** It may seem logical to assume that children who are sexually abused follow a direct path from being victimized to becoming a runaway as

an adolescent, and then becoming a prostitute as an adult. The findings of the current research support the first part of this relationship; 5.8 percent of abused and neglected children became runaways, compared with only 2.4 percent of the controls.

As noted earlier, the researcher found that sexually abused children were more likely than other victims to be arrested for prostitution as adults, and the odds were higher that a sexually abused child would be charged with prostitution as an adult (table 4). But are juvenile runaways subsequently charged with prostitution? The researcher looked at all runaways in the sample studied, both the victimized groups and the control group. When some of these runaways became adults, they were charged with sex crimes. None of the runaways were arrested for prostitution, however.

Thus, the findings do not support the notion of a direct causal link between childhood victimization, becoming a runaway, and in turn being arrested for prostitution. Some adults were found to be arrested for prostitution, but they were not the runaways in this sample.

## Understanding the aftermath of childhood sexual abuse

All types of childhood abuse and neglect put the victims at higher risk for criminal behavior. However, the particular type of victimization suffered by children who are sexually abused does not set them apart. It does not put them at an even higher risk of arrest, for they are no more likely than children who are physically abused or neglected to be charged with a crime later in life.

### R e s e a r c h   i n   B r i e f

---

**Table 3: Likelihood and Odds of Being Arrested for Any Sex Crime[a]**

| Type of Childhood Victimization | Number of Subjects | Likelihood[b] % | Odds[c] |
|---|---|---|---|
| Any Sexual Abuse | 153 | 3.9 | 4.7 |
| Any Physical Abuse | 146 | 6.2 | 4.1 |
| Any Neglect | 609 | 3.6 | 2.2 |
| Control Group | 667 | 1.6 | — |

[a]Sex crimes include prostitution, incest, child molestation, rape, sodomy, assault and battery with intent to gratify, peeping, public indecency, criminal deviant conduct, and contributing to the delinquency of a minor.

[b]p<.02

[c]The numbers are odds ratios. They depict the odds that a person who has experienced a certain type of childhood abuse or neglect will commit a sex crime. Thus, for example, the odds that a childhood sexual abuse victim will be arrested as an adult for any sex crime is 4.7 times higher than for people in the control group, who experienced no victimization as children. (In calculating these odds, sex, age, and race were taken into account.)

---

The same is true for sex crimes. People victimized by sexual abuse as children are also significantly more likely than nonvictims to be arrested for a sex crime, although no more so than victims of physical abuse and neglect.

This similarity among all three groups of maltreatment victims suggests that for sexual abuse victims, the criminal effect later in life may result not from the specifically sexual nature of the incident but rather from the trauma and stress of these early childhood experiences or society's response to them.

**For prostitution, the likelihood is greater.** For prostitution, findings were consistent with those of previous studies: childhood sexual abuse victims run a greater risk than other maltreatment victims of being arrested for prostitution. The percentage of sexual abuse victims arrested for this offense was low, however (3.3 percent).

**From runaway to prostitute?** As noted earlier, while the findings support the existence of a link between

sexual abuse in childhood and becoming a runaway as a juvenile, they do not support a subsequent link to adult prostitution. That is, being arrested as an adolescent runaway does not predispose people who were sexually abused as children to be arrested for prostitution as adults.

The current research is limited because of its exclusive reliance on official criminal histories. Certainly, such records underestimate the number of runaways, since many of them may be brought to the attention of social service agencies without being arrested. For this reason, other types of data should be examined. However, the fact that none of the runaways identified in this study were arrested for prostitution (while other individuals were) suggests that the connection is at least not as strong as would have been previously thought.

**Other sex crimes.** Childhood sexual abuse victims were not at greater risk later in life of arrest for rape or sodomy. Rather, the findings reveal an

association between these crimes and childhood physical abuse, not sexual abuse. Males who were physically abused in childhood showed a greater tendency than other abused and neglected children and the controls to be arrested for these types of sex crimes. This is consistent with earlier findings regarding the "cycle of violence," which indicated that physical abuse in childhood is associated with the highest rates of arrest for violence later in life.[5] Thus, the violent aspect of rape rather than its sexual component or sexual motivation may explain the association. Indeed, practitioners and clinicians who work with these victims commonly refer to rape as a crime of violence, not simply a sex crime.

### Patterns of offending

Tentative evidence is offered here to support the notion that when sexual abuse is differentiated by type, the subsequent patterns of juvenile and adult offending are also different. The *Sexual Abuse Plus* group tended to be at greater risk for running away, particularly compared to the other abuse and neglect groups and the controls. Other analysis showed this group more often victimized by family members or relatives in their own homes than the *Sexual Abuse Only* group. If one's home is abusive in multiple ways, it is not surprising that the victims would resort to running away as an escape.

These tentative differences suggest that studies of the long-term consequences of childhood sexual abuse might find it worthwhile to disaggregate sexual abuse experiences into groups consisting exclusively of sexual abuse and groups consisting of sexual abuse in conjunction with other childhood victimization. Future research might examine the question of whether

**Research in Brief**

the effect of multiple forms of abuse is additive.

## Criminal behavior is not the inevitable outcome

The link between early childhood sexual abuse and later delinquent and adult criminal behavior is not inevitable. Although it is clear that individuals who were sexually abused in childhood are at increased risk of arrest as juveniles and adults, many do not become delinquents or adult criminals. In fact **the majority of the sexually abused children in this study do not have an official criminal history as adults.** Long-term consequences of childhood sexual abuse may be manifest across a number of domains of psychological distress and dysfunction, but not necessarily in criminal behavior. Delinquency and criminality represent only one possible type of outcome of childhood sexual abuse. A number of researchers have described depression, anxiety, self-destructive behavior, and low self-esteem among adults who were sexually abused in childhood. Further research with these samples is underway to document the long-term effects of childhood victimization in a broad array of outcomes. (See "Preview of Work in Progress.")

## Implications for policy

In planning and implementing treatment and prevention programs for children who are sexually abused, practitioners need to keep in mind that these children are in no sense destined for later involvement in criminal behavior. Like other victims of abuse and neglect, the majority will manifest no such negative outcome, at least as evidenced by official records of arrest. However, interventions need to be grounded in the knowledge that childhood victims of sexual abuse, as well as other types of abuse and neglect, are at increased risk for criminal involvement compared to nonvictims.

The need to avoid projecting criminal outcomes for sexually abused children has to be balanced by awareness of the particular risks they face. For example, interventions for sexually abused children should be informed by knowing that the likelihood of becoming a juvenile runaway is not only greater than among nonvictims, but also greater than for other types of childhood maltreatment victims. In developing interventions, it is also important to consider the higher risk for later prostitution that sexual abuse victims face. The health threat posed,

not only with respect to the more conventional sexually transmitted diseases, but particularly to HIV infection, makes the need for prevention interventions directed at childhood sexual abuse even more urgent.

*According to this study, child victims arrested as runaways are not arrested for prostitution as adults.*

As the example of prostitution makes clear, outcomes later in life may differ with the type of victimization experienced in childhood. This makes it evident that not all types of childhood maltreatment are alike and makes it incumbent on practitioners to craft responses that meet particular needs. While practitioners need to be aware that sexually abused children are at greater risk of becoming juvenile runaways, they also need to temper that awareness with the knowledge that these runaways are not necessarily "tracked" into prostitution as adults.

Information from the interview phase of the study is likely to bring further nuances to light. If running away does not necessarily lead to prostitution, it may nonetheless place the victim at risk in ways that are not documented in the arrest record.

The interviews may also shed light on intervening factors that mediate between the experience of victimization in childhood and behavioral outcomes in adulthood. Again, prostitution is an example. Since prostitutes have

Table 4: **Likelihood and Odds of Being Arrested for a Specific Sex Crime**

| Type of Childhood Victimization | Number of Subjects | Prostitution | | Rape or Sodomy | |
|---|---|---|---|---|---|
| | | Likelihood[b] % | Odds[b] | Likelihood % | Odds[b] |
| Any Sexual Abuse | 153 | 3.3 | 27.7 | 0.7 | c |
| Any Physical Abuse | 146 | 0.7 | c | 2.1 | 7.6 |
| Any Neglect | 609 | 1.5 | 10.2 | 1.1 | c |
| Control Group | 667 | 0.1 | — | 0.4 | — |

[a]p<.003

[b]See Note C on table 3.

[c]Not statistically significant. All other findings on odds were significant at the p<.05 level.

**R e s e a r c h   i n   B r i e f**

diverse backgrounds, it is unlikely that any single factor (for example, childhood victimization) explains their entrance into this type of life. While early sexual abuse places a child at increased risk, many other factors play a role, and these factors may emerge in the interviews. If such factors are identified, they would necessarily affect the way practitioners intervene for child victims.

## Future directions

Researchers have recently begun to acknowledge that studies of the impact of childhood abuse (including sexual abuse) find substantially large groups of individuals who appear to have experienced little or no long-term negative consequences. There are a number of possible explanations, among them inadequate measurement techniques on the part of the researchers. It is also possible that some factors or characteristics of the abuse incident (less severity, for example), or some characteristics of the child (having effective coping skills, for example) or the child's environment

(having a close relationship with a supportive person, for example) may have served as a buffer from the long-term consequences. Protective factors in the lives of abused and neglected children need to be uncovered.

Future studies need to examine cases in which children appear to have overcome, or been protected from, the negative consequences of their early childhood experiences with abuse. The knowledge from such studies would have important implications for developing prevention and treatment programs for children who experience early childhood victimization. These "protective factors" are being explored as part of the study now being conducted by the present researcher.

## Notes

1. A summary of this research is in Widom, Cathy Spatz, *The Cycle of Violence,* Research in Brief, Washington, D.C.: U.S. Department of Justice, National Institute of Justice, October 1992. The document can be obtained from the National Criminal Justice Reference Service, Box 6000, Rockville, MD 20849–6000; call 800–851–3420 or order through the Internet at looknejrs@aspensys.com.

2. A fuller presentation is in Widom, C. S., and Ames, M. A., "Criminal Consequences of Childhood

Sexual Victimization," *Child Abuse and Neglect,* 18 (1994):303–318.

3. Browne, A., and Finkelhor, D., "Impact of Sexual Abuse: A Review of the Research," *Psychological Bulletin,* 99 (1986):66–77.

4. Beitchman, J. H., et al., "A Review of the Long-Term Effects of Child Sexual Abuse." *Child Abuse and Neglect,* 16 (1992):101–118.

5. A full description of the research design is in Widom, Cathy Spatz. "Child Abuse, Neglect, and Adult Behavior: Research Design and Findings on Criminality, Violence, and Child Abuse." *American Journal of Orthopsychiatry,* 59 (1989):355–67.

6. Of the 153 cases of sexual abuse, 40 were processed in juvenile court and 113 in adult criminal court.

7. In calculating the odds, the researcher controlled for the person's sex, race, and age, as these factors may affect the likelihood of being arrested for a crime.

8. See Widom, *Cycle of Violence:* 3.

Cathy Spatz Widom, Ph.D., is professor of criminal justice and psychology at the State University of New York at Albany.

Findings and conclusions of the research reported here are those of the authors and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

*The National Institute of Justice is a component of the Office of Justice Programs, which also includes the Bureau of Justice Assistance, Bureau of Justice Statistics, Office of Juvenile Justice and Delinquency Prevention, and the Office for Victims of Crime.*

**NCJ 151525**

---

**U.S. Department of Justice**
Office of Justice Programs
*National Institute of Justice*

*Washington, D.C. 20531*

---

Official Business
Penalty for Private Use $300

BULK RATE
POSTAGE & FEES PAID
DOJ/NIJ
Permit No. G–91

E



**United States General Accounting Office**

# GAO

Report to the Chairman, Subcommittee on Crime, Committee on the Judiciary, House of Representatives

September 1996

# CYCLE OF SEXUAL ABUSE

## Research Inconclusive About Whether Child Victims Become Adult Abusers





GAO/GGD-96-178



GAO

United States
General Accounting Office
Washington, D.C. 20548

General Government Division

B-272972

September 13, 1996

The Honorable Bill McCollum
Chairman, Subcommittee on Crime
Committee on the Judiciary
House of Representatives

Dear Mr. Chairman:

This is our third and final report responding to your request that we review and synthesize the current state of research knowledge on ways to prevent sex crimes against children. Our first report, issued on June 21, 1996, summarized reviews of the research literature on the effectiveness of treatment programs in reducing the recidivism of sex offenders.[1] Our second report, issued on July 26, 1996, summarized reviews of the research literature on the effectiveness of education programs designed to help children avoid becoming victims of sexual abuse.[2] This report summarizes the results of, and discusses the methodologies used in, the studies that have been done on the cycle of sexual abuse—that is, on the likelihood that individuals who were victims of sexual abuse as children will become sexual abusers of children in adulthood.

This report does not address a follow-on question that you raised concerning ways to prevent sexually abused children from becoming adult sexual offenders against children, because the existence of a cycle of sexual abuse was not established by the research studies we reviewed.

## Background

Sexual abuse can have negative consequences for children during the time of abuse as well as later in life, according to several recent research reviews.[3] Initial effects reportedly have included fear, anxiety, depression, anger, aggression, and sexually inappropriate behavior in at least some portion of the victim population. Long-lasting consequences reportedly have included depression, self-destructive behavior, anxiety, feelings of isolation and stigma, poor self-esteem, difficulty in trusting others, a

---

[1]Sex Offender Treatment: Research Results Inconclusive About What Works to Reduce Recidivism (GAO/GGD-96-137, June 21, 1996).

[2]Preventing Child Sexual Abuse: Research Inconclusive About Effectiveness of Child Education Programs (GAO/GGD-96-156, July 26, 1996).

[3]See J. H. Beitchman et al., "A Review of the Long-Term Effects of Child Sexual Abuse," Child Abuse and Neglect, Vol. XVI (1992), pp. 101-118; A. Browne and D. Finkelhor, "Impact of Child Sexual Abuse: A Review of the Research," Psychological Bulletin, Vol. XCIX, No. 1 (1986), pp. 66-77; and D. Finkelhor, "Early and Long-Term Effects of Child Sexual Abuse: An Update," Professional Psychology: Research and Practice, Vol XXI, No. 5 (1990), pp. 325-330.

B-272972

tendency toward revictimization, substance abuse, and sexual maladjustment.

In addition, researchers have noted that there is widespread belief that there is a "cycle of sexual abuse," such that sexual victimization as a child may contribute to perpetration of sexual abuse as an adult. Such a pattern is consistent with social learning theories—which posit that children learn those behaviors that are modeled for them—and also with psychodynamic theories—which suggest that abusing others may help victimized individuals to overcome childhood trauma. Critics have argued that empirical support for the cycle of sexual abuse is weak, and that parents are unduly frightened into thinking that little can be done to mitigate the long-term effects of sexual abuse. There remain many unanswered questions about the risk posed by early sexual victimization, as well as about the conditions and experiences that might increase this risk (such as number of victimization experiences, age of the victim at the time of the abuse, and whether the abuse was perpetrated by a family member). There are also questions about factors that may prevent victimized children from becoming adult perpetrators (such as support from siblings and parents or positive relationships with other authority figures). Answers to such questions would be useful in developing both prevention strategies and therapeutic interventions.

Studying the relationship between early sexual victimization and later perpetration of sexual abuse is methodologically difficult. If researchers take a retrospective approach, and ask adult sex offenders whether they experienced childhood sexual abuse, there are problems of selecting a representative sample of offenders, finding an appropriate comparison group of adults who have not committed sex offenses but are similar to the study group in other respects, minimizing errors that arise when recalling traumatic events from the distant past, and dealing with the possibility that offenders will purposely overreport childhood abuse to gain sympathy or underreport abuse to avoid imputations of guilt. A prospective approach—selecting a sample of children who have been sexually abused and following them into adulthood to see whether they become sexual abusers—overcomes some of the problems of the retrospective approach, but it is a costly and time-consuming solution. In addition, researchers choosing the prospective approach still face the challenge of disentangling the effects of sexual abuse from the effects of other possible problems and stress-related factors in the backgrounds of these children (e.g., poverty, unemployment, parental alcohol abuse, or other inadequate social and family functioning). This requires the selection

B-272972

of appropriate comparison groups of children who have not been sexually abused and children who have faced other forms of maltreatment, as well as the careful measurement of a variety of other explanatory factors.

## Results in Brief

We identified 25 studies that provided quantitative information relevant to the question of whether persons who were sexually abused as children were at heightened risk of becoming sexual abusers of children in adulthood. Of these studies, 23 were retrospective—that is, they began with a sample of known adult sex offenders of children and sought to determine whether they were sexually abused themselves during childhood. Only two studies were prospective. These began with samples of sexually victimized children and tracked them into adulthood to determine how many became sex offenders.

A number of the retrospective studies found that a substantial percentage of adult sex offenders of children said they had been sexually abused as children. However, a majority of the studies found that most offenders said they had not been sexually abused during childhood. These studies varied in terms of their estimates of the percentages of such offenders who had been abused, from zero to 79 percent, partly because of differences in the types of offenders studied and in how childhood sexual abuse was defined and measured. In general, because they had several methodological shortcomings, these studies offered insufficient evidence that being sexually abused as a child led directly to the victim's becoming an adult sex offender. The two prospective studies employed analytic methods that were better suited to establishing such a link than were the retrospective studies. Respectively, about 7 percent and 26 percent of sexually abused children in these studies were found to be sex offenders as adults. However, the various design and measurement problems of the prospective studies precluded the drawing of definitive conclusions from them as well.

Nevertheless, overall, the retrospective studies, prospective studies, and research reviews indicated that the experience of childhood sexual victimization is quite likely neither a necessary nor a sufficient cause of adult sexual offending. The two prospective studies concluded that the majority of victims of sexual abuse during childhood did not become sex offenders as adults. Therefore, childhood sexual victimization would not necessarily lead to adult sexual offending. In addition, the majority of retrospective studies concluded that most adult sex offenders against children did not report that they were sexually victimized as children.

B-272972

Therefore, childhood sexual victimization would probably not be sufficient to explain adult sexual offending. While some studies indicated that sexual victimization in childhood may increase the risk that victims will become sexual offenders as adults, other studies found that many other conditions and experiences might also be associated with an increased risk. For example, one prospective study we reviewed found that children who were neglected were even more likely than children who were sexually abused to commit sex offenses as adults.

## Scope and Methodology

We collected, reviewed, and analyzed information from available published and unpublished research on the cycle of sexual abuse. Identifying the relevant literature involved a multistep process. Initially, we identified experts in the sex offense research field by contacting the Department of Justice's Office of Juvenile Justice and Delinquency Prevention and Office of Victim Assistance, the National Institute of Mental Health's Violence and Traumatic Stress Branch, the American Psychological Association, and academicians selected because of their expertise in the area. These contacts helped identify experts in the field, who in turn helped identify other experts. We also conducted computerized searches of several on-line databases, including ERIC (the Education Resources Information Center), NCJRS (the National Criminal Justice Reference Service), PsycINFO,[1] Dissertation Abstracts, and the National Clearinghouse on Child Abuse.

We identified 40 articles on the cycle of sexual abuse issued between 1965 and 1996. Four of these reviewed the literature in the area; of these, two were published in 1988, one was published in 1990, and one was published in 1991. Of the remaining articles, 23 presented findings from retrospective research studies, which began with a sample of known adult sex offenders of children and sought to determine (by asking the offenders) whether they were sexually abused during childhood. Another four presented findings from two prospective research studies, which began with samples of sexually victimized children and tracked them into adulthood to determine how many became sex offenders. Of the original 40 articles, we excluded 5 because they presented findings only, or primarily, on adolescent sex offenders against children, and an additional 4 because we were unable to obtain them.

---

[1]A database of the American Psychological Association covering the literature in psychology and the behavioral sciences.

B-272972

For the studies in our review, we recorded the quantitative results, summarized the methodologies used, and summarized the authors' conclusions about the cycle of sexual abuse. Each study was reviewed by two social scientists with specialized doctoral training in evaluation research methodology. Conclusions in this report are based on our assessment of the evidence presented in these studies.

We sent the list of research articles to two experts, both of whom have done extensive research in the field, to confirm the comprehensiveness of our list of articles. In addition, as a final check, we conducted a second search of computerized on-line databases in March 1996 to ensure that no new research articles or reviews had been published since our original search in October 1995.

We sent a draft copy of our report for comment to the two experts previously consulted, as well as to one additional expert, to ensure that we had presented the information about the research studies accurately.[5] Their technical comments were incorporated where appropriate. We did not send a draft to any agency or organization because we did not obtain information from such organizations for use in this study. We did our work between October 1995 and August 1996 in accordance with generally accepted government auditing standards.

## Results Inconclusive About the Relationship Between Childhood Sexual Victimization and Adult Sexual Offending Against Children

There was no consensus among the studies we reviewed that being sexually abused as a child led directly to the victim's becoming an adult sexual abuser of children. However, some studies did conclude that it might increase the risk that victims would commit sexual abuse later. A majority of the retrospective studies noted that most sex offenders had not been sexually abused as children, and the two prospective studies showed that the majority of victims of sexual abuse during childhood did not become sex offenders as adults. The 4 review articles we obtained, which collectively covered roughly two-thirds of the 25 studies we reviewed, concluded that the evidence from these studies was insufficient to establish that being sexually abused as a child is either a necessary or a sufficient condition for the victim's becoming a sexual abuser as an adult.

---

[5]The two experts who reviewed the comprehensiveness of our list of articles were Dr. R. Karl Hanson, Senior Research Officer in Corrections Research at the Department of the Solicitor General of Canada, and Dr. Cathy Spatz Widom, Professor of Criminal Justice and Psychology at the State University of New York at Albany. The third expert consulted was Dr. Robert A. Prentky, Director of Clinical and Forensic Services at the Joseph J. Peters Institute in Philadelphia.

B-272972

## Retrospective Studies Varied in Groups Studied, Definitions of Sexual Abuse Used, and Results Obtained

We reviewed 23 retrospective studies. Appendix I provides additional information on these studies.[6] All but one of the retrospective studies focused on adult male sex offenders, and in most studies the offenders sampled were imprisoned or in some type of treatment program. However, these studies varied considerably in the types of child sexual abusers studied, whether control or comparison groups were used, and if so, the types of individuals in these groups.[7]

The retrospective studies also varied considerably in their findings and conclusions. The percent of adult sex offenders against children identified as being sexually abused as children themselves ranged from zero to 79 percent. This variation partially reflects differences across studies in how childhood sexual abuse was defined, as well as other differences in study methodology.[8] This variation may also reflect the differences in the types of child sex offenders studied. For example, both Hanson and Slater (1988) and Garland and Dougher (1988) concluded from their reviews of retrospective studies that offenders who selected male children as victims were more likely to have been sexually abused themselves than were offenders against female children.

A few of the studies found that sex offenders of children were more likely to have been sexually abused as children than were members of control groups composed of noninstitutionalized nonoffenders. However, many studies found that, when compared with other types of sex offenders (e.g., rapists or exhibitionists) and other types of nonsexual offenders (i.e., men incarcerated for nonsexual crimes), adult sex offenders of children were not necessarily more likely to have been sexually abused as children.

---

[6]R. K. Hanson and S. Slater (1988) and R. K. Hanson (1991) reviewed 14 of the 23 retrospective studies covered in this report, and 5 others. R. J. Garland and M. J. Dougher (1988) reviewed 7 of these 23 studies, and 2 others. L. M. Williams and D. Finkelhor (1990) reviewed 3 of these 23 studies, and 3 others. (See bibliography for full citations.)

[7]Some studies looked at child sex offenders defined quite broadly, while others looked at specific types of offenders (e.g., incestuous fathers, homosexual pedophiles, or heterosexual pedophiles). Some studies did not use control or comparison groups. Others compared sex offenders to men incarcerated or in treatment for nonsexual offenses, to men clinically depressed, to college students who dated minimally, or to law enforcement officers, among others. Seven of the 23 studies compared sex offenders to a control group of noninstitutionalized men drawn from the general population.

[8]Some studies simply asked study group members whether they had been sexually abused as children, and left it to the individuals themselves to determine what constituted sexual abuse. Other studies asked study group members whether they had been involved sexually as children, or before age 13 or age 16, with a person 5 or more years older than themselves. Studies involving incest offenders sometimes asked offenders whether they had been involved in incestuous relationships as children. However, these relationships may not have involved older adults or may not have been coercive in nature. Further, sexual abuse victimization experiences were not always limited to acts involving physical contact. For example, in one study, childhood sexual victimization included being solicited by adult males or females through words, gestures, or some other sexual approach.

GAO/GGD-96-178 Cycle of Sexual Abuse Research Results

B-272972

According to several researchers, the relationship between childhood sexual victimization and adult perpetration of sexual offenses against children is complex and requires measurement and analysis of a host of factors. For example, it has been postulated that adult sexual offending is not simply a result of the experience of childhood sexual victimization, but also of other factors such as age at onset of the abuse, nature of the abuse, stability of the caregiver, and/or physical abuse.[9] Studies that collect data on such additional factors may add to our understanding of what types of sexual abuse, perpetrated under what conditions against what types of child victims, are associated with what types of adult sexual offending against what types of victims under what types of conditions. However, while such retrospective studies can help explore factors possibly related to adult sexual offending, they cannot establish the importance of these factors in predicting adult sexual offending. The reason for this is discussed in the following section.

## Retrospective Studies Had Several Shortcomings

The retrospective studies we reviewed had several shortcomings that precluded our drawing any firm conclusions about whether there is a cycle of sexual abuse. First, the studies focused on known sex offenders of children (i.e., offenders who have been detected, arrested, or convicted, or who had been referred or had presented themselves for treatment), and these offenders may not be typical or representative of all sex offenders against children. Second, self-reports of childhood sexual abuse obtained from known sex offenders are of questionable validity. Known offenders may be motivated to overreport histories of abuse to gain sympathy or to excuse their own offenses.[10] Third, where comparison or control groups were used, attempts to match group members to sex offenders of children on factors possibly related to being sexually abused or abusive were

---

[9]See, for example, R. A. Prentky and R. A. Knight, "Age of Onset of Sexual Assault: Criminal and Life History Correlates," in Sexual Aggression: Issues in Etiology, Assessment, and Treatment, eds. G. C. N. Hall, R. Hirschman, J. R. Graham, and M. S. Zaragoza (Washington, D.C.: Taylor and Francis, 1993), pp. 43-62; and R. A. Prentky et al., "Developmental Antecedents of Sexual Aggression," Development and Psychopathology, Vol. I (1989), pp. 153-169.

[10]One research study suggested that some sex offenders may claim to have been victims of child sexual abuse when they were not. See: Jan Hindman, "Research Disputes and Assumptions about Child Molesters," National District Attorney Association Bulletin, Vol. VII, No. 4 (1988), pp. 1-3. Hindman studied convicted adult child molesters treated at an Oregon clinic between 1980 and 1988. Offenders were required to write a detailed sexual history, including information on whether they were abused as children. Since 1982, offenders have also been told that they will be subject to polygraph testing, that their written autobiography must conform with the polygraph test, and that they will be sent back to jail if they do not pass the test. A higher percentage of offenders who wrote their sexual histories before the polygraph requirement was instituted in 1982 claimed that they had been sexually victimized as children (67 percent) than of those who were told that their sexual histories would have to conform with the polygraph test (29 percent).

B-272972

typically limited; few of the studies attempted to control for such factors statistically.

Finally, one of the major shortcomings of these retrospective studies is that they cannot reveal how likely it is that a person who has been sexually abused as a child will become a sexual abuser in adulthood. For example, even if 100 percent of sexual abusers of children were sexually abused as children, this would not necessarily mean that sexual abuse causes abused children to become abusers themselves. It may be that only a small percentage of sexually abused children become sex offenders against children. Determining how likely victims of childhood sexual abuse are to become adult sex offenders requires that a sample of sexually abused children be followed forward in time, rather than the histories of sex offenders be traced backward.

## Prospective Studies Used Better Methodologies, but Results Were Inconclusive

Our review of the literature identified two research studies (described in four articles) that have used a prospective approach in examining the cycle of sexual abuse. One of these studies is part of a larger study of the cycle of violence.[11]

Widom is the primary researcher in the larger study, which is still ongoing. It involves a cohort of 908 substantiated cases of child abuse (physical and/or sexual) or neglect processed through the courts between 1967 and 1971.[12] These abuse/neglect cases were restricted to children who were 11 years of age or younger at the time of the abuse or neglect incident. They included 153 sexually abused children, 160 physically abused children, and

---

[11]On the cycle of sexual abuse, see C. S. Widom and M. A. Ames, 1994; C. S. Widom, 1995; and C. S. Widom, 1996. On the cycle of violence generally, see M. G. Maxfield and Cathy Spatz Widom, "The Cycle of Violence: Revisited Six Years Later," Archives of Pediatrics and Adolescent Medicine (April, 1996); Cathy Spatz Widom, The Cycle of Violence: Research in Brief (Washington, D.C.: U.S. Department of Justice, National Institute of Justice, October 1992); Cathy Spatz Widom, "Child Abuse, Neglect, and Adult Behavior: Research Design and Findings on Criminality, Violence, and Child Abuse," American Journal of Orthopsychiatry, Vol. LIX (1989), pp. 355-367; Cathy Spatz Widom, "The Cycle of Violence," Science, Vol. CCXLIV (1989), pp. 160-166; and Cathy Spatz Widom, "Does Violence Beget Violence?: A Critical Examination of the Literature," Psychological Bulletin, Vol. CVI (1989), pp. 3-28.

[12]The study has relied on the official records of agencies that handled these cases. Detailed information about the abuse and/or neglect incident and family composition and characteristics was obtained from the files of the juvenile court and probation department, the authority responsible for cases of abused, neglected, or dependent and delinquent children. The records of the sexual abuse cases were obtained from the juvenile court and from the adult criminal court of a metropolitan area in the Midwest. If there was evidence in the records that the charges of sexual abuse had been investigated and found to be true, the case was coded as involving sexual abuse.

B-272972

697 neglected children.[13] This prospective study also includes a control group of 667 individuals who had no record of abuse or neglect and who were either born in the same hospitals or attended the same elementary schools as the abused children. The control and study group members were matched on sex, age, race, and approximate family socioeconomic status.

Local, state, and federal official arrest records containing information recorded up to June 1994 were used to determine how many of the study and control group members were arrested for sex offenses. Table 1 shows results pertaining to sex offenses from the most recent analyses based on this larger study.[14] The study did not distinguish whether the sex offense was perpetrated against a child or an adult.[15]

**Table 1: Results From the Research of Widom and Colleagues on the Cycle of Sexual Abuse**

| Adult arrests | Sexually abused (N = 153) | | Physically abused (N = 160) | | Neglected (N = 697) | | Controls (N = 667) | |
|---|---|---|---|---|---|---|---|---|
| | Odds ratio[a] | Percent | Odds ratio[a] | Percent | Odds ratio[a] | Percent | Odds ratio[a] | Percent |
| Any sex crime[b] | 1.4 | 6.5% | 1.4 | 11.0% | 2.1 | 13.1% | Not applicable | 6.0% |
| Prostitution | 3.7* | 3.9% | 0.9 | 1.4% | 5.0* | 3.6% | Not applicable | 0.6% |
| Rape or sodomy[c] | 1.9 | 4.2% | 2.4 | 4.7% | 1.8 | 3.6% | Not applicable | 2.1% |

Note 1: When criminal history checks were conducted in 1994, fewer than 1 percent of the individuals in the sample were under 25 years of age.

Note 2: An asterisk (*) denotes statistical significance.

[a]Odds ratios reflect the differences between groups in the odds or likelihood of becoming a sex offender. For example, an odds ratio of 1.4 indicates that sexually abused children are nearly 1-1/2 times as likely as children in the control group to become adult sex offenders. Odds ratios are based on logistic regression analysis, with all three types of abuse in the equation (comparisons are with controls). These equations also control for age, sex, and race.

[b]Sex crimes include prostitution, incest, child molestation, rape, sodomy, assault and battery with intent to gratify, peeping, public indecency, criminal deviant conduct, and contributing to the delinquency of a minor.

[c]Percentages and odds ratios are for males only.

Source: Data provided by C.S. Widom, 1996.

---

[13]Some individuals in each of these groups experienced more than one type of maltreatment. Thus, the numbers add up to more than 908 individuals.

[14]C. S. Widom, 1996; C. S. Widom, personal communication.

[15]To strengthen the study, Widom is extending data collection in a number of ways. Future analyses will include participant self-report data, which will allow corroboration of the results from official arrest data and potentially provide more precise information on the nature of the sex offenses committed (i.e., whether they involve child or minor victims, etc.).

B-272972

Compared to the control group, a higher percentage of those who had been sexually abused, physically abused, or neglected as children were arrested as adults for any sex crime, for prostitution, and (among males) for rape or sodomy. To determine how different the study groups were from the control group, Widom statistically controlled for such differences between the groups as age, race, and sex; calculated odds ratios; and performed statistical tests. The results indicated that the differences between the sexually abused group and the control group in the odds of arrest for any sex crime or for rape or sodomy separately were not statistically significant. Sexually abused children were significantly more likely to have been arrested for prostitution, however. Twenty-three to 27 years later, sexually abused children were nearly four times more likely to have been arrested for prostitution. On the other hand, members of the childhood neglect study group were significantly more likely than members of the control group to have been arrested for any sex crime or for prostitution.

Because it could allow researchers to discern the likelihood of victims becoming abusers, the prospective approach is methodologically superior to the retrospective approach. Widom's study, however, has several limitations. First, published work from the study has so far relied solely on official arrest data, which may fail to identify some offenders (those who avoid detection or arrest).[16] Second, the study groups of victimized children were identified by using records of substantiated cases of abuse or neglect that were processed through the state courts. Such cases may represent only the most severe instances of abuse and may not be generalizable to all children who have been abused or neglected.[17] Finally,

---

[16]We noted in footnote 15 that Widom is undertaking new analyses that will make use of self-report data on commission of sex offenses to supplement official arrest data.

[17]Abuse and/or neglect cases that are substantiated at the court level may not be representative of all cases because over half of child maltreatment reports are not substantiated by social services investigators, and the vast majority of cases substantiated by local or county departments of social services never reach the court level. (See J. Leiter, K. A. Myers, and M. Zingraff, "Substantiated and Unsubstantiated Cases of Child Maltreatment: Do Their Consequences Differ?" Social Work Research, Vol. XVIII, No. 2 (June 1994), pp. 67-82; and M. T. Zingraff et al., "Child Maltreatment and Youthful Problem Behavior," Criminology, Vol. XXXI, No. 2 (May 1993), pp. 173-202.) In addition, Widom states that the cases included in her study were processed before the child abuse reporting laws were passed, and many cases of sexual abuse were not reported. Some researchers have suggested using all substantiated reports of abuse and neglect (not just those that reach the court level), or including unsubstantiated reports, in research on the consequences of abuse and neglect. However, Widom has warned that using unsubstantiated reports might introduce bias because these reports leave open the question of whether abuse or neglect actually occurred and are likely to be biased toward the less serious end of the continuum. (See C.S. Widom, "Sampling Bias and Implications for Child Abuse Research," American Journal of Orthopsychiatry, Vol. LVIII (1988), pp. 260-270.) Furthermore, if prospective studies find little support for the cycle of sex abuse among the most severe cases—those that have been substantiated at the court level—it is not likely that strong support for such a relationship will be found using less severe cases.

the number of sexually abused males in the abused/neglected sample was small (a total of 24). Statistical comparisons based on small numbers of cases should be interpreted with caution, since small sample sizes may not yield reliable estimates.

We located one other study that used a prospective design and followed sexually victimized children into early adulthood. This study sampled 147 boys under the age of 14 who were seen in the emergency room of an urban hospital because of sexual abuse between 1971 and 1975.[18] The researchers also collected data on a comparison sample of boys of the same race and roughly the same age who were seen in the same emergency room at roughly the same time for reasons other than sexual abuse. In the period 1992 to 1994, official juvenile and adult arrest records for the entire victim and comparison sample were collected, and the researchers attempted to locate and interview as many of the men as possible.[19] Fifty of the 147 boys in the victim sample, and 56 of the 147 boys in the comparison sample, were interviewed. They were asked to self-report instances of sex-offending, and were also asked a number of other questions about their family of origin, sexual history, history of sexual victimization, psychological functioning, drug and alcohol use, and criminal behavior.[20]

As shown in table 2, the study found little difference between the victim and comparison samples in the percentages that were arrested for, or that self-reported, sex offenses. According to the researchers, one explanation for this finding is that the victim and comparison samples are not as different as originally intended with respect to their having been victims of child sexual abuse. For instance, in the comparison group, 40 percent of the 56 men interviewed reported that they had themselves been sexually abused. Furthermore, 55 percent of the men in the victim sample did not recall, or at least did not report to interviewers, that they had been sexually abused. When the researchers reanalyzed the data and compared all victims (from both the victim sample and the comparison sample) with

[18] L. M. Williams et al., 1995.

[19] The researchers checked official arrest records from the city's juvenile court, its adult probation department, and the National Criminal Information Center. Sex offenses included rape, involuntary deviate sexual intercourse, sexual assault, indecent assault, indecent exposure, and incest. It appears that arrest records were examined for all members of the victim and comparison sample. However, Williams et al. only present arrest information for sample members who were located and interviewed.

[20] In an effort to protect men who did not remember childhood abuse that had occurred or might not want others to know about it, the researchers did not reveal the fact of childhood victimization to men who did not bring it up on their own. Study group members were told that they had been selected for a follow-up study of men who received emergency room services in the hospital in the early 1970s.

B-272972

the remaining nonvictimized members of the comparison group, they did not find a significant difference between the two groups in the likelihood of becoming a sex offender. These findings must also be interpreted with caution, however, because no-difference findings are sometimes attributable to comparing small samples rather than to a real absence of difference between groups.

**Table 2: Results From the Research of Williams and Colleagues on the Cycle of Sexual Abuse**

| Outcome variable | "Official" victim sample (N = 50) | "Official" comparison sample (N = 56) | All sexual abuse victims (both samples) (N = 69) | Nonvictims in comparison sample (N = 33) |
|---|---|---|---|---|
| Arrested for sex offense[a] | 14% | 13% | 16% | 6% |
| Self-reported sex offense[b] | 14 | 14 | 13 | 15 |
| Any sex offense[c] | 26 | 20 | 24 | 18 |

[a]Includes any arrest for a sex offense as a juvenile or as an adult. Sex offenses included rape, involuntary deviate sexual intercourse, sexual assault, indecent assault, indecent exposure, and incest.

[b]Includes all individuals who self-reported having committed a sex offense, whether they were arrested for the offense or not. Study group members were asked to report on any initiation or occurrence of sexual contact with children under the age of 12 and any sexual contact with adolescents or adults when physical force, threats of force, or the coercion of adult or supervisory authority was used to achieve the sexual contact.

[c]Includes all individuals who were arrested for a sex offense and those who were not arrested but who self-reported sex offenses.

Source: L. M. Williams et al., 1995.

The generalizability of these findings may be limited since the sample of sexually abused boys (and the matched comparison group) is neither a random sample nor a sample that is representative of the general population of children at risk of such abuse. Over 80 percent of the boys sampled were African-American, and a disproportionate number of the men who were interviewed were from poor families and had criminal records. About one-third of the interviewed men who were sexually abused as boys, and about one-fifth of all of the men interviewed, were incarcerated at the time of interview.

The Williams et al. study is instructive in that it points to a number of difficulties involved in conducting prospective studies of the relationship between childhood victimization and adult offending. These difficulties include (1) the need to determine whether members of comparison groups

B-272972

were victims of sexual abuse, and (2) the need to employ more than a single outcome measure of offending. Of 15 men who self-reported any sex offense, only 5 had an arrest record for a sex offense; and of 14 men who had been arrested for a sex offense, only 5 self-reported a sex-offending behavior.

## Conclusions

A number of studies have been done on the cycle of sexual abuse, many of which were reviewed in this report. Most of the studies were retrospective in design; that is, they began with a sample of known sex offenders of children and sought to determine whether they were sexually abused during childhood. The chief limitation of the retrospective studies is that studying a known group of sexual offenders cannot provide any direct information about the extent to which children who are sexually abused become sexual offender as adults. The two studies we reviewed that were prospective in design attempted to overcome this limitation by identifying samples of sexually victimized children and tracking them into adulthood to determine how many became sex offenders. These studies also had limitations, which made it difficult to reach any definitive conclusions about the cycle of sexual abuse. However, in spite of their limitations, overall, the retrospective studies, prospective studies, and research reviews did indicate that the experience of childhood sexual victimization is quite likely neither a necessary nor a sufficient cause of adult sexual offending. Further research would be necessary to determine what kinds of experiences magnify the likelihood that sexually victimized children will become adult sexual offenders against children and, alternatively, what kinds of experiences help prevent victimized children from becoming adult sexual offenders against children.

We are sending copies of this report to the Ranking Minority Member of the House Subcommittee on Crime and the Chairman and Ranking Minority Member of the Senate Committee on the Judiciary. Copies will also be made available to others upon request.

B-272972

The major contributors to this report are listed in appendix II. Please call me at (202) 512-8777 if you have any questions about this report.

Sincerely yours,

Laurie E. Ekstrand
Associate Director, Administration
   of Justice Issues

GAO/GGD-96-178 Cycle of Sexual Abuse Research Results

# Contents

| | |
|---|---:|
| Letter | 1 |
| Appendix I<br>Retrospective Studies of Adult Sex Offenders of Children | 18 |
| Appendix II<br>Major Contributors to This Report | 30 |
| Research Articles Used in This Review | 31 |

| Tables | | |
|---|---|---:|
| | Table 1: Results From the Research of Widom and Colleagues on the Cycle of Sexual Abuse | 9 |
| | Table 2: Results From the Research of Williams and Colleagues on the Cycle of Sexual Abuse | 12 |

Appendix I

# Retrospective Studies of Adult Sex Offenders of Children

| Study | Study group(s)[a] | Percent abused[b] |
|---|---|---|
| Alford et al., 1988 | 50 imprisoned child sex offenders | 35% |
| | 14 child sex offenders admitted to a psychiatric hospital | 50 |
| Baker, 1985 | 20 incestuous fathers | 45 |
| Ballard et al., 1990[e] | 383 incest offenders classified into two institutional (a,b) and two community-based (c.d) settings: | 54 |
| | (a) 63 in prison | 65 |
| | (b) 41 in mental health facilities | 61 |
| | (c) 240 in Parents United[d] | 50 |
| | (d) 39 in private practice | 49 |
| Bard et al., 1987 | 68 child molesters | 57 |

**Appendix I**
**Retrospective Studies of Adult Sex**
**Offenders of Children**

| Comparison group(s)[c] | Percent abused[b] | Comments |
|---|---|---|
| None | Not applicable | This study reports the percentages of two groups of child sex offenders who reported, in clinical interviews, having been involved sexually, as a child, with a person 5 or more years older than themselves. The authors offer no definitive conclusions about whether being abused leads to becoming an abuser, but do note that the sex offenders commonly were victims, and that the abuse was commonly done by women. |
| 20 nonincestuous fathers | 5% | This study compares incestuous fathers recruited through Parents United,[d] and a group of nonincestuous fathers in therapy for reasons other than sexual abuse. The primary focus of the study involves whether incestuous fathers differ from nonincestuous fathers in terms of parental rejection, adult nurturance, and the perception of adult females as sexually threatening. As regards the history of abuse, incestuous fathers were found to be more likely than nonincestuous fathers to have been involved in incestuous relationships in their own childhoods, although in some cases the father initiated that relationship. No other information on history of abuse is offered. |
| None | Not applicable | This study looks at differences between incest offenders in institutional settings and community-based settings on a number of characteristics, and is primarily concerned with the levels of social skills in the different groups. Sizable percentages of all groups are shown to have been sexually abused as children, although no comparison group is employed and no general conclusions about the cycle of sexual abuse are offered. |
| 107 rapists | 23 | These results were offered as part of a larger study that examined differences between rapists and child molesters on a number of dimensions. Study and comparison samples were drawn from patients in the Massachusetts Treatment Center for Sexually Dangerous Persons. No firm conclusions were drawn about the cycle of sexual abuse. |

(continued)

**Appendix I**
**Retrospective Studies of Adult Sex**
**Offenders of Children**

| Study | Study group(s)[a] | Percent abused[b] |
|---|---|---|
| Bennett, 1985 | 34 incestuous fathers or father-surrogates | 38% |
| Condy et al., 1987 | 92 convicted child molesters | 37 |
| Dhawan and Marshall, 1996 | 16 incarcerated child molesters | 50 |
| Dutton and Hart, 1992 | Incarcerated men grouped as follows: | |
| | (a) 107 sexual violence/strangers | 22 |
| | (b) 52 sexual violence/family | 30 |

Appendix I
Retrospective Studies of Adult Sex
Offenders of Children

| Comparison group(s)[c] | Percent abused[b] | Comments |
|---|---|---|
| 18 nonincestuous fathers | 6% | This unpublished dissertation compared incestuous fathers participating in a treatment program with a "normal" nonincestuous comparison group of fathers on childhood and adolescent experience of sexual abuse and on five aspects of cognitive style. Ten of 26 (38 percent) incestuous fathers for whom data were available reported experiencing sexual abuse as children or adolescents, compared to one of 18 (6 percent) nonincestuous fathers. The author concluded that sexual victimization may predispose men to sexual abuse in adulthood, but that victimization is neither a necessary nor a sufficient condition for becoming an offender. |
| 65 convicted rapists<br>55 inmates convicted of nonsexual crimes<br>359 college men | 57<br>47<br>16 | This study reports the percentages of male inmates convicted of different offenses, as well as of the college men, who reported having been sexually involved, before the age of 16, with a woman or girl who was at least 5 years older and at least 16 years of age. Sexual involvement was higher for all of the inmate groups than for the group of college men, although it is noted that only a small minority of cases involved force, and that in a large proportion of the cases males initiated the activity. |
| 29 incarcerated rapists<br>20 incarcerated nonsexual offenders | 62<br>20 | This study obtained data from child molesters, rapists, and nonsexual offenders serving time in two medium-security penitentiaries. The three groups self-reported whether they had ever been sexually abused, whether the abuse involved bodily contact or not (noncontact abuse included solicitations and exhibitionism), whether the perpetrator was a family member or stranger, and how upsetting it was. The authors found that the two groups of sex offenders were more likely to have been abused than were the nonsexual offenders, and concluded that sexual abuse, coupled with other family background characteristics (i.e., poorer relations, less support, more physical abuse) may be importantly related to becoming a sex offender. |
| Incarcerated men, grouped as follows:<br><br>(c) 239 physical violence/strangers<br>(d) 123 physical violence/family<br>(e) 77 no violence | <br><br>4<br>12<br>13 | As part of a broader study of the impact of various types of childhood abuse and neglect on violent and aggressive behavior in adulthood, data were provided on the history of sexual abuse among incarcerated males, classified according to whether they had committed acts of physical or sexual violence directed towards strangers or family members. Prisoners who had committed sexual acts of violence were more likely to have been the victims of childhood sexual abuse than were other prisoners. In this study, it is not clear how many of the perpetrators of sex crimes were child molesters. |

(continued)

**Appendix I**
**Retrospective Studies of Adult Sex**
**Offenders of Children**

| Study | Study group(s)[a] | Percent abused[b] |
|---|---|---|
| Faller, 1989 | 154 sexually abusive fathers, stepfathers, or live-in boyfriends | 27% |
| Frisbie, 1969 | 311 child molesters | 24 |
| Gaffney et al., 1984 | 33 pedophiles[f] | 27 |
| Gebhard et al., 1965 | Includes 8 nonmutually exclusive groups of sex offenders: | |
| | 199 heterosexual offenders vs. children | 10 (F) 24 (M) |
| | 174 heterosexual offenders vs. minors | 16 (F) 14 (M) |
| | 25 heterosexual aggressors vs. children | 11 (F) 16 (M) |
| | 27 heterosexual aggressors vs. minors | 4 (F) 30 (M) |
| | 56 incest offenders vs. children | 8 (F) 19 (M) |
| | 66 incest offenders vs. minors | 6 (F) 13 (M) |
| | 96 homosexual offenders vs. children | 8 (F) 32 (M) |
| | 136 homosexual offenders vs. minors | 6 (F) 35 (M) |

Appendix I
**Retrospective Studies of Adult Sex
Offenders of Children**

| Comparison group(s)[c] | Percent abused[b] | Comments |
|---|---|---|
| 154 mothers of sexual abuse victims | 50% | This study examined whether offenders in intrafamilial sexual abuse cases referred to the Michigan Interdisciplinary Project on Child Abuse and Neglect, and the mothers of the victims of the offender's abuse, had any history of sexual abuse in the families of origin. Data on sexual abuse history were available for 116 of the 154 offenders, and for 130 of the 154 mothers. Of the offenders, 53 percent had experienced sexual abuse in their families of origin, and 27 percent had been the direct victims of such abuse. The corresponding percentages for the mothers were 58 percent and 50 percent, respectively. |
| None | Not applicable | As part of a larger study of sex offenders in the state of California, interviews were conducted with 311 subjects who had sexually abused minors under age 14. Lacking a comparison group, no firm conclusions were offered about the cycle of sexual abuse, but the study reports that predominately heterosexual child molesters were less likely to have been abused as children than predominately homosexual ones (15 percent versus 66 percent). |
| 21 nonpedophilic paraphiliacs[g]<br>33 depressed nonparaphiliacs | 14<br>Not reported | Subjects of this study were inpatients at Johns Hopkins Biosexual Psychohormonal Clinic. Pedophiliacs were found to be more likely than others to have pedophiliac family members, although they did not differ significantly from other paraphiliacs in terms of having been abused as children. No information on childhood abuse was presented for those in the comparison group. |
| Includes 8 nonmutually exclusive groups of sex offenders, one group of nonsexual offenders, and one group of men who were not incarcerated:<br><br>217 heterosexual offenders vs. adults<br>140 heterosexual aggressors vs. adults<br>25 incest offenders vs. adults<br>199 homosexual offenders vs. adults<br>56 peepers<br>135 exhibitionists<br>888 incarcerated nonsexual offenders<br>477 nonincarcerated men | <br><br><br>9 (F) 21 (M)<br>10 (F) 23 (M)<br>0 (F) 13 (M)<br>4 (F) 33 (M)<br>3 (F) 24 (M)<br>12 (F) 17 (M)<br>10 (F) 31 (M)<br>3 (F) 8 (M) | This early and broad study of different types of sex offenders provides data on prepubertal heterosexual and homosexual activity on 14 types of sex offenders (most of whom were incarcerated at the time of the study), on incarcerated nonsexual offenders, and on a rather haphazardly drawn comparison group of nonincarcerated men. Such activity is not strictly limited to experiences of abuse; it includes not only physical contact, but also being solicited by adult males or females by words, gestures, or other sexual approach. All of the subjects in the study were men, and the numbers to the left indicate the percentages whose prepubertal sexual contact involved adult females (F) and males (M). The study found there was more contact with adult males than adult females for all but one of these various groups, and while sex offenders were not always more likely than incarcerated nonsexual offenders to have been involved sexually, as children, with adults, all groups showed greater homosexual involvement than the nonincarcerated comparison group. |

(continued)

**Appendix I**
**Retrospective Studies of Adult Sex**
**Offenders of Children**

| Study | Study group(s)[a] | Percent abused[b] |
|-------|-------------------|-------------------|
| Greenberg et al., 1993 | 135 pedophilic child molesters[f] | 42% |
| | 43 hebephilic child molesters[h] | 44 |
| Groff and Hubble, 1984 | 16 incestuous fathers and 26 incestuous stepfathers | 5 |
| Groth, 1979 | 178 child molesters | 31 |
| Kirkland and Bauer, 1982 | 10 incestuous fathers | 10 |
| Langevin and Lang, 1985. | 29 heterosexual pedophiles[i] | 21-24 |
| | 22 homosexual pedophiles[i] | 14-19 |

Appendix I
**Retrospective Studies of Adult Sex
Offenders of Children**

| Comparison group(s)[c] | Percent abused[b] | Comments |
|---|---|---|
| None | Not applicable | This study compared histories of childhood sexual victimization among pedophilic and hebephilic child molesters. The former differ from the latter on the basis of molesting younger children (i.e., 12 or under). Similar percentages of the two groups, drawn from patients seen at a sexual behaviors clinic, reported a history of having sexual contact with an adult while under the age of 13. Among hebephiles, homosexuals were more likely than heterosexuals to report such contact, but no difference by sexual orientation was found among pedophiles. |
| None | Not applicable | The only information provided on the cycle of sexual abuse in this study, which finds few differences between fathers and stepfathers convicted of incest, is that, in the two groups combined, only 2 of the 42 subjects had been abused as children. |
| 170 rapists 62 law enforcement officers | 29% 3 | This study reports the percentages of subjects in each group that experienced sexual trauma as children, which can include witnessing sexual activity. The percentages of child molesters and rapists reported to have been the victims of forcible sexual assault as children were 22 percent and 5 percent, respectively. Sexual assaults of the comparison group of law enforcement officers were not reported. While this group is of questionable comparability to the offenders, and the information on victimization experiences was collected differently for them, the authors conclude that there is a link between being abused and becoming an offender. |
| 12 individuals matched on various characteristics | Not reported | In this study, which focuses primarily on whether incestuous fathers differ from a matched comparison group in terms of personality disorders, 1 of the 10 incestuous fathers reported a history of incest in his own childhood. No comparable information was given for the comparison group, and no additional information on victimization was offered for either group. |
| 160 sexually anomalous men[f] 54 individuals matched on various characteristics | 21-29 15-19 | This study reports the percentages in each group who, at age 12 or younger, had "sex play" with boys or girls who were 4 or 5 years older, or with men or women. The ranges in percents result from possible overlap; i.e., 21 percent of the heterosexual pedophiles had sex with older girls or women, and 3 percent had sex with older boys, so between 21 and 24 percent had sex with older boys or girls or with men or women. While it is not known whether any of this sex play was coercive, the authors conclude that sexual abuse, by itself, does not account for why people later become pedophiles. |

(continued)

**Appendix I**
**Retrospective Studies of Adult Sex**
**Offenders of Children**

| Study | Study group(s)[a] | Percent abused[b] |
|---|---|---|
| Lee, 1982 | 39 sexually abusive fathers, stepfathers, or surrogate fathers | 0% |
| McCarty, 1986 | 26 mothers who were incest offenders | 76 |
| Overholser and Beck, 1989 | 12 convicted child molesters | 58 |
| Seghorn et al., 1987 | 54 child molesters | 57 |
| Tingle et al., 1986 | 43 child molesters | 56 |

GAO/GGD-96-178 Cycle of Sexual Abuse Research Results

**Appendix I
Retrospective Studies of Adult Sex
Offenders of Children**

| Comparison group(s)[c] | Percent abused[b] | Comments |
|---|---|---|
| 39 physically abusive fathers, stepfathers, or surrogate fathers | 0% | This unpublished dissertation describes differences between a sample of fathers and stepfathers who had sexually abused their daughters and stepdaughters, and fathers, stepfathers, and surrogate fathers who had physically abused their sons or daughters. In these small samples, few differences between groups were found. No subjects in either group reported having been sexually abused as children. |
| None | Not applicable | This study's primary focus is on differences between incestuous mothers who were independent offenders, co-offenders (with a male accomplice), and accomplices, in terms of such characteristics as intelligence, employment, marital history, drug use, and emotional disturbance. Childhood information was available for 17 of these mothers, and 13 (76 percent) reported childhood sexual victimization. |
| 12 convicted rapists<br><br>36 men who were either nonsexual offenders or nonoffenders:<br><br>(a) 12 inmates convicted of nonsexual offenses<br>(b) 12 low socioeconomic status volunteers<br>(c) 12 college students with minimal dating experience | 25<br><br>6 | This study was primarily concerned with how well behavioral and life history data could be used to classify (or distinguish) different groups of offenders and nonoffenders. The authors report, independent of the classification analyses, that the two groups of sex offenders were more likely than the three groups of nonsexual offenders and nonoffenders to have been sexually abused as children (i.e., forced to engage in coercive sexual activity before the age of 13). The 6 percent reported for the nonsexual offenders and nonoffenders is for all three groups combined; percentages were not reported for each of these groups separately. |
| 97 rapists | 23 | This study compared child molesters and rapists residing in the Massachusetts Treatment Center for Sexually Dangerous Persons in 1982, and found the former more likely to have been victims of sexual assault as children. It concludes that sexual abuse results from the global pathology of families of the abused, and that sexual victimization as a child is more contributory to becoming a child molester than a rapist. |
| 21 rapists | 38 | This descriptive study of convicted rapists and child molesters who were seen at a Florida treatment center reports characteristics that distinguish the two groups; i.e., rapists were more aggressive and violent in their childhoods. The authors did not find, however, significant differences between the groups in their histories of sexual abuse. |

(continued)

**Appendix I
Retrospective Studies of Adult Sex
Offenders of Children**

| Study | Study group(s)[a] | Percent abused[b] |
|---|---|---|
| Williams and Finkelhor, 1992 | 55 incestuous fathers in the Navy | 64% |
| | 63 civilian incestuous fathers | 79 |

Appendix I
**Retrospective Studies of Adult Sex
Offenders of Children**

| Comparison group(s)[c] | Percent abused[b] | Comments |
|---|---|---|
| 53 nonincestuous fathers in the Navy<br>63 civilian nonincestuous fathers | 21%<br>41 | This preliminary, descriptive analysis compared incestuous and nonincestuous fathers from U.S. Navy and civilian samples, the fathers having been matched on age, age of daughter, education, and occupation. In both samples, incestuous fathers were more likely than nonincestuous fathers to have reported being sexually abused as children, although the report does not make clear what types of victimization experiences were elicited by interviews with the subject. The authors conclude that sexual victimization is related to incestuous abuse of daughters. |

Note: F = female; M = male.

[a]Study groups included individuals who had perpetrated sexual abuse against children.

[b]The percent abused represents the percentage of the study groups or the comparison groups who were sexually abused as children. The studies varied in how they defined and measured sexual abuse. (See report text and comments in the last column of this table.)

[c]Comparison groups included individuals who had perpetrated sexual crimes against adults (e.g., rapists), individuals who had committed nonsexual crimes, or nonoffenders who might or might not be matched with the study group.

[d]Parents United is a support group that emphasizes and promotes the reunification of the incest family.

[e]Study included both male and female offenders.

[f]Pedophiles (or pedophilic child molesters, or pedophiliacs) are sexual deviants whose preferred sexual objects are children.

[g]Paraphiliacs (or nonpedophilic paraphiliacs) are sexual deviants whose deviant behavior does not involve children. In this study, they included primarily exhibitionists and sadists.

[h]As defined in this study, hebephiles (or hebephilic child molesters) were child molesters who admitted to coerced sexual activity with extrafamilial children between the ages of 13 and 16.

[i]As defined in this study, sexually anomalous men were sex offenders who were nonpedophilic and preferred mature partners.

Appendix II

# Major Contributors to This Report

| | |
|---|---|
| **General Government Division, Washington, D.C.** | Evi L. Rezmovic, Assistant Director, Administration of Justice Issues<br>Douglas Sloane, Evaluator-in-Charge<br>David Alexander, Senior Social Science Analyst<br>Barry Seltser, Supervisory Social Science Analyst |
| **Los Angeles Field Office** | Tom Jessor, Senior Evaluator |

# Research Articles Used in This Review

## Research Reviews

Garland, Randall J., and Michael J. Dougher. "The Abused/Abuser Hypothesis of Child Sexual Abuse: A Critical Review of Theory and Research." Adult Human Sexual Behavior With Children and Adolescents: Biosocial Dimensions, ed. J.R. Feierman (New York: Aldine de Gruyter, 1988), pp. 488-509.

Hanson, R. Karl. "Characteristics of Sex Offenders Who Were Sexually Abused as Children." Sex Offenders and Their Victims, ed. R. Langevin (Oakville, Ontario: Juniper Press, 1991), pp. 77-85.

Hanson, R. Karl, and S. Slater. "Sexual Victimization in the History of Child Sexual Abusers: A Review." Annals of Sex Research, Vol. I (1988), pp. 485-499.

Williams, Linda Meyer, and David Finkelhor. "The Characteristics of Incestuous Fathers: A Review of Recent Studies." In The Handbook of Sexual Assault: Issues, Theories, and Treatment of the Offender, eds. W. L. Marshall, D. R. Laws, and H. E. Barbaree (New York: Plenum Press, 1990), pp. 231-255.

## Retrospective Approach

Alford, Jane, Mary Grey, and C. James Kasper. "Child Molesters: Areas for Further Research." Corrective and Social Psychiatry and Journal of Behavior Technology Methods and Therapy, Vol. XXXIV (1988), pp. 1-5.

Baker, D. Father-Daughter Incest: A Study of the Father. San Diego: California School of Professional Psychology, 1985. Dissertation Abstracts International, 46, 951B.

Ballard, D. T., et al. "A Comparative Profile of the Incest Perpetrator: Background Characteristics, Abuse History, and Use of Social Skills." In The Incest Perpetrator: A Family Member No One Wants to Treat, ed. A. L. Horton et al. (Newbury Park, CA: Sage, 1990), pp. 43-64.

Bard, Leonard A., et al. "A Descriptive Study of Rapists and Child Molesters: Developmental, Clinical, and Criminal Characteristics." Behavioral Sciences and the Law, Vol. V, No. 2 (1987), pp. 203-220.

Bennett, S. R. Cognitive Style of Incestuous Fathers. Lubbock, Texas: Texas Tech University, 1985. Dissertation Abstracts International, 47, 778B.

**Research Articles Used in This Review**

Condy, Sylvia. R., et al. "Parameters of Sexual Contact of Boys With Women." Archives of Sexual Behavior, Vol. XVI (1987), pp. 379-394.

Dhawan, Sonia, and W. L. Marshall. "Sexual Abuse Histories of Sexual Offenders." Sexual Abuse: A Journal of Research and Treatment, Vol. VIII, No. 1 (1996), pp. 7-15.

Dutton, D.G., and S.D. Hart. "Evidence for Long-term, Specific Effects of Childhood Abuse and Neglect on Criminal Behavior in Men. International Journal of Offender Therapy and Comparative Criminology, Vol. XVI, No. 2 (1992), pp. 129-137.

Faller, Kathleen Coulborn. "Why Sexual Abuse? An Exploration of the Intergenerational Hypothesis." Child Abuse and Neglect, Vol. XIII, No. 4 (1989), pp. 543-548.

Frisbie, Louise V. Another Look at Sex Offenders in California. Sacramento: California Department of Mental Hygiene, Mental Health Research Monograph No. 12, 1969.

Gaffney, Gary. R., Shelly F. Lurie, and Fred S. Berlin. "Is There Familial Transmission of Pedophilia?" Journal of Nervous and Mental Diseases, Vol. CLXXII (1984), pp. 546-548.

Gebhard, P. H., et al. Sex Offenders: An Analysis of Types. New York: Harper and Row, 1965.

Greenberg, David M., John M. W. Bradford, and Susan Curry. "A Comparison of Sexual Victimization in the Childhoods of Pedophiles and Hebephiles." Journal of Forensic Sciences, Vol. XXXVIII, No. 2 (March 1993), pp. 432-436.

Groff, M. G., and L. M. Hubble. "A Comparison of Father-Daughter and Stepfather-Stepdaughter Incest." Criminal Justice and Behavior, Vol. XI (1984), pp. 461-475.

Groth, A. Nicholas. "Sexual Trauma in the Life Histories of Rapists and Child Molesters." Victimology: An International Journal, Vol. IV, No. 1 (1979), pp. 10-16.

**Research Articles Used in This Review**

Kirkland, Karen D., and Chris A. Bauer. "MMPI Traits of Incestuous Fathers." Journal of Clinical Psychology, Vol. XXXVIII, No. 3 (1982), pp. 645-649.

Langevin, R., and R. A. Lang. "Psychological Treatment of Pedophiles." Behavioral Sciences and the Law, Vol. III, No. 4 (1985), pp. 403-419.

Lee, R. N. "Analysis of the Characteristics of Incestuous Fathers." Dissertation Abstracts International, Vol. XLIII, No. 2343B (1982). University Microfilms No. DA8227677.

McCarty, Loretta M. "Mother-Child Incest: Characteristics of the Offender." Child Welfare, Vol. LXV, No. 5 (September/October 1986), pp. 447-458.

Overholser, James C., and Steven J. Beck. "The Classification of Rapists and Child Molesters." Journal of Offender Counseling, Services and Rehabilitation, Vol. XIV, No. 2 (1989), pp. 169-179.

Seghorn, Theoharis K., Robert A. Prentky, and Richard Boucher. "Childhood Sexual Abuse in the Lives of Sexually Aggressive Offenders." Journal of the American Academy of Child and Adolescent Psychiatry, Vol. XXVI (1987), pp. 262-267.

Tingle, David, et al. "Childhood and Adolescent Characteristics of Pedophiles and Rapists." International Journal of Law and Psychiatry, Vol. IX (1986), pp. 103-116.

Williams, Linda Meyer, and David Finkelhor. The Characteristics of Incestuous Fathers. Durham, New Hampshire: University of New Hampshire, 1992.

## Prospective Approach

Widom, Cathy Spatz. "Childhood Sexual Abuse and Its Criminal Consequences." Society, Vol. XXXIII, No. 4 (May/June 1996), pp. 47-53.

Widom, Cathy Spatz. Victims of Childhood Sexual Abuse—Later Criminal Consequences: Research in Brief. Washington, D.C.: U.S. Department of Justice, National Institute of Justice, March 1995.

Widom, Cathy Spatz, and M. Ashley Ames. "Criminal Consequences of Childhood Sexual Victimization." Child Abuse and Neglect, Vol. XVIII, No. 4 (1994), pp. 303-318.

**Research Articles Used in This Review**

Williams, Linda Meyer, et al. Juvenile and Adult Offending Behavior and Other Outcomes in a Cohort of Sexually Abused Boys: 20 Years Later. Philadelphia: Joseph J. Peters Institute, 1995.

**Ordering Information**

The first copy of each GAO report and testimony is free.
Additional copies are $2 each. Orders should be sent to the
following address, accompanied by a check or money order
made out to the Superintendent of Documents, when
necessary. VISA and MasterCard credit cards are accepted, also.
Orders for 100 or more copies to be mailed to a single address
are discounted 25 percent.

Orders by mail:

U.S. General Accounting Office
P.O. Box 6015
Gaithersburg, MD 20884-6015

or visit:

Room 1100
700 4th St. NW (corner of 4th and G Sts. NW)
U.S. General Accounting Office
Washington, DC

Orders may also be placed by calling (202) 512-6000
or by using fax number (301) 258-4066, or TDD (301) 413-0006.

Each day, GAO issues a list of newly available reports and
testimony.  To receive facsimile copies of the daily list or any
list from the past 30 days, please call (202) 512-6000 using a
touchtone phone.  A recorded menu will provide information on
how to obtain these lists.

For information on how to access GAO reports on the INTERNET,
send an e-mail message with "info" in the body to:

info@www.gao.gov

or visit GAO's World Wide Web Home Page at:

http://www.gao.gov

PRINTED ON ♲ RECYCLED PAPER

**United States**
**General Accounting Office**
**Washington, D.C. 20548-0001**

Bulk Rate
Postage & Fees Paid
GAO
Permit No. G100

**Official Business**
**Penalty for Private Use $300**

**Address Correction Requested**

# Addressing the victim to offender cycle

livingwell.org.au/managing-difficulties/addressing-the-victim-to-offender-cycle

## Do boys who have been sexually abused go on to commit sexual offences?

In writing this page, we want to be clear up front that research evidence tells us that **being sexually abused *does not* cause someone to sexually offend** and that **the majority of boys who are sexually abused *do not* go on to commit abuse.**

However this question, whether or not boys who have been sexually abused will go on to commit sexual offences, remains a serious concern that deserves careful consideration. Not just because it is important to consider all possible factors that contribute to sexual offending, but also because too often discussions of the 'victim to offender cycle' do not adequately explore the impact of uninformed public discussion on the lives of men subjected to sexual abuse.

Unfortunately, this particular topic has been characterised by misinformation and overly simplistic treatment. There is a common belief that being sexually abused 'causes' a boy to become sexually abusive. As a result, many men who have suffered sexual abuse are faced with often overwhelming fear of 'becoming a perpetrator.'

It is a telling observation that of all the possible 'outcomes' of the sexual abuse of boys (such as depression, anxiety, flashbacks, relationship difficulties, disturbed sleep, suicidality, post trauma distress, etc.) the risk of later sexual offending is one of the most researched.

## This page aims to do 3 things

1. Summarize the best available research on the relationship between boys' and men's experience of sexual victimisation, and factors that can contribute to an individual committing sexual offences.
2. Examine the effects and influence of the 'victim to offender' idea in the lives of men and boys who have been subjected to sexual abuse.
3. Consider concerns related to sexualised behaviour by children who have been sexually abused and the problem of abusive thoughts and fantasies.

We recognise that this web page cannot provide a definitive review of the literature on sexual offending and experiences of victimisation. Nonetheless, we hope to go some way to redressing the absence of consideration of the impact of uncritical acceptance of the 'victim-to-offender' idea on the lives of boys and men who have been sexually abused.

F



## 1. What does the research say about sexual offending?

So, who actually commits sexual offences? What do these offenders have in common?

It is a mistake, when considering the problem of sexual offending, to immediately focus in on the question of whether someone has a history of being sexually abused. There are a range of factors that have been identified as being linked to sexual offending, and there are disputes amongst researchers as to which of these is most significant. For example, some researchers challenge us to look at the role of **gender**, given that the overwhelming majority of those committing sexual offences are male, with around 80% of boys and 96% of girls sexually assaulted by males.

There is a common, if unsettling, finding from the research on the role of **masculinity** in sexual offending. Men who commit sexual abuse have a lot in common with men in general, and tend to identify with *traditional* or *stereotypical* ideals of masculinity.

Also, when considering sexual offending it is also important to make a clear distinction between deliberate sexual offending as **adults**, and instances where children exhibit sexualised behaviour or have been forced to act sexually towards other children as part of their own experience of sexual abuse.

Research over the past 40 years has identified a number of **risk factors** that can contribute to the likelihood of a person committing sexual offences. Compared to the general population, adults who commit sexual offences against children tend to:

- Show greater aggression and violence, non-violent criminality, anger/hostility, substance abuse, paranoia/mistrust, and have diagnosable antisocial personality disorders.
- Be more likely to show anxiety, depression, low self-esteem, and external locus of control (i.e. feel that they are not in control of, or responsible for, their own actions).
- Generally have more problematic sexual patterns (including fantasies and sexualised coping strategies).
- Have low social skill/competence, report more feelings of loneliness, more difficulties with intimate relationships, and lack of secure attachment.
- Have poorer histories of family functioning, including more harsh discipline, poorer attachment or bonding, and generally worse functioning their family of origin, including physical abuse, and sexual abuse.
- Express more tolerant attitudes to child sexual abuse and minimize the perpetrators culpability.

As we can see from the above list, being sexually abused is **only one of a number of factors** to be considered when investigating sexual offending.

In fact, research findings suggest that most men who have sexually offended were **not** sexually abused.

We will now go on to look specifically at research that examines the cycle of abuse. In doing so, we wish to reiterate that regardless of the questions of personal history, risk factors and questions of gender: Each individual who commits sexual abuse has deliberately chosen to do so. *It doesn't just happen.*

### What does the research say about the 'cycle of abuse' and 'risk' of abusing?

There is research suggesting that boys who have been subject to sexual abuse are at higher 'risk' of offending later in life than boys who have not.

It is important to understand what is meant by 'higher risk.' To say that being sexually abused is a 'risk factor' for later offending does not mean it 'causes' later offending.



One British study examined the future offending behaviour of boys who had been sexually

abused. It found that 88%, the vast majority, **did not go on to commit sexual offences**.

12% of men who were sexually abused in childhood went on to commit sexual offences. This is a significantly higher rate of sexual abuse perpetrated than by the general population of men, and is a serious concern that needs careful investigation. This is what we mean by risk factor — but it certainly doesn't mean that men automatically go on to commit abuse. This is demonstrated by the 88% who *didn't*.

## Meta Analysis

In 2009, two US researchers published a paper which reviewed 7 studies of the 'victim-to-offender cycle.' They focused on males who had been sexually abused in childhood. They looked for factors which increased or decreased the risk of committing a sexual offence (on children of either gender, adolescent and adult women, or both). In general, their findings did not suggest that there is a straightforward relationship between being abused and offending. Presented below in a simplified form are factors identified as increasing risk of offending:

- Masturbation, fantasy, and pleasure connected to abuse.
- Physically abused (in addition to sexual abuse) in childhood.
- Witnessed high/severe levels of violence in childhood family home.
- Sexually abused by both family and non-family abusers.

Some other factors that have been proposed as heightening the risk of offending among boys include: physical abuse, neglect and rejection, witnessing domestic violence in childhood, and other harmful behaviours such as cruelty to animals. Another variable to be aware of is that an appropriate, supportive response at the time of disclosure can diminish the likelihood of future offending behaviour (Wilcox, Richards et al., 2004).

## In all cases, the findings are about 'higher risk,' not 'cause and effect'

In noting the evidence that *some* boys subjected to sexual abuse have committed sexual offences, it is important to not over generalise and treat *all* boys and men who have been sexually abused as having a potential for future offending. An early review study of the 'Cycle of child sexual abuse' (commissioned by the United States General Accounting Office at the request of a Committee of the US House of Representatives) found so little evidence to support this idea that they discounted focussing on sexually abused boys as an effective way to prevent future sexual abuse.



There is no doubt that all the above information presents a complicated picture. In a sense, this is helpful because it illustrates that there is **no straightforward link** between abuse and abusing. There are two clear messages:

**Being sexually abused does not cause someone to sexually offend.**

**The majority of boys who are sexually abused do not go on to commit abuse.**

## 2. The impacts on men of the victim-to-offender idea

### Effects on men who were sexually abused

Men who have experienced sexual abuse repeatedly comment on how disturbing the 'victim to offender' idea is to them. What we hear, again and again, is an absolute outrage about the horror of child sexual abuse. We hear how distressed they are at the suggestion that they would do something to harm a child.

Counter to this idea, men who have been sexually abused often express a fierce commitment to protecting and caring for children in their life. Nevertheless, the 'victim to offender' idea is out there in the community.

The idea of the 'victim-to-offender' cycle:

- causes distress in its own right. It stops boys and men from disclosing sexual abuse due to the fear of being viewed as a potential offender. Even though he **knows** he presents no danger, he is likely to be concerned that others, including those close to him, will view him with suspicion.

- has men feeling that they need to be constantly on guard, monitoring their thoughts and behaviours in case they become 'possessed.' Men who have been sexually abused report being very much aware of ideas that they might be 'contaminated' or experience the 'vampire effect,' because of what was done to them.

The suggestion of a secret, hidden desire lurking in the subconscious can lead a person to engage in high level monitoring of their inner world of thoughts and feelings, searching for signs of 'becoming a potential abuser' — something that is exhausting and from which there can appear no escape. It is not surprising that men can become caught up in this painful, internal self monitoring, given that 'hyper vigilance' of the outer world is already familiar to them, something developed as a child as a means to evade further sexual abuse (through constant monitoring of the environment, of what is being said, the tone used, where people are, awareness of possible danger signs).

The fear of 'becoming an abuser' stops sexually abused men from developing intimate relationships, marrying, having children, becoming fully involved in parenting, bathing or changing the nappy of their children, playing with or coming into contact with children, from relaxing, and from trusting in themselves. Here are two men's accounts of how the victim to offender idea has impacted on their lives:

> A man in 30s remembered hearing professionals talking with his family when he was 10 years old, after disclosure of sexual abuse. What stuck with him was their expressed concerns that because he had been abused he would become an abuser. He says 'Now I think that what I heard about them worrying about me becoming an abuser did as much damage as the abuse itself. I was scared to have kids, in case the monster waiting inside appeared. It was only when I held my daughter that I knew that I was ok. That was 17 years of unnecessary hell in my head.'

> A man in his 50s, in a men's sexual abuse support group, spoke passionately about his commitment to living a life based on not harming or abusing others, and acting to assist people in need. 'My fear is that, if I get Alzheimers disease or something, I will forget all these things that are important to me. Maybe then 'it' will come out and I'll hurt or abuse someone.'

It is not only the popular media and public myths about male sexual abuse that promotes the victim-to-offender cycle. As in the first quote above, some boys and men have encountered well-meaning professionals who are misinformed about the links between being sexually abused and sexual offending. The research and clinical literature about boys and men who have been sexually abused has not always helped matters, encouraging counsellors and therapists to interact with men who have had unwanted sexual contact as potential abusers (Ouellette, 2009).

The critical psychologists Ruth Miltenburg and Elly Singer published an article in 2000 about the way a lot of psychological research has a *problem oriented* focus which does not account for the fact that "...despite horrific experiences, many people nevertheless succeed in constructing a satisfactory life for themselves." They argued that in order to understand how child abuse influences people, we need to really listen to what people say about the moral decisions they make in living their lives. What has not been the subject of comprehensive research is what influences and supports men sexually abused in childhood to better care for and protect children.

## Some questions a man might consider

For those men sexually abused in childhood, it can be useful to take some time to consider how the victim-to-offender idea has impacted on your life:

- Has the fear of abusing been a source of worry for you?
- How has fear of abusing affected the way you relate to children in your life? How has it affected your relationship with other people you are close to?
- If you are a parent or carer, has fear of abusing influenced how comfortable you are with having intimate, caring, loving feelings towards your children? If so, how?
- If you are not a parent, has fear of abusing influenced this decision in any way?
- How would you behave differently in your relationships if this fear was not a factor?
- If you worry about the possibility of children being abused, and take steps to protect children and avoid harm, what might that say about your intentions, about the kind of person you are trying to be?
- What values are important to you in terms of how you believe children should be treated?
- How might you act according to these values in ways that promote greater safety, care and support for children? How might this mean you are different from the person who abused you?

## Why does this idea persist?

Given that the evidence is clear that most sexually abused boys do not go on to commit sexual abuse, how can we explain the enduring power and appeal of this idea of a cycle of abuse? Various authors have suggested a few reasons, including;

1. It is a simplistic explanation. Given the complex and frightening realities of child sexual abuse, it is not surprising that a neat, simple 'circle' explaining why such shocking things happen is reassuring. It is less confronting than the reality that some people make a deliberate choice to sexually abuse a child.
2. It fits neatly in with some old ideas of 'contamination' and 'the vampire bite.'
3. If the 'risk' is contained to a group of 'others' – men who were sexually abused – of which we are not a member, then it is less confronting for us.

7/9

4. It means not having to confront the cultural conditions that allow child sexual abuse
   to happen. If sexual abuse can be explained by individual life history, we are not
   confronted to address more challenging, bigger societal factors, such as trying to
   explain and address the fact that the majority of sexual offences against children are
   committed by males.

## 3. Worries about abusing

### Sexualised behaviour as a child

Some men and women remember and express concern that when they were children or
young people, they initiated sexually inappropriate or abusive contact with other children
after they were sexually abused. Some report that as children or young people they were
pressured to do this by the person who offended against them, sometimes threatening,
coercing or encouraging them to do this. We have spoken with adults who believe these
behaviours 'prove' that they are a future risk to others.

It is important to make a distinction between adults deliberately engaging in sexually
abusive behaviour and the actions of children or young people. When young people or
children experience a sexually traumatic event (which could include an instance of sexual
abuse, or living in an abusive environment), it is not uncommon that they 'act-out' — what
experts call 'reactive sexualised behaviour.' Obviously this behaviour can cause great
distress and should be taken seriously. However, it is understood that children's responses
to traumatic events can be driven by confusion, distress and impulsive attempts to 'self-
soothe' (attempting to manage upsetting thoughts and feelings). Trauma-related sexualised
behaviour is often short-lived and can be resolved when a child or young person is offered
appropriate support (from a counsellor or a responsible adult in their lives).

In contrast, most adults who commit sexual abuse are very deliberate, planned and
calculated in how they go about it. While some researchers stress the role of opportunity,
sexual abuse is not likely to 'just happen.' (The exception to this may be for some people
who have a cognitive/intellectual disability which can cause them to act impulsively).

If you reacted to being abused as a child by acting out sexually, it is understandable that
this may be a source of great distress to you now. It may also be useful for you to find an
informed counsellor to help make sense of what occurred. However, assuming this
behaviour stopped in childhood, in itself it does *not* mean you are going to commit a sexual
offence now as an adult.

### Thoughts and fantasies related to abusing

Men sexually abused in childhood report being distressed by sexualised thoughts and fantasies, particularly relating to causing someone harm. Everybody has fantasies and thoughts, including sexual thoughts. Some of these thoughts help us to feel pleasure and sexual enjoyment in healthy relationships. Others might be a source of embarrassment, shame, guilt, or concern. Unfortunately, there are so many mixed and conflicting messages about sex that even healthy, non-abusive sexual thoughts can cause people distress.

There is a difference between what happens in nightmares and how we behave when awake, between fantasy and reality. We all have thoughts we don't actually act on. While we do want to challenge the idea that all men who were sexually abused are 'potential offenders', we equally don't want to dismiss anyone who is genuinely worried about their own abusive thoughts and potential for committing sexual abuse. The first thing to say is: If you are making plans to set up a situation to sexually abuse a child or anyone else, seek appropriate help as soon as possible, call a helpline, talk to someone who can assist you.

If you are having sexualised thoughts of abuse, being worried by these thoughts is a better response than not worrying. As we saw above, sexualised abusive fantasies (especially while masturbating) can be one of the risk factors for committing abuse. It is highly likely that these thoughts and fantasies disturb and distress you even if you have no intention on acting on them and therefore it is important you obtain appropriate professional help from someone who is familiar working with men who have been sexually abused.

We suggest reading the information on this link to the website 1in6.org, for men who have had unwanted sexual contact: Am I going to become abusive?

## References

- Ouellette, M. (2009). ""Some things are better left unsaid": discourses of the sexual abuse of boys.(Report)." Jeunesse: Young People, Texts, Cultures 1(1): 67(27).
- Miltenburg, R. and E. Singer (2000). "A concept becomes a passion: Moral commitments and the affective development of the survivors of child abuse." Theory & Psychology 10(4): 503.
- Richards, AIC paper

Copyright © 2012-2020 Living Well All rights reserved. | Site Map

# DOC. 67

1

| | |
|---|---|
| 1 | UNITED STATES DISTRICT COURT |
| | MIDDLE DISTRICT OF FLORIDA |
| 2 | ORLANDO DIVISION |
| 3 | Case No.:   6:19-cr-00260-CEM-DCI |
| 4 | |
| 5 | UNITED STATES OF AMERICA, |
| 6 | |
| 7 | Plaintiff,          Orlando, Florida |
| | September 3, 2020 |
| | v.               10:03 a.m. - 11:57 a.m. |
| 8 | EDGAR JOHAN DIAZ-COLON, |
| 9 | |
| 10 | Defendant. |
| 11 | _____/ |
| 12 | TRANSCRIPT OF SENTENCING |
| 13 | BEFORE THE HONORABLE CARLOS E. MENDOZA |
| | UNITED STATES DISTRICT JUDGE |
| 14 | |
| 15 | |
| 16 | APPEARANCES: |
| 17 | Counsel for the Government: |
| 18 | Emily C.L. Chang |
| | United States Attorneys Office |
| 19 | 400 West Washington Street |
| | Suite 3100 |
| 20 | Orlando, Florida  32801 |
| 21 | |
| 22 | Counsel for Defendant: |
| 23 | Ali Kamalzadeh |
| | Jenna N. Kelly |
| | Federal Public Defender's Office |
| 24 | 201 South Orange Avenue |
| | Suite 300 |
| 25 | Orlando, Florida 32801 |

---

2

1   APPEARANCES: (continuing)

2   Interpreter:          Stella Kirkpatrick

3   Court Reporter:       Nikki L. Peters, RPR, CRR, CRC
                          Federal Official Court Reporter
4                         401 West Central Boulevard
                          Suite 4600
5                         Orlando, Florida  32801
                          courttranscripts@outlook.com
6

7   Proceedings recorded by mechanical stenography.
    Transcript produced by Computer-Aided Transcription.

INDEX OF PROCEEDINGS

|  |  | PAGE |
|---|---|---|
| Objections by the Defense | | 5 |
| Argument by the Government | | 11 |
| Mitigation by the Defense | | 14 |
| GOVERNMENT'S WITNESSES | | |
| Special Agent Kevin Kaufman | | |
| Direct Examination By Ms. Chang | | 35 |
| Cross-Examination By Ms. Kelly | | 42 |
| Redirect Examination By Ms. Chang | | 44 |
| Allocution by the Defendant | | 45 |
| Statement by Joseph Ortiz | | 47 |
| Sentencing Argument by the Government | | 51 |
| Rebuttal Argument by the Defense | | 60 |
| Response by the Government | | 65 |
| Sentence | | 69 |
| Certificate of Reporter | | 75 |

E X H I B I T S

|  | PAGE |
|---|---|
| Government's Exhibit Nos. 1A, 2A, and 3A | 11 |
| Defense exhibits | 74 |

```
1                P R O C E E D I N G S

2            THE COURTROOM DEPUTY:  United States of

3    America v. Edgar Johan Diaz-Colon, Case No. 6:19-cr-260.

4            Counsel, please state your appearances for the

5    record.

6            MS. CHANG:  Good morning, Your Honor.  Emily Chang on

7    behalf of the United States, with me is Special Agent Kevin

8    Kaufman of the FBI.

9            THE COURT:  Good morning.

10           MS. KELLY:  Good morning, Your Honor.  Jenna Kelly,

11   along with Mr. Diaz-Colon.

12           MR. KAMALZADEH:  Ali Kamalzadeh on behalf of

13   Mr. Diaz-Colon.

14           THE COURT:  All right.  Good morning.  Will the

15   defendant please stand and raise your right hand.  You will be

16   placed under oath.

17           Let's place our interpreter under oath first.

18           (Interpreter sworn.)

19           THE INTERPRETER:  I do.

20           THE COURTROOM DEPUTY:  State your name and language,

21   please.

22           THE INTERPRETER:  Stella Kirkpatrick.

23           THE COURT:  Language, please.

24           THE INTERPRETER:  Spanish.

25           THE COURT:  Thank you.
```

*United States District Court*
*Middle District of Florida*

```
1            All right.  If the defendant would be kind enough to

2    raise his right hand.  He's going to be placed under oath.

3            (Defendant sworn via interpreter.)

4            THE DEFENDANT:  I swear.

5            THE COURT:  You can put your hand down.  Sir, please

6    state your full name for the record.

7            THE INTERPRETER:  Edgar Diaz-Colon.

8            THE COURT:  All right, sir.  On April 22nd, 2020, you

9    entered pleas of guilty as to Counts I through V of the

10   indictment, each charging you with production of child

11   pornography in violation of Title 18, U.S. Code,

12   Sections 255 -- or 2251(a) and 2251(e).  The Court previously

13   accepted your guilty pleas and has already adjudged you guilty

14   of those offenses.  We've now reached the stage in the

15   proceedings where it is my duty to address several questions to

16   you, your attorney, and counsel for the Government.

17           All right, sir.  There was a presentence

18   investigation prepared in anticipation of today's hearing.

19   Have you had a chance to review it?

20           THE DEFENDANT:  Yes.

21           THE COURT:  Have you had a chance to review it with

22   the advice of your attorney?

23           THE DEFENDANT:  Yes.

24           THE COURT:  Do you need more time to go over that

25   document before we move forward?
```

*United States District Court*
*Middle District of Florida*

5

1          **THE DEFENDANT:**  No.

2          **THE COURT:**  All right.  And this question is for your

3     attorney.  First of all, on the initial, and then on the final

4     Presentence Investigation Report, that there was some

5     objections from the defense.  Have those been resolved or do we

6     need to take those up at this time?

7          **MS. KELLY:**  They have not been resolved, Your Honor.

8          **THE COURT:**  All right.  I'm going to give you an

9     opportunity to briefly make any additional argument.  I'm

10    pulling it up now on the computer, and I'll hear from the

11    United States.  Once we get these issues resolved, we'll move

12    forward.  So who's going to be arguing for the defense on this?

13         **MR. KAMALZADEH:**  I am, Your Honor.

14         **THE COURT:**  Okay.

15         **MR. KAMALZADEH:**  May I approach?

16         **THE COURT:**  Sure.  All right.  The floor is yours.

17         **MR. KAMALZADEH:**  Thank you.

18         Your Honor, the first objection that is still

19    outstanding goes to the pattern enhancement.  It is our

20    position, as we laid out in the PSR, with regard to the

21    application of 4B1.5 -- I'm sorry, not -- yes, 4B1.5, the

22    guidelines already take into account on multiple occasions --

23    one, we have the grouping.  As the PSR lays out, each count is

24    taken into consideration and calculated for purposes of

25    sentencing.  And then you have the grouping adjustment, which

*United States District Court*
*Middle District of Florida*

6

1     in this case added four points on top of his guidelines, once

2     they were calculated, as to the base offense level after

3     adjustments.  And then you have a five-level pattern

4     enhancement based on, again, the counts in this case specific

5     to the three children.

6          It's our position that this is duplicative.  It's

7     effectively double counting.  We do recognize that,

8     effectively, those arguments are foreclosed in the Eleventh

9     Circuit.  But for purposes of preservation, we would just point

10    out to the Court that there are several ways the guidelines

11    take into account -- the sentencing commission itself has

12    indicated dissatisfaction with regard to the guidelines and how

13    harsh they are and how repetitive they are in these types of

14    cases.  Unfortunately, Congress has not acted at this point,

15    and we'd move for the Court to take action in its place.

16         **THE COURT:**  And I appreciate your candor on

17    disclosing the Eleventh Circuit legal authority.

18         All right.  You want to move on to your next

19    objection, Mr. Kamalzadeh?

20         **MR. KAMALZADEH:**  Yes, Your Honor.  The next item is

21    the -- the departure argument.  I don't know if you want me to

22    hold that off with regard to our variance presentation for

23    mitigation.

24         **THE COURT:**  Well, you can make a departure now.  But

25    you're always welcome to argue variance if the departure

*United States District Court*
*Middle District of Florida*

1    argument doesn't succeed.

2            **MR. KAMALZADEH:**  Yes, Your Honor.

3            The next section that we had raised was a departure

4    under 5K2.22.  Effectively, that covers specific offender

5    characteristics as grounds for a downward departure in child

6    crimes and sexual offenses.

7            And under the U.S. Sentencing Commission primer that

8    addresses departures and variances, the commentary states,

9    under subsection 3, there are encouraged grounds for departure.

10   And it specifically states:  "If a special factor is

11   encouraged, the Court may use it as a basis for a departure,

12   but only if the applicable guideline does not already take that

13   factor into account or if the factor is present to an

14   exceptional degree."  And we weigh heavily on the

15   exceptional-degree prong of the downward departure,

16   specifically to Mr. Diaz-Colon's characteristics of his

17   background.

18           As we pointed out in the PSR, that's in the PSR

19   narrative, Mr. Diaz-Colon was sexually abused as a young child.

20   Before that, his grandfather and grandmother who were caring

21   for him separated.  And shortly thereafter, at the young age of

22   five, his grand -- well, Mr. Diaz-Colon was clearly at the

23   young age of five -- his grandfather took his own life.

24           Prior to that, Your Honor, Mr. Diaz-Colon was removed

25   from his family at the request of his grandparents because his

*United States District Court*
*Middle District of Florida*

1    mother had no interest in caring for him, though she continued

2    to have children thereafter.  And so she had very little

3    interaction with him.  Her letter is in our mitigation

4    appendix.  You can tell by the tone it's somewhat cold.

5    Although she's trying to provide some support for her son, you

6    can tell that that relationship has never come to fruition

7    since he was a child.

8            Those factors, taking into consideration the

9    abandonment -- and within that abandonment, I think it's

10   important for the Court to know that the family still met.  So

11   we have a circumstance where Mr. Diaz-Colon is with his

12   grandparents.  His family, at least with his siblings, are

13   meeting.  They have a resentment toward him because of how his

14   grandparents are caring for him, and he has a resentment

15   because he's not part of that nuclear family.  And so you have

16   this emotional abuse going on, and then you have the loss of

17   his grandfather, which was basically the only paternal

18   individual in his life, departing at his own hands.  And then

19   you have the sexual abuse a couple of years later, by a

20   sibling, no less, in his family.

21           And then, thereafter, his grandmother is caring for

22   him.  There is an issue with ADHD.  She's advised to -- and

23   Mr. Diaz-Colon is prescribed Ritalin.  She doesn't believe in

24   the medication and never goes through in ensuring he, as a

25   child, properly gets prescribed this medication as needed

*United States District Court*
*Middle District of Florida*

1    considering the things that he was dealing with after meeting

2    with a psychologist or a psychiatrist.  And then you have this

3    domino effect.

4           Shortly thereafter, as he's growing up, use of

5    illicit substances to cope with his ADHD.  And then that

6    obviously takes on its own animal with regard to his use and

7    its relation to the offense conduct in this case.

8           So those factors are our argument, Your Honor, that

9    appear in an exceptional degree for purposes of a consideration

10   of a departure in this case.

11          **THE COURT:**  All right.  Mr. Kamalzadeh, you also are

12   objecting to, I believe, paragraph 17 in its entirety; is that

13   correct?

14          **MR. KAMALZADEH:**  May I --

15          **THE COURT:**  Sure.

16          **MR. KAMALZADEH:**  -- grab a piece of paper?

17          And may I have a moment, Your Honor?

18          **THE COURT:**  Sure.

19          (Court was at ease.)

20          **MR. KAMALZADEH:**  Thank you, Your Honor.  With regard

21   to paragraph 17, we dispute the accuracy of the reporting of

22   both vaginal/anal penetration, as well as the use of a belt.

23   And those are our objections to that paragraph, Your Honor.

24          **THE COURT:**  All right.  So let me understand --

25   Ms. Chang, you provided two interview -- recorded interviews

1    that I've had a chance to review.  Are you seeking to admit

2    these as part of your case in aggravation today?

3           **MS. CHANG:**  Yes, Your Honor.  I'll be admitting them

4    through the agent.

5           **THE COURT:**  All right.  Will the defense be objecting

6    to these being admitted today?

7           **MR. KAMALZADEH:**  No, Your Honor.

8           **THE COURT:**  Okay.  Then -- I mean, you're still

9    welcome to call your agent.  I've reviewed them, and I've been

10   provided with Government Exhibit 1A and 1 -- and 2A, which

11   appear to be a transcript.  Are these transcripts of the

12   recording?

13          **MS. CHANG:**  They are, Your Honor.  All of the

14   exhibits that the United States is admitting today were

15   attached to the sentencing memorandum.

16          **THE COURT:**  Okay.

17          **MR. KAMALZADEH:**  And we received a copy as well,

18   Your Honor.

19          **THE COURT:**  Any objections to my admitting them at

20   this time?

21          **MR. KAMALZADEH:**  No, Your Honor.

22          **THE COURT:**  All right.  They're all admitted.  And I

23   appreciate you making the recording available to me ahead of

24   time so that I could view them before today.

25          **MS. CHANG:**  And, Your Honor, I would just request

1    that they be moved in under seal.

2            THE COURT:  Any objection?

3            MR. KAMALZADEH:  No objection, Your Honor.

4            THE COURT:  All right.  Without objection, they are

5    admitted under seal.

6        (Government's Exhibit Nos. 1A, 2A, and 3A received in

7    evidence under seal.)

8            THE COURT:  So one more question.  You're finished

9    with your objection; is that correct?  Your three objections?

10           MR. KAMALZADEH:  Yes, Your Honor.

11           MS. KELLY:  Your Honor, may I have a moment?

12           THE COURT:  You may have a moment.

13       (Court was at ease.)

14           THE COURT:  Okay.  So what's been previously marked

15   as Government's 1A, 2A, and 3A are admitted under seal without

16   objection from the defense.

17           Anything further from the defense?

18           MR. KAMALZADEH:  No, Your Honor.

19           THE COURT:  All right.  Ms. Chang, would you like to

20   argue in response?

21           MS. CHANG:  Yes, Your Honor.  With respect to the

22   pattern enhancement objection, the Eleventh Circuit case to

23   note is *United States v. Babcock*, which is 924 F.3d 1180, which

24   is from the Eleventh Circuit in 2019.  That addresses that

25   issue.

1            With respect to 5K2.22, Your Honor, I don't think a

2    departure is warranted.  I don't believe that the defendant has

3    even established the legal grounds for using abandonment,

4    sexual trauma, ADHD, basically the factors that ordinarily

5    would be presented in support of a downward variance.  Why -- I

6    mean, those are not encouraged departures.  There's no

7    authority that those are encouraged departures under 5K2.22,

8    and 5K2.22 does not specifically address any of those factors.

9    So while the Court may review and consider those in support of

10   a variance, I don't believe that a departure is warranted.

11           With respect to paragraph 17, the United States will

12   be calling the agent.  And I believe that the evidence that is

13   before the Court in the exhibits that have been already

14   admitted foreclose the objection to Government -- I'm sorry, to

15   paragraph 17.  And we rest on whatever is said in those

16   exhibits versus what's stated in the PSR.

17           THE COURT:  All right.  Thank you for your argument.

18           With regard to the three objections, they're noted

19   and preserved for the record, but they're going to be

20   overruled.

21           The Court will adopt the undisputed factual

22   statements.  As to the controverted factual statements, I'll

23   allow Ms. Chang to present her evidence and make that

24   determination subsequent to that presentation.

25           But the Court will adopt the probation office's

1    recommendations as stated in the addendum and determines that
2    the guidelines are as follows.  Total offense level is 43;
3    criminal history category is III; the term of imprisonment is
4    1,800 months; supervised release is five years to life; no
5    restitution; a fine of 50,000 to $500,000; and a $500 special
6    assessment; that's $100 per count.
7         So there were a number of items filed by the defense,
8    and I do appreciate that, as well, prior to today's hearing,
9    that I had a chance to review.  And specifically, it was filed
10   as Document 46, titled, "Mitigation Appendix," on August 27th.
11   Will there be any additional presentation in terms of
12   mitigation from the defense before I hear from the United
13   States?
14        **MR. KAMALZADEH:**  Yes, Your Honor.
15        **THE COURT:**  All right.  If -- are you calling
16   witnesses?
17        **MR. KAMALZADEH:**  No, Your Honor.  Just a
18   presentation, and I provided a hard copy for you as well.
19        **THE COURT:**  Well, thank you.  Feel free to come
20   forward and present that.
21        And I neglected to remind you, even though I was
22   reminded by Ms. Hernandez, if you're going to share the podium,
23   we have Lysol wipes up there.  If you'd be kind enough to wipe
24   down after you're finished speaking.
25        **MR. KAMALZADEH:**  I'm going to wipe down, since I

1    already spoke there, Your Honor, and I'll take that podium, if
2    that's okay?
3         **THE COURT:**  That sounds like a good idea.
4         **MR. KAMALZADEH:**  Thank you.
5         (Court was at ease.)
6         **MR. KAMALZADEH:**  May I proceed, Your Honor?
7         **THE COURT:**  Feel free to proceed.
8         **MR. KAMALZADEH:**  As the Court noted, Mr. Diaz-Colon's
9    guidelines are 30 years, 360 months.  And that is extrapolated
10   as to each count.  So as the Government sought out in its
11   sentencing memorandum, they are seeking a sentence of 150
12   years, or 1800 months, as well as U.S. probation is seeking the
13   same, 1800-month recommendation for the parties.
14        With regard to Mr. Diaz-Colon and the exposure with
15   regard to the sentencing guidelines, effectively we're looking
16   at a death sentence.  Granted, the case law supports the Court
17   with regard to 5G1.2.  (d) specifically allows the Court to run
18   these sentences consecutively.  But our arguments to the Court
19   today is that there are factors that warrant the Court consider
20   to consider a downward variance as well as a sentence that runs
21   concurrent to each count.
22        Symbolically, each count captures the conduct in this
23   case.  Each count would give closure to the victims in this
24   case.  And based on the characteristics of Mr. Diaz-Colon, a
25   sentence, Your Honor, of 15 years, a minimum with regard to the

1   statutory exposure in this case, concurrent to all five counts,

2   is what we seek today.

3        If the Court were to sentence Mr. Diaz-Colon to a

4   consecutive sentence, either to the mandatory minimum or to his

5   guidelines, we are effectively throwing away the key and

6   providing him no motivation or incentive for treatment, one of

7   the factors under 3553 that the Court should consider.

8        Pursuant to *Booker*, Your Honor, the Court is now

9   unencumbered and has the ability to consider every convicted

10  person as an individual and every case as a unique study in the

11  human failings.  Specifically, this is one of those cases where

12  we must analyze Mr. Diaz-Colon as an individual and look at him

13  specifically to his conduct as well as the events that led to

14  his conduct.

15       With regard to the 3553 factors, I would like to

16  start with regard to the nature and circumstances of the

17  offense.

18       What you're looking at here, Your Honor, are excerpts

19  from what I would say is the seminal case when you're dealing

20  with offenses related to child production cases.  This is

21  *United States v. Irey*.  The citation is below to the exact

22  paragraph that I'm citing, quoting to.  I'll read for the

23  Court.

24       "On a hard drive they found a collection of more than

25  1200 images of Irey sexually violating young girls.  The agents

1   sent those 1200-plus images to NCMEC, which, in turn, provided

2   an extensive report about where those images had been seen

3   before.  More than 100 separate law enforcement agencies

4   reported to the national center that they had previously turned

5   up some of those images of Irey's sexual abuse of underage

6   girls in their investigation of child pornography.  The graphic

7   images Irey had produced and distributed were already widely

8   known as the famous 'pink wall series,' so named because of the

9   pink walls that could be seen in the background of some of

10  those photos and images.  The series included images of some of

11  the worst child sex abuse the agents had ever seen.  And as the

12  assistant U.S. attorney pointed out at sentencing, 'Pictures of

13  these children, some of whom are four or five, six years old,

14  will forever be out there online.  As a record of their abuse

15  continues to circulate, they will be victimized over and over

16  again.'"

17       Further in the opinion:  "At a change of plea hearing

18  on July 2nd of '07, Irey pleaded guilty to one count, violating

19  18 USC 2251(c).  When asked to tell the Court what he had done,

20  he replied, 'Went to overseas, visited numerous brothels where

21  they had underage children and photographed them, had sex with

22  them, had them on my laptop when I entered the United States.'

23  He added -- he added, excuse me, that it happened over a period

24  of four years, the last time being in 2006.  Irey agreed with

25  the Government's statement at the hearing that he had admitted

1    to the agents that while overseas he had sex with children, he

2    knew they were minors, had produced pornographic images of

3    that, and had then transported those images back to the

4    country."

5            Later in the opinion, they identified the expert

6    stating that Irey was capable of relating intimately to adult

7    women but he found Irey experienced intense sexual cravings for

8    female children as well.  And Irey was "highly sexualized" and

9    admitted having engaged in forms of sexual-disordered behavior

10   with prostitutes, sadomasochistic acts, having viewed images

11   involving bestiality on the internet.

12           In this last paragraph, Your Honor, Irey admitted to

13   Dr. Shaw that he had used prostitutes in this country and in

14   doing so contracted a venereal disease which he passed along to

15   his wife.  Irey admitted that he had visited child brothels in

16   Cambodia for the past five years.  He did, however, lie to

17   Dr. Shaw about some of the details of the sexual abuse of

18   children.

19           The reason I point this out to the Court is if the

20   Court is familiar with this opinion in this case, Mr. Irey

21   received a downward variance based on some of the mitigation.

22   It went up to the Eleventh Circuit.  It then went on en banc

23   and the Eleventh Circuit itself imposed a 30-year sentence.

24           When you -- we look at individuals that come before

25   the Court, we're looking at a spectrum of individuals with

1    regard to their conduct.  And the reason I point this out is

2    this is an individual that, for multiple years, traveled the

3    world and captured the images of children that he was having

4    sex with, brought them back, bartered with them over -- online

5    and even was synonymous with the term "pink wall series" with

6    the number of images he had created and the number of children

7    he had abused.  However, Mr. Irey was only exposed to 30 years.

8            Here we are today with Mr. Diaz-Colon who has been

9    very remorseful.  That's all throughout his PSR, including his

10   interview with Dr. Ruiz.  He's accepted responsibility.  The

11   time frame that relates to the offense conduct is very small.

12   It's a small window of time with regard to the activities with

13   the three children.  The Government has had plenty of time to

14   review the evidence in this case to determine if there's anyone

15   else out there that would be of concern, and nothing has been

16   provided to the defense which indicates this was isolated.

17           In our mitigation appendix, Your Honor, we have a

18   letter from a friend of his who indicates that he was --

19   Mr. Diaz-Colon was around her children and was never a threat.

20   We have information that family members that Mr. Diaz-Colon was

21   around and their children were interviewed and nothing came --

22   came about of that information.

23           So this isn't an individual that's preying on all

24   children across the board.  There are circumstances, based on

25   statements Mr. Diaz-Colon made to the probation office in his

19

1    PSR report and to Dr. Ruiz, that when he's dealing with all of
2    the trauma from his past, he uses illicit substances and, as a
3    result, goes down this rabbit hole, for lack of a better term.
4    The fact that -- the mitigation letters that are provided
5    indicates that Mr. Diaz-Colon, as well as Dr. Ruiz's summary
6    and conclusion of her findings, indicate that he is not -- or
7    does not have a propensity to seek out children.
8         Dr. Ruiz points out that he's able to have a healthy
9    relationship with adult women.  She also pointed out that he
10   was very forthcoming with the information, was very earnest,
11   very remorseful, broke down multiple times throughout the
12   interview.  The same occurred during his probation officer
13   interview where he became very emotional.  It's documented
14   throughout our mitigation that Mr. Ruiz -- pardon me,
15   Mr. Diaz-Colon, effectively, it's a battle within himself,
16   hates himself for what has happened and regrets everything that
17   has occurred.
18        I think it's important that these photos were not
19   distributed -- or these videos were not distributed.  They were
20   simply found on his device, effectively isolating the exposure
21   of these children.
22        Dr. Ruiz indicates in her report that Mr. Diaz-Colon
23   is a low risk for reoffending as long as he received the proper
24   treatment.  The factors that she considered are that he's
25   maintained healthy, intimate adult relationships.  He has skill

20

1    sets, meaning he's employable.  There are no intellectual
2    deficits that would prevent him from successfully completing a
3    dual-diagnosis treatment program.
4         The next slide, Your Honor, as I've appeared before
5    you on many occasions, I present to you a list of cases the
6    Court has sentenced itself with multiple defendants in this
7    district that deal specifically, or at least in part, with
8    production counts.  And as you can see to the far right, we
9    have the guideline range and the sentence imposed.  And when
10   we're looking at the nature and characteristics of the offense
11   committed, we have to look at Mr. Diaz-Colon isolated as well
12   as in comparison to other individuals that are similarly
13   situated.  And our argument, Your Honor, is his conduct in this
14   case, though egregious, warrants a variance considering the
15   short window of time involved, the fact that there's no
16   distribution of the images, as well as the other factors that
17   I've articulated with regard to Mr. Diaz-Colon and his personal
18   characteristics.
19        The next factor for Your Honor is history and
20   characteristics of Mr. Colon himself.  And so the question is,
21   is how do we go from this little boy to Mr. Diaz-Colon today?
22   The first picture is when Mr. Diaz-Colon was seven years old.
23   That is when -- the first time he was sexually abused.  Today
24   he's before this Court at the age of 33.
25        How do we get there?

21

1   The first is his grandmother's letter that's in our

2 sentencing appendix at Doc. 46.  This is at page 2, paragraph 2

3 and 3.  And she states:  "Edgar's mother" -- meaning his

4 biological mother -- "had two children from another marriage,

5 and we asked her to give him to us."  This is his grandmother

6 speaking.  "Edgar was my first grandchild, and he was the apple

7 of my husband's eye.  Sadly, after our separation, her husband

8 took her [sic] life.  Edgar was about five years old.  I think

9 that my husband's death affected him.  After he died, Astor" --

10 pardon me.  "After he died, Edgar asked for him a lot.  Edgar's

11 mother lived 15 minutes away from us, but she never visited

12 him.  Edgar saw his mother very few times in his life, and he

13 was always sad and asked about her.  I gave him love but

14 noticed that there was sadness in him.  He would ask why his

15 siblings lived with her and he did not.

16   "Edgar and I love each other very much.  We were

17 always together, and he was an intelligent boy and a good boy.

18 But, as I said, he was always very sad."

19   The next excerpt is from his mother's letter at

20 Doc. 46, page 6, paragraph 1, where she introduces herself.

21 "My name is Melinda Colon.  I'm Edgar Diaz-Colon's mother.

22 What little I can say is that I know that I was not in my son's

23 life.  His grandmother raised him since he was very young.

24 When Johan was young, I was pregnant with my fourth child, and

25 I already had two before Johan.  Afterwards, I had two more,

22

1 and I had a total of six sons.  And I know that my son missed

2 me a lot, and I know that it might had affected his life.  I

3 never visited him, but I stayed in contact."

4   The next is from Dr. Ruiz's report at Doc. 47, at

5 page 27, paragraphs 2 and 3, Your Honor.  This is her

6 reporting.  "The defendant tells me that he has -- he was

7 sexually abused by his oldest brother at least twice during

8 ages seven and eight.  He never talked about it, thinking it

9 was normal.  His grandmother would hit him with whatever she

10 had in her hand if he misbehaved.  His peers would bully him

11 because he was somewhat overweight and wore glasses, and they

12 would call him names and fat-shamed him.  They would also say

13 he would never amount to anything.

14   "He denies any incidents of trauma to the head but

15 said he was involved in an automobile accident in Tampa where

16 he hit his head and had a concussion resulting in

17 disorientation for a couple of months with the feeling of heavy

18 arms.  He had difficulty concentrating but did not go to the

19 hospital and refused to get checked."

20   As to the psychiatric treatment:  "The defendant

21 tells me that his grandmother took him to see a doctor or

22 therapist when he was young, because he was hyperactive, and

23 was placed on Ritalin, but he would not take it.  When older,

24 he started taking Adderall which he obtained on the streets,

25 and he took it until three months prior to the alleged offense.

1    At age 15, he tried to commit suicide by overdosing on his

2    grandmother's medication, which was related to a breakup with

3    his girlfriend."

4         And lastly, Your Honor, again, at Dr. Ruiz's report,

5    47, at 29, paragraph 1, she spoke with the grandmother.  "She

6    tells me that his birth and development were normal.  The

7    mother allowed them to have the child when he was only three

8    months old.  Her husband William was madly in love with him,

9    and he would go every weekend to pick him up until finally they

10   had custody of the child.  However, when Edgar was about six

11   years of age, William hung himself.  This greatly affected the

12   defendant.  Edgar was his grandfather's light.

13        "He was smart in class, although he was hyperactive.

14   And his mother never inquired about him, nor does she do so at

15   this time.  The rest of the family does not support him.  She

16   believes the mother would smoke marijuana.  She tells me that

17   the child -- as a child, he was extremely hyperactive, and they

18   had placed him on medication, but she didn't really want him to

19   take it.  He would then take them occasionally, and did not

20   really do much for him.

21        "When his common-law wife would not allow him to see

22   his daughter, this affected him tremendously.  About the age of

23   18, he began to use drugs.  He had never been problematic or

24   gotten into fights.  He was not aggressive, and he never told

25   about auditory or visual hallucinations, but she always saw him

*United States District Court*
*Middle District of Florida*

1    as sad and depressed."

2         So why am I quoting all these different sections

3    within the PSR and the mitigation?  The studies -- and this is

4    at Exhibit C of the binders that you have.  The first article

5    is a *New York Times* article.  It's from 1989.  I think that's

6    relevant because this has been something that's studied for a

7    very long time, Your Honor.  This article from the *New York*

8    *Times* addresses key factors found to "worsen the long-term

9    impact of abuse":  Abuse that starts early, abuse that lasted

10   for a duration of time, abuse in which the perpetrator had a

11   close relationship with the victim, and abuse the child

12   perceived as particularly harmful, and abuse that occurred

13   within a cold emotional atmosphere in the family.  These

14   factors, researchers say, help identify which children need

15   treatment most urgently.

16        The reason that's relevant here is Mr. Diaz-Colon

17   never received that treatment.  What's important to note is

18   that the victims here were caught early.  They're going to have

19   an opportunity to be supported by a loving family.  They're

20   going to have the opportunity to receive the services they need

21   to recover, as best as they can, considering the circumstances

22   they were put in.  However, to understand why we're here today,

23   we must analyze what happened to Mr. Diaz-Colon.  And

24   specifically, when these factors are not treated, we have a

25   cycle of abuse that occurs.

*United States District Court*
*Middle District of Florida*

25

1    Exhibit D, which is the National Institute of

2  Justice, that article, researchers sought to find out whether

3  those who had been sexually abused were more likely to engage

4  in later delinquent and criminal behavior than those who had

5  experienced other types of abuse.  Effectively, the question

6  is, is there an inevitability or likelihood from being sexually

7  victimized in childhood to being charged with an offense in

8  adulthood, particularly a sex offense?  Now, specifically, they

9  found that there are factors that exacerbate or create a

10  heightened risk.  And those factors are an individual that's in

11  a very cold emotional environment, that is exposed to mental or

12  some type of verbal abuse, illicit substances, among other

13  factors that are found in Mr. Diaz-Colon's case.

14    We have abandonment issues from his family.  We have

15  the loss of his grandfather at an early age.  And then we have

16  sexual abuse by a family member, close family member, and then

17  further abandonment from his nuclear family, brothers and

18  siblings that resent him.  So there's this environment

19  festering, that's causing -- effectively, what the studies

20  show, Your Honor, is when a child is abused at an early age,

21  cognitively, that child remains suppressed inside.

22  Effectively, we all grow up as adults, and individuals like

23  Mr. Diaz-Colon grow up to be adults.  However, they have issues

24  with regard to coping with the trauma that was never treated.

25    As Dr. Ruiz reported, and as Mr. Diaz-Colon

26

1  self-reported to her as well, he utilized illicit substances to

2  cope with the untreated trauma.  And one of the reasons that

3  we're here today is during those episodes where he's using

4  multiple illicit substances he goes into these circumstances

5  where a child is victimized.

6    The next is Exhibit E, Your Honor.  This is the

7  United States General Accounting Office.  They conducted a

8  report back in 1996.  The title says itself, "Cycle of Sexual

9  Abuse, Research Inconclusive about Whether Child Victims Become

10  Adult Abusers."

11    What's key here is when you look at an individual

12  that's sexually abused and then everything in their environment

13  remains the same, the results are inconclusive.  But what the

14  General Accounting Office found is that there is support for

15  when -- an example, one retrospective study showed when

16  found -- children are found to be neglected, they are even more

17  likely -- children who were sexually abused to commit sexual

18  offenses as adults.  Again, this is the perfect storm that's

19  being created with Mr. Diaz-Colon as he's a child.

20    We have substances like Ritalin that are being

21  prescribed to him where he needs this Ritalin for purposes of

22  his own personal treatment.  But you have a culture where this

23  type of medication is not accepted.  And so Mr. Diaz-Colon did

24  not have the opportunity to have his sexual abuse treated.  He

25  did not have the opportunity to have his ADHD properly treated.

27

1    And you have an environment that is festering as a child, as he

2    grows up to an adolescent.

3        Exhibit F, Your Honor, in the binder, this is an

4    article by *Living Well* addressing the victim-to-offender cycle.

5    It indicates that research over the past 40 years identified a

6    number of risk factors that can contribute to the likelihood of

7    a person committing sexual offenses.  "Compared to the general

8    population, adults who commit sexual offenses against children

9    tend to show greater aggression and violence, nonviolent

10    criminality, anger and hostility, substance abuse, paranoia,

11    mistrust, and have diagnosable antisocial personality

12    disorders, to be more likely to show anxiety, depression, low

13    self-esteem, an external locus of control, they feel they are

14    not in control or responsible for their own actions.

15    Generally, these individuals have more problematic sexual

16    patterns, including fantasies and sexually coping strategies --

17    and sexualized coping strategies."

18        When we look at this information, Your Honor, in

19    comparison to Dr. Ruiz's report, these conditions follow in

20    step with regard to what Mr. Ruiz -- pardon me, Mr. Diaz-Colon

21    was dealing with throughout his adolescent years.  We have an

22    individual where it's documented where he's having domestic

23    violence incidents.  You have reporting for U.S. probation with

24    his -- his former partner, that he would become explosive,

25    violent, he'd completely become a different person when on

*United States District Court*
*Middle District of Florida*

28

1    drugs.  This is also reported in the mitigation letters from a

2    close friend of his who stated that Mr. Diaz-Colon is a

3    completely different individual when not using illicit

4    substances.

5        The next slide, Your Honor, again, I don't want to

6    overburden the Court with so many articles, but this is just a

7    list of articles to have in front of you to show that there is

8    article after article that deals with childhood trauma,

9    undiagnosed, and the consequences that that leads to later in

10    life.

11        So as I noted, Dr. Ruiz pointed out in her summary of

12    conclusions the defendant presented with signs and symptoms of

13    a depressive disorder that was untreated.  "As a youth, he

14    suffered from Attention Deficit Hyperactivity Disorder and was

15    treated with Ritalin and Adderall.  Unfortunately, that

16    treatment was not followed through.  And as an adult, he tried

17    to self-medicate with Adderall and progressed to other drugs.

18    It appears that he was self-medicating his depressed state.  He

19    has always had abandonment issues that have not been resolved.

20    He was sad, tearful, and cried throughout his interview.  He

21    has difficulty with sleep and has nightmares with some symptoms

22    of Post-Traumatic Stress Disorder that are still active.

23    However, he has never received psychiatric care and treatment

24    and has never been in a substance abuse rehabilitation

25    program."

*United States District Court*
*Middle District of Florida*

1          Specifically, Your Honor, in this case there is

2     documented multiple occasions that Mr. Diaz-Colon attempted to

3     take his life, first as a teenager and again as an adult.  This

4     follows in the pattern of conduct of individuals that are

5     sexually abused, and have never been treated, with that trauma.

6          Dr. Ruiz points out that systems -- symptoms, pardon

7     me, of Post-Traumatic Stress Disorder and depression include

8     alcoholism and drug abuse, suicidal thoughts and suicide

9     attempts, problems with -- in intimate relationships, major

10    depressive disorder, reoccurring episodes, and severe, without

11    psychotic features, including polysubstance dependency -- and

12    in his case Post-Traumatic Stress Disorder was diagnosed --

13    acute and chronic, acute stress disorder, victim of sexual

14    abuse, child neglect and abandonment by the mother and father,

15    and a depressed mood with mild insomnia, some difficulty in

16    social settings, but generally functioning with moderate

17    symptoms.

18         As I noted and as Dr. Ruiz noted and as

19    Mr. Diaz-Colon reported to U.S. probation, he has a history of

20    suicidal attempts starting at age 15.  This is in the PSR on

21    Doc. 47 in Dr. Ruiz's report.  And she just goes on to identify

22    the factors from his childhood that carry over as an adult that

23    creates this -- for lack of a better term -- a perfect storm of

24    behavior.

25         So the determination is, what is just punishment,

*United States District Court*
*Middle District of Florida*

1     adequate deterrence, and respect for the law and the protection

2     of the public in this type of case?  When we look at Dr. Ruiz,

3     who had an opportunity to interview Mr. Diaz-Colon, she had an

4     opportunity to look at his records both in his case and in his

5     past, and the good thing here is there is an opportunity to

6     rehabilitate.  The question here is, how much term of

7     incarceration do we need to be placed -- does need -- needs to

8     be placed on Mr. Diaz-Colon to allow him to attempt to

9     reintegrate to society?

10         As I noted, running any sentence consecutive to any

11    counts is effectively a death sentence for Mr. Diaz-Colon.

12    He's 33, and we have five counts at 15 years at the minimum,

13    running consecutive.  If my math is correct, it's 75 years.

14    Even with BOP good time, he's not coming out, Your Honor.

15         **THE COURT:**  I think your math is wrong.  I think it's

16    150 years.

17         **MR. KAMALZADEH:**  At 15 years?

18         **THE COURT:**  Oh, no.  You're asking 15.  Oh.

19         **MR. KAMALZADEH:**  15.  I'm sorry.  Yes, 15 years,

20    Your Honor.

21         **THE COURT:**  Because 1800 divided by 12 --

22         **MR. KAMALZADEH:**  That 150, if he's maxed out.

23         **THE COURT:**  Which is what, I believe, the Government

24    is asking for.

25         **MR. KAMALZADEH:**  Yes, Your Honor.

*United States District Court*
*Middle District of Florida*

1        **THE COURT:**  All right.  Go on ahead.

2        **MR. KAMALZADEH:**  Yes.  If he even were --

3        **THE COURT:**  You're asking for 15 years on each count?

4        **MR. KAMALZADEH:**  Yes, Your Honor.  And if you were to

5   run them consecutive, it's 75, if my math is correct, 15 and 5,

6   25.

7        And so effectively, what are we attempting to

8   accomplish?  One is a deterrence factor to Mr. Diaz-Colon.  One

9   is ensuring that the conduct in this case is properly accounted

10  for and any other individuals that come before this Court

11  understand the ramifications of this type of conduct.

12        Protection to the public, that can be in a couple of

13  ways.  With a 15-year concurrent sentence across the board, we

14  allow Mr. Diaz-Colon to get the proper treatment in BOP

15  facilities.  And with the imposition of a term of supervision

16  of just as long, of 15 years, that allows this Court to monitor

17  his progress, effectively, once he's released.  On top of that,

18  Your Honor, the term of incarceration of 15 years will ensure

19  that the victims in this case will be adults by then and no

20  longer have to worry about Mr. Diaz-Colon harming them as a

21  child.

22        A term of incarceration of 15 years, with the 15

23  years of supervision, concurrent on all counts, will ensure

24  that once he's released, the strict requirements of being

25  required to register as a sexual offender and all the

1   collateral consequences that follow, will hold him accountable

2   for his conduct.

3        As we noted, and as Dr. Ruiz noted, Mr. Diaz-Colon

4   would benefit from a long-term dual-diagnosis residential

5   program.  She noted that he has sufficient intelligence to

6   benefit from this type of program.  This is not an individual

7   that we need to throw away.  Effectively, any sentence of

8   consecutive terms, we are essentially throwing this individual

9   away.  There is no value for life at that point.

10        I ask the Court to reflect upon the duration of the

11  abuse in this case.  It was short.  There was no distribution

12  of the videos.  Law enforcement caught this early on.  I think

13  it's important, with regard to Mr. Diaz-Colon's behavior after

14  being arrested, he was forthcoming.  He's admitted his conduct,

15  and he's extremely remorseful.

16        I would point out and remind the Court that in *Irey*,

17  we have an individual who traveled the world and bartered,

18  effectively, children for his own gain and pleasure, and that

19  individual only got 30 years.

20        The next factor I'd like the Court to consider is

21  this *Notre Dame Law Journal* article.  It just addresses how

22  sometimes in the 3553 analysis we undervalue the

23  rehabilitation, training, and treatment.  And I emphasize that,

24  Your Honor, because, as I said, any exposure that includes

25  consecutive sentences, either the top of the guidelines or at

1    the bottom of the statutory minimum, there is no incentive for
2    Mr. Diaz-Colon to improve himself and have hope, in some
3    respects, that he can effectively receive the treatment that he
4    needs, that he never got as a child, in order to return to
5    society and have a second chance.
6          There are victims in this case.  There's no doubt
7    about it.  But another thing the Court should consider is
8    there's a fourth victim, and that's Mr. Diaz-Colon.  Not to
9    take away from the impact of what he's created with regard to
10   the three children in this case, but the -- the evidence shows
11   that we have an individual that was sexually abused and
12   abandoned and did not receive the proper treatment that he
13   should have.  And we have an opportunity to afford him that
14   treatment and at least an opportunity to regain himself later
15   on in life.
16         As I started, I asked, "Who is Mr. Diaz-Colon?"  As I
17   pointed out in our sentencing mitigation, you have a teenager
18   who was a cadet, who wanted to serve in the military, whose
19   innocence was taken from him at an early age.  And the data
20   supports that individuals like Mr. Diaz-Colon who have their
21   innocence robbed of them and don't receive the proper treatment
22   and care and support that they should, that that cycle of abuse
23   repeats itself.
24         We believe a sentence of 15 years as to each count,
25   concurrent, symbolically holds Mr. Diaz-Colon accountable to

*United States District Court*
*Middle District of Florida*

1    each child.  Each child has their day in court.  Fifteen years
2    holds him accountable.  And we ask that 15 years to also follow
3    with 15 years of supervision, Your Honor.
4          Thank you.
5          **THE COURT:**  All right.  So I'm going to presume that
6    you combined your mitigation presentation with your final
7    argument.  You did it all in one.
8          **MR. KAMALZADEH:**  I'm sorry.
9          **THE COURT:**  That's fine.  So what we're going to do
10   now, the Government hasn't had a chance to call their witnesses
11   yet.  We'll just have the Government call their witnesses, and
12   then you can make your sentencing argument, and we'll move on
13   to the conclusion.
14         So, Ms. Chang, are you ready to proceed?
15         **MS. CHANG:**  Yes, Your Honor.  The United States calls
16   Special Agent Kevin Kaufman.
17         **THE COURTROOM DEPUTY:**  Agent Kaufman, please raise
18   your right hand.
19              **SPECIAL AGENT KEVIN KAUFMAN**
20   was called as a witness and, having first been duly sworn,
21   testified as follows:
22         **THE WITNESS:**  I do.
23         **THE COURTROOM DEPUTY:**  Please have a seat.
24         **THE COURT:**  All right.  Good morning.  Please make
25   yourself comfortable with the chair's proximity to the

*United States District Court*
*Middle District of Florida*

1   microphone and state your full name into that microphone.

2   Please spell your last name.

3           **THE WITNESS:**  It's Kevin Kaufman, K-A-U-F-M-A-N.

4           **THE COURT:**  Ms. Chang, your witness.

5                     DIRECT EXAMINATION

6   **BY MS. CHANG:**

7   **Q.**   Good morning, Agent Kaufman.  Where do you work?

8   **A.**   I work for the FBI.

9   **Q.**   What do you do there?

10  **A.**   I'm assigned to the Tampa division Violent Crimes Against

11  Children Task Force.

12  **Q.**   Did you participate in the investigation of the defendant?

13  **A.**   I did.

14  **Q.**   And during the investigation, how many child victims were

15  identified?

16  **A.**   Three.

17  **Q.**   Was the FBI able to identify any other victims?

18  **A.**   No.

19  **Q.**   Why not?

20  **A.**   The subject had multiple videos and images on his devices.

21  They were very similar to the victims that were the live

22  victims that we were able to identify, and we could not

23  identify any of the other victims or potential victims in those

24  other videos.

25  **Q.**   How old was CV-2 when the defendant victimized her?

*United States District Court*
*Middle District of Florida*

1   **A.**   Seven years old.

2   **Q.**   How old was CV-3 when the defendant victimized her?

3   **A.**   Six years old.

4   **Q.**   And are they sisters?

5   **A.**   Yes.

6   **Q.**   Were both of them forensically interviewed?

7   **A.**   They were.

8   **Q.**   By whom?

9   **A.**   Jacqlyn Hordern at the Kids House in Seminole County.

10  **Q.**   And is that a child advocacy center for the state?

11  **A.**   Yes.

12  **Q.**   And when were they interviewed?

13  **A.**   They were interviewed, I believe -- I've got to get the

14  date.  I'm sorry.

15  **Q.**   When relative to the defendant's arrest?

16  **A.**   I'm sorry.  Right after the defendant was arrested.

17  **Q.**   Were the interviews recorded?

18  **A.**   Yes.

19  **Q.**   And were they transcribed?

20  **A.**   They were.

21  **Q.**   And just for clarity of the record, is Government

22  Exhibit 1A the recorded interview of CV-2?

23  **A.**   Yes.

24  **Q.**   And is 1B the -- I'm sorry, the transcript of CV-2's

25  interview?

*United States District Court*
*Middle District of Florida*

37

1   **A.**   Yes.

2   **Q.**   Is 2A the recorded interview of CV-3?

3   **A.**   Yes.

4   **Q.**   And is 2B the transcript of CV-3's interview?

5   **A.**   Yes.

6   **Q.**   Have you reviewed these?

7   **A.**   I have.

8   **Q.**   And according to CV-2, how did the defendant sexually

9   abuse her?

10  **A.**   The defendant made her or forced her to perform oral sex

11  multiple times and ejaculated in her mouth.  He multiply --

12  anally and vaginally raped her multiple times.

13  **Q.**   Where, locationally, did he abuse her?

14  **A.**   It was a makeshift studio that was in the garage of the

15  residence of the girls' house.

16  **Q.**   And according to CV-2, did the defendant abuse her on one

17  occasion, so that is on a single day, or on multiple days?

18  **A.**   Multiple.

19  **Q.**   Did he also physically abuse her?

20  **A.**   He did.

21  **Q.**   How?

22  **A.**   He would strike her with a belt.  He would duct-tape her

23  mouth, and he would do this to keep her quiet.

24  **Q.**   You're kind of touching on this, but did the defendant

25  also threaten CV-2?

*United States District Court*
*Middle District of Florida*

38

1   **A.**   On multiple occasions while the act was going on, the

2   defendant would whisper to her that, "Hey, if you told your

3   parents, I'm going to kill you."

4   **Q.**   Did the defendant also -- I'm sorry.  Did CV-2 indicate

5   that the defendant had rules that he made her follow?

6   **A.**   Yes.

7   **Q.**   What were those rules?

8   **A.**   Not to cry out and not to -- not to tell her parents --

9   while they were doing it.

10  **Q.**   And what happened if she broke the rules?

11  **A.**   He would beat her.

12  **Q.**   Was CV-2 present at times when CV-3 was also abused by the

13  defendant?

14  **A.**   Yes.

15  **Q.**   And what did CV-2 try to do about that?

16  **A.**   CV-2 tried to protect CV-3 by telling Mr. Colon to stop

17  what he was doing.

18  **Q.**   And how did the defendant react?

19  **A.**   He disregarded her pleas for help and Mr. Colon continued

20  to abuse CV-2.

21  **Q.**   What did CV-3 say in her interview about how exactly the

22  defendant sexually abused her?

23  **A.**   CV-3 stated that Mr. Colon performed -- made her perform

24  oral sex on him and oral sex on her -- Mr. Colon would

25  perform -- and, also, Mr. Colon would anally rape her and would

*United States District Court*
*Middle District of Florida*

1    digitally penetrate her vagina with his finger.

2    **Q.**   Let's talk about CV-1.  How old was CV-1 when the

3    defendant abused her?

4    **A.**   Three.

5    **Q.**   And how did CV-1 know the defendant?

6    **A.**   It was the niece of his girlfriend at the time or live-in

7    roommate.

8    **Q.**   Was CV-1 interviewed?

9    **A.**   Yes.

10   **Q.**   By whom?

11   **A.**   The Pasco County Child Protection Team.

12   **Q.**   And was that forensic interview recorded?

13   **A.**   It was not.

14   **Q.**   Why not?

15   **A.**   It's against their policy to record interviews with

16   children.

17   **Q.**   Was a written report about CV-1's interview generated?

18   **A.**   Yes.

19   **Q.**   And is that what is contained in Government Exhibit 3?

20   **A.**   Yes.

21   **Q.**   What did CV-1 say about how the defendant sexually abused

22   her?

23   **A.**   He would touch and kiss her buttocks all the time and

24   kissed her vagina.

25   **Q.**   What did CV-1 say about how the defendant physically

1    abused her?

2    **A.**   That he would beat her and hit her.

3    **Q.**   And was that on one occasion or multiple occasions?

4    **A.**   Multiple.

5    **Q.**   During the investigation, did law enforcement obtain not

6    only the defendant's cell phone but also multiple storage

7    devices?

8    **A.**   Yes.

9    **Q.**   Digital storage devices?

10   **A.**   Yes.

11   **Q.**   Who did law enforcement obtain those digital storage

12   devices from?

13   **A.**   From Mr. Colon's live-in girlfriend or roommate at the

14   time.

15   **Q.**   And who did the girlfriend say that the devices belonged

16   to?

17   **A.**   Mr. Colon.

18   **Q.**   Where had she found them?

19   **A.**   Found them in his vehicle and also around the apartment

20   they lived in.

21   **Q.**   And did some of those various storage devices contain

22   child sex abuse videos that depict the defendant abusing

23   children?

24   **A.**   Yes.

25   **Q.**   Approximately how many child sex abuse videos were on the

1   defendant's storage devices?  Not his cell phone, just the

2   storage device.

3   **A.**   Well over 1500.

4   **Q.**   And those, for clarification, were not all of him abusing

5   children, correct?

6   **A.**   That's correct.

7   **Q.**   Have you reviewed the United States' sentencing

8   memorandum?

9   **A.**   I have.

10  **Q.**   And, in particular, did you review the descriptions of

11  three videos on pages 7 and 8 of the sentencing memorandum?

12  **A.**   Yes.

13  **Q.**   Are those accurate descriptions of videos found on the

14  defendant's devices?

15  **A.**   Yes, ma'am.

16  **Q.**   What age range of children were depicted in the sex abuse

17  videos on the defendant's storage devices?

18  **A.**   It ranged in age from infant all the way up to 16, 17

19  years old.

20  **Q.**   What types of sex acts were depicted in those child sex

21  abuse videos in the defendant's possession?

22  **A.**   It was an array of collection:  Bestiality; there was

23  bondage; oral, anally rape of young kids ranging in age from --

24  all the way from infant, all the way up to 16, 17 years old.

25         **MS. CHANG:**  Nothing further, Your Honor.

1          **THE COURT:**  Cross-examination?

2          **MS. KELLY:**  Yes, please.

3                    **CROSS-EXAMINATION**

4   BY MS. KELLY:

5   **Q.**   Good morning.

6   **A.**   Good morning.

7   **Q.**   Child victim 1 was assaulted on July 27th, 2019?

8   **A.**   If that's the accurate date, yes.

9   **Q.**   And based on your recollection, did this happen in

10  Zephyrhills, Florida?

11  **A.**   Yes.

12  **Q.**   And child victims 2 and 3 were assaulted on July 8th,

13  2018; is that correct?

14  **A.**   They were assaulted multiple times, but that is the

15  reported date, correct.

16  **Q.**   And is that reported date approximately a year before -- a

17  year before child victim 1 was assaulted?

18  **A.**   Yes.

19  **Q.**   There's no indication that Mr. Diaz-Colon ever traveled

20  back to Sanford after his arrest?

21  **A.**   After Mr. Colon's arrest?

22  **Q.**   I'm sorry.  There's no indication that Mr. Diaz-Colon

23  traveled back to Sanford from Zephyrhills, Florida?

24  **A.**   I can't answer that.  I don't know if he traveled back and

25  forth.

1    **Q.**   That's fine.

2        And you indicated that the transcripts of E.O. and B.O.

3    are accurate representations of their interviews?

4    **A.**   Yes.

5    **Q.**   Excuse me. Child victims 2 and 3?

6    **A.**   2 and 3, yes.

7    **Q.**   In both of the interviews of child victims 2 and 3, didn't

8    they give the interviewer information about a three-year-old

9    child?

10    **A.**   They had knowledge about the abuse of the three-year-old

11    child, that Mr. Colon had abused a three-year-old child, that's

12    correct.

13    **Q.**   And didn't they tell the interviewer that that knowledge

14    came from either their mom or their dad?

15    **A.**   That's correct.

16    **Q.**   So it's correct if I were to ask you that a portion of

17    child victim 2 and child victim's 3 interview with the

18    interviewer was influenced by their parents?

19    **A.**   No. I don't think so.

20    **Q.**   Even though they told the interviewer that "mommy and

21    daddy" gave them information about child victim 1?

22    **A.**   Both of the child interviews, both CV-2 and CV-3 were

23    focused more on the instance in their involvement with

24    Mr. Colon, not with CV-1.

25    **Q.**   I understand what the focus of the interview was. But in

*United States District Court*
*Middle District of Florida*

1    the interview both child victims 2 and child victim 3 cited

2    information that came from their parents, correct?

3    **A.**   That's correct.

4    **Q.**   Okay. Thank you.

5        **MS. KELLY:** No further questions, Your Honor.

6        **THE COURT:** Redirect examination?

7                **REDIRECT EXAMINATION**

8    **BY MS. CHANG:**

9    **Q.**   Is there any indication that the parents of CV-2 and CV-3

10    influenced their testimony as to the defendant's sexual abuse

11    of them?

12    **A.**   Absolutely not.

13    **Q.**   And, in fact, is there evidence that the defendant

14    actually did sexually abuse CV-2 and CV-3?

15    **A.**   There is.

16    **Q.**   Are four of the five charged counts in this case to which

17    the defendant pled guilty, are they depictions of the defendant

18    sexually abusing CV-2 and CV-3?

19    **A.**   Yes.

20    **Q.**   And in CV-2's interview, did she or did she not state that

21    the defendant himself showed him [sic] a video of him abusing a

22    three year old?

23    **A.**   Yes.

24    **Q.**   And in that video, did CV-2 tell the interviewer that she

25    saw the video and asked the defendant, "Why did you do this?"

*United States District Court*
*Middle District of Florida*

1    **A.**    Yes.  And I think his response was, "Because I can."

2              **MS. CHANG:**  I have nothing further, Your Honor.

3              **THE COURT:**  All right.  If -- before I hear -- is

4    there any further -- feel free to be seated at counsel table.

5              Is there anything further in terms of evidentiary

6    presentation from the United States?

7              **MS. CHANG:**  Not evidence, Your Honor.  But the father

8    of CV-2 and CV-3 would like to be heard.

9              **THE COURT:**  And they will be heard.  And before

10   they're heard, I neglected to ask -- if the defendant would be

11   kind enough to stand at counsel table.

12             You have a very important decision to make, and

13   that's whether or not you're going to be making a statement to

14   the Court prior to my imposing the sentence.  The decision is

15   yours and yours alone, but I need to make sure that whatever

16   decision you make, that decision is knowing, voluntary,

17   intelligent, and with the advice of counsel.  Have you had a

18   chance to talk to your attorneys about whether or not you will

19   be making a statement here today?

20             **THE DEFENDANT:**  Yes.

21             **THE COURT:**  Would you like to make a statement?

22             **THE DEFENDANT:**  Yes.

23             **THE COURT:**  All right.  Feel free to do so.

24             **THE DEFENDANT:**  Good morning, Your Honor.

25             **THE COURT:**  I need you to speak -- I'm having trouble

1    hearing the interpreter.  If you could be closer to the

2    microphone, please.

3              Thank you.

4              **THE DEFENDANT:**  Hereby, I am apologizing.  The victim

5    is already -- I want to apologize to the victims for my

6    actions.  I am very sorry for doing so.  I am today sitting in

7    my cell thinking about my behavior, and this will never happen

8    again.  During this time in jail, I have grown to think about

9    the actions, wrong actions, and the consequences and what

10   causes --

11             **COURT REPORTER:**  Excuse me, Your Honor.  May I ask

12   the interpreter to speak up a little?

13             **THE COURT:**  Yes.  Could you say that again?  My court

14   reporter didn't get that.

15             **THE DEFENDANT:**  And what causes the actions, what

16   causes to the people as well as to myself.

17             I am angry at myself, because none of this should

18   have ever happened.  I am terribly sorry.  And if there was a

19   way I had to undo all this, I would definitely do it.  One more

20   time I ask for forgiveness for having caused all this.

21             **THE COURT:**  All right.  Thank you, sir.

22             Feel free to be seated at counsel table.  The Court

23   will definitely take that into consideration prior to imposing

24   a sentence.

25             Ms. Chang, you said that there were a couple of

1    unsworn statements.

2         **MS. CHANG:**  Just one, I believe.

3         **THE COURT:**  All right.

4         **MS. CHANG:**  This is the father of CV-2 and CV-3.

5         **THE COURT:**  All right, sir.  If you'd be kind enough

6    to come up to the podium.

7         He doesn't need to go to the witness chair, just at

8    the podium.

9         Once at the podium, please -- no, the podium right

10   behind you.  That's okay.  This is a very strange environment

11   for many people for the first time.

12        So, sir, if you'd be kind enough to state your full

13   name and spell your last name, and then I'll hear whatever

14   statement you'd like to make.

15        **THE WITNESS:**  My name is Joseph Ortiz, O-R-T-I-Z.

16        **THE COURT:**  Mr. Ortiz, good morning.  Feel free to

17   make your statement.

18        **THE WITNESS:**  At first, this guy used to be a friend.

19   In fact, he was my only friend, considered my best friend.  He

20   was also my coworker for over six years.  I trusted him.

21        We used to work together.  I used to pick him up

22   every day to go to work.  I took him home to his family every

23   day after work.  We ate lunch, and we shared food.  When he was

24   facing hardships in his life, I was there for him.  When he

25   lost his apartment, I took him under my wing and allowed him to

*United States District Court*
*Middle District of Florida*

1    stay in my house, a decision I will regret for the rest of my

2    life.

3         We shared our food with him.  We shared our vehicles

4    with him.  We shared our roof with him.  We helped him in every

5    way we could, free of any charges, and he managed to screw us

6    over in every way that you could imagine.  I even allowed him

7    to even hold my newborn baby daughter.

8         At first, when he lost his car, I lent him my

9    motorcycle so he can use it for his transportation.  He managed

10   to dismantle my motorcycle, piece by piece, until it was no

11   longer working, and left it there like it was scrap just

12   because he was high on drugs and bored.  Secondly, we helped

13   him get his own car from a dealership by motivating him and

14   cosigning over my name to help him out.  The car lasted about a

15   month with him, because he never made any of the payments,

16   because he spent all his earning, his income, on drugs, causing

17   the vehicle to get repossessed, messing up my credit.  All he

18   worried about was getting high and buying drugs.

19        Later on, I learned that it wasn't just that, he also

20   enjoyed molesting and forcing sexual acts on my young little

21   babies.  I didn't know about that until -- until later.

22   Shortly after whatever happened with the vehicle and stuff, he

23   moved back with his ex-wife and his daughter, but I didn't find

24   out what he actually did to my daughter until about a year

25   later.  When he moved out, I cut off all communication with him

*United States District Court*
*Middle District of Florida*

1  because something inside of me just wasn't right and was

2  telling me to do so just for some reason.

3      I should have never allowed him to even enter my

4  house.  My wife and my brother warned me about him, told me to

5  never trust him, but I didn't listen.  Now I'm paying for it, a

6  painful consequence that will haunt me for the rest of my life.

7      One night when I was watching TV at home with my

8  family, and his ex-wife, the mother of his daughter, which is

9  also about the same age as my daughters, knocked on my door.

10  Little did I know that night will torment me for the rest of my

11  life.  She was shaking and didn't know how to tell me.  She

12  told me what he was doing and that she recognized my daughters

13  on the videos and pictures that he had on his phone and that he

14  was possibly sharing these videos and pictures online.

15      When she showed me what he was doing to my babies, I

16  nearly fainted.  This feeling of sorrow and regret overtook me

17  instantly.  I witnessed the sexual acts he was performing on my

18  daughters.  That's something I wish for no father or mother to

19  ever have to witness or for no family to ever have to relive

20  that experience by having to speak about it like I'm doing

21  today.

22      I won't go into any graphic details, but the pain,

23  the things that I saw him doing that night, will forever haunt

24  me.  God knows what he's done before to other kids.  I now look

25  at my daughters differently, in a sad way.  I had let my family

*United States District Court*
*Middle District of Florida*

1  down.  Their innocence is gone.

2      I had to quit my job and switch to a whole new

3  different industry because everything I did in that job brought

4  back hateful memories of him.  I even cut off all communication

5  with everyone that we both knew just so I didn't have to run

6  into him ever again.  Immediately after that, I stopped having

7  anybody over my house, including family members.

8      My wife and I will never be the same.  We wish we

9  could move to a new location away from all this, but we can't

10  due to us not having enough income to afford to do so.  We even

11  took our kids out of public schools and decided to homeschool

12  them to avoid any future pain.

13      My daughters are scared of him.  They told me all

14  these things he did to them and told me that they didn't like

15  any of those things that he forced them to do.  He used to wake

16  up in the middle of the night and force them to do these things

17  while my wife and I were sleeping in the other room.  He

18  threatened them with harm if they ever spoke a word about what

19  he was doing to them.  My daughters are forever scarred.  Their

20  innocence is gone.  Sometimes my daughter wake up with

21  nightmares about this guy doing things to him -- doing things

22  to them, but I always guarantee that they will no longer have

23  to worry about him because I will not allow him near them ever

24  again.

25      And to know that I used to trust this man.  He was

*United States District Court*
*Middle District of Florida*

1    considered family to me.  Only God knows, only God has been

2    able to help us cope with this situation.  If he did this to

3    our little daughters, I wonder how many other little daughters,

4    little girls, he had done this to that nobody is aware of yet.

5         If he was to be released, I wonder, how many other

6    young girls will he hurt?  How many other families will have to

7    go through this?  How much further will his pedophile desires

8    go?  Knowing him, it will only get worse.

9         But I'll leave the decision-making to the Court.  But

10   if it was up to me, I wouldn't let this guy walk free ever

11   again.  I wouldn't want this man to ever hurt anybody else's

12   daughter ever again.

13        **THE COURT:**  Thank you, Mr. Ortiz.  Feel free to be

14   seated in the courtroom.

15        Ms. Chang, if that concludes your presentation of

16   evidence in aggravation, you're invited to make your sentencing

17   argument.

18        **MS. CHANG:**  Thank you, Your Honor.

19        Your Honor, the United States seeks a sentence within

20   the guidelines, specifically the maximum sentence of 150 years

21   for the defendant.

22        The United States does not seek this sentence

23   lightly.  We recognize the gravity of the sentence that we're

24   asking for.  This request is borne from a careful and sober

25   reflection on the nature and circumstances of the defendant's

1    offenses, his history and characteristics, and the factors set

2    forth in Title 18, United States Code, Section 3553(a).

3         The nature and circumstances of the offense, I don't

4    even need to say it.  They are extremely serious.  They are on

5    par with the most serious offenses this Court will ever see.

6    The defendant sexually abused three young children in multiple

7    ways, on multiple days.  And this is something that the defense

8    has characterized as a crime of short duration.  I submit to

9    the Court that any sexual abuse of -- pick any one of them,

10   performing -- being forced to perform oral sex on an adult as a

11   six year old, anal rape, vaginal rape.  Pick any of them.  Even

12   one second of that is too long of a duration.  This happened

13   multiple times, on multiple days, to multiple children.  It's

14   not a short duration.

15        And it happened over a span of time.  As the defense

16   attorney brought out on cross, these offenses were separated by

17   about a year.  Between CV-1 and CV-2 and 3, there was a year of

18   time.  This isn't some crazy spree that happened in a heat of a

19   moment.  This was premeditated over time.

20        The PSR sets forth the five videos that form the

21   basis of the defendant's convictions.  But those five videos do

22   not, in and of themselves, adequately or fairly represent the

23   extent of the defendant's crimes or the circumstances in which

24   they occurred.  Because those videos don't show him vaginally

25   and anally raping children who were no older than your average

1  kindergartener or first grader. Those videos don't show him

2  hitting a child with a belt or berating a child crying for help

3  or threatening to kill a child if she told her parents or

4  taping a child's mouth so she would just be quiet. And the

5  videos do not show the insidious and calculated way in which

6  the defendant gained access to these children.

7        When the defendant was down on his luck, as CV-2 and

8  CV-3's father just told the Court, he, a Good Samaritan, gave

9  the defendant food, vehicles, a roof to stay under in his

10  garage studio. This Good Samaritan gave the defendant a haven

11  just steps from his home because they were best friends. In

12  fact, the defendant was his only friend. And so he even gave

13  the defendant keys to his home so that, like a member of the

14  family, the defendant could shower and use the bathroom.

15        And what did the defendant do in the face of such

16  generosity and the things that we want in a society? He

17  returned evil for good. He used his access to his benefactor's

18  home to access and lure the man's children, CV-2 and CV-3, who

19  were then ages seven and six. And the defendant brought those

20  children into his garage studio, on multiple occasions, and

21  turned what should have been a haven into a house of horrors

22  for those two little girls. Not only did he anally and

23  vaginally rape them repeatedly, he forced them to perform sex

24  acts on him and recorded it. He coerced them to remain silent

25  and literally beat them into submission. He preyed on their

1  vulnerability, their helplessness, and their fear. He is truly

2  the monster that parents fear, and he has irrevocably stolen

3  the innocence from these victims. They are the ones serving a

4  life sentence of their own because of the defendant.

5        And what about CV-1? Three-year-old CV-1 was the

6  niece of the defendant's girlfriend at the time. And that

7  niece visited her aunt and stayed the night, as nieces do, or

8  should be able to do, safely and securely, without being

9  abused. And once again, the defendant pounced on this

10  opportunity and abused her too. It's unclear how many times

11  the defendant sexually abused CV-1 and precisely how he did it,

12  but we know it happened because the defendant made at least one

13  video recording of that. But beyond that, it's hard to say.

14  And why? Why can't we say? Because she was interviewed, but

15  she's three. In 15 years -- the defense is asking for 15 years

16  for this defendant. In 15 years, that three year old, she will

17  just have turned 18. That's how young she is.

18        And as is the case with most three year olds, she's

19  just learning how to use her words. And how can a three year

20  old verbalize the trauma of sexual abuse? Your Honor, you've

21  seen it in Government Exhibit 3. She uses words like "jamma"

22  and "Edgar kissed my jamma." "Edgar touched my butt all the

23  time." That's best a three year old can do.

24        The defendant targeted vulnerable children, children

25  who could not fight back, children unlikely to, and, especially

1    in CV-1's case, could not adequately speak for themselves.  His

2    offenses are despicable, and they weigh in favor of a guideline

3    sentence.

4         And this is the point at which I want to correct

5    something that the defense presented to the Court.  The defense

6    has represented that the guidelines range for this defendant is

7    360 to 1800 months.  That's false.  And I think it's probably

8    just a mistake, but it's a mistake.  It's wrong.  This

9    defendant's guidelines offense level is over 43.  The

10   guidelines pushes it back to 43 because the table ends at 43.

11   But 43 lands at life; not at 360 to life, life.  And so his

12   guidelines range is 1800 months, and that's what he deserves

13   given the nature -- given all the factors that I'm discussing.

14        The history and characteristics of the defendant also

15   weigh in favor of a guideline sentence.  Your Honor, this

16   defendant finished high school.  He finished -- he got a

17   two-year degree in surgical assistance.  He held jobs.  He's

18   had opportunities.  He's lived his life.

19        What did he do with that life?  We're told that he

20   suffered a litany of troubles, and that's a reason to vary

21   downward significantly, by 90 percent, to 15 years.  And in

22   support, we've got this report by Dr. Ruiz.  And she

23   concludes -- I think the defense characterized it as that she

24   concluded that he poses a low risk of recidivism.  But based on

25   what?  Page 1 of that report, which is attached to the final

1    PSR, I'm just going to quote it.  I'll read it.  "I reviewed

2    the following documents:  Indictment, narrative of client's

3    life, timeline of defendant's history, timeline of his

4    residence, telephone consultation with defendant's

5    grandmother."

6         Okay.  Nowhere in there is CV-2's interview, CV-3's

7    interview, CV-1's interview, the case materials.  So there's

8    this phrase, "garbage in, garbage out."  I'm not saying this is

9    garbage.  I'm saying incomplete facts in equals incomplete

10   facts out.

11        And this psychologist was given incomplete facts in,

12   and so on page 6 of her report she concludes with incomplete

13   opinions out.  Her opinions:  "He does not possess deviant

14   sexual interests, pro-offending attitudes, or self-management

15   issues.  He is capable of intimacy skills as he has maintained

16   proper romantic relationships in the past."  Well, we only know

17   about one romantic relationship in the past.  And in that

18   romantic relationship, he abused the ex-girlfriend's

19   three-year-old niece without her knowledge.  So incomplete

20   opinions out.

21        The defendant -- oh, as for this "no deviant sexual

22   interest," the defendant's sexual interest in children is

23   undeniable, and that's what makes him a danger to children both

24   now and in the future.  He stored his vast collection of child

25   sex abuse videos in various places.  He had thousands of them

57

1     on his phone.  He had thousands of them on his digital storage
2     devices.  And the agent described some of those videos, and I
3     did not want to repeat them.  They're in the sentencing
4     memorandum.  Because they don't bear repeating again.  The
5     Court knows what they are.  And one doesn't keep that type of
6     contraband in such vast quantity unless that person has a very
7     serious problem.
8          Now, speaking of problems, the defendant now claims
9     that he was a victim of sexual abuse and abandonment.  And I
10    guess he's arguing that that means he deserves something of a
11    pass or a reduced punishment because of that.  And that
12    argument is fairly common in these sexual-offender cases, and
13    they never really seem to make much sense.  Because if the
14    defendant was a victim of sexual abuse, that means he knows
15    firsthand how horrible it is, how damaging and degrading it is.
16    And someone who understands how terrible sexual abuse is should
17    be the very first to avoid inflicting it on other children.
18         Now, if it's not true, if, as the defendant now
19    claims, it's the opposite, if it's actually the case that his
20    status as a childhood sex abuse survivor makes him so angry, so
21    hurt, so broken, so damaged, and so desensitized to the
22    humanity of others that he felt compelled to inflict that same
23    pain on others -- and that's really the argument that he's
24    making, that all those things are true.  And if that's true,
25    then he is every bit the public menace and danger that his

58

1     offenses indicate that he is.
2          The last thing I want to address, Your Honor, is
3     the -- the amount of time and substance that you were told
4     about sentencing disparities.  And the case of *Irey* was brought
5     to your attention.  And it was outlined for this Court and for
6     everyone today of how awful *Irey*'s conduct was.  "He traveled
7     the world, and he spread his venereal diseases to everyone,
8     including all these children, and he recorded it.  And, look,
9     he only got 30 years."  Well, why did he get only 30 years?
10    Because he only pled guilty to one count, and the max was 30
11    years.
12         And in this other table that the Court -- I'm sorry,
13    that the defense provided to the Court, several of these cases
14    are recent, in recent -- sufficiently recent memory that I can
15    recall the details of them.  Oscar Luis Burgos was sentenced to
16    300 months in a case involving production and receipt.  This is
17    an apples-and-oranges analysis, Your Honor.  Oscar Luis Burgos
18    abused a 14 year old that he met online.  He never laid a
19    finger on her.  But he enticed her to produce pornographic
20    images and received the images.  But he never visited her.  And
21    he got 300 months for the one count of production.
22         Justin Richard Testani was given the maximum sentence
23    of 60 years in a case involving two counts of production.  That
24    case involved at least seven victims, ages roughly 10 to 13.
25    And those were all children that the defendant met online.  He

1  threatened them, as this defendant did.  But he never met them

2  physically and never himself engaged in sex acts with them.  He

3  did entice them and coerce them to produce child pornography,

4  and it was terrible.  And he received his maximum sentence of

5  60 years.

6       Deepak Deshpande had one victim, and he was convicted

7  of online enticement and production.  His victim was 15 or 16

8  years old at the time, and he did meet with her four or five

9  times in person to sexually abuse her.  He recorded it.  And

10 then he arranged to try to have her killed as he was waiting

11 for sentencing.  But he received a life sentence from this

12 Court.

13       My point is, each case has to be taken on its own

14 facts.  And taking this case on its facts, as terrible as they

15 are, it's plain that the severe sentence of 150 years is

16 warranted here.  And so for the reasons set forth in our

17 sentencing memorandum, and including the need to protect the

18 public, to provide adequate deterrence, promote respect for the

19 law, and provide just punishment, we respectfully submit that a

20 sentence of 150 years in this case will be sufficient but not

21 greater than necessary to satisfy the sentencing objectives set

22 forth in Section 3553(a).

23       Thank you.

24       **THE COURT:**  All right.  Thank you for your argument.

25 I'm going to take a brief recess before returning to impose the

1  sentence.  It will be less than 10 minutes.  Court is in

2  recess.

3       (Recess from 11:31 a.m. to 11:37 a.m.)

4       **THE COURT:**  The Court has asked the defendant why

5  judgment should not now be pronounced, and after hearing the

6  defendant's response, the Court has found no cause to the

7  contrary.  The parties have made statements on their behalf or

8  have waived the opportunity to do so, and the Court has

9  reviewed the presentence report.

10      **MR. KAMALZADEH:**  Your Honor, I apologize for

11 interrupting.  But considering the circumstances of the

12 Government's presentation, I would ask a brief rebuttal with

13 regard to --

14      **THE COURT:**  I'll give you the rebuttal, but so you

15 know, you ask for rebuttal in almost every case.  So this is

16 the norm, not the exception.  But I agree with you, based on

17 the severity of the case, if you want an opportunity to address

18 the Court, but that means Ms. Chang will have another

19 opportunity as well.

20      So come on forward.

21      **MR. KAMALZADEH:**  Thank you, Your Honor.

22      The basis of the majority of Ms. -- or the

23 Government's argument, Your Honor, is effectively telegraphing

24 to the Court that the 3553(a) factors, as it pertains to the

25 individual, don't apply, the only pertinent information is the

1    Government's case.

2         We intentionally provided a lot of science in our

3    presentation to support our position as to the actual cognitive

4    and impulsive behavior that developed from a child to an adult.

5    The Government ignores that. Garbage in, garbage out.

6         The science doesn't work for the Government when it's

7    for the defense. The Government had every opportunity to bring

8    its own expert and review our mitigation and present anything

9    in counterargument with regard to Mr. Diaz-Colon's personal

10   history. They chose not to.

11        The fact of the matter is, Mr. Diaz-Colon was

12   victimized as a child. And we're not saying, "Look at

13   Mr. Diaz-Colon in the eyes as an adult today." We're asking the

14   Court to look at his behavior as a result of the conduct that

15   happened to him as a child, the science that backs it, that

16   when you are abused and you don't receive treatment that you

17   need, that is necessary at that developmental stage, that, yes,

18   this develops into hostility, substance abuse, and, as a

19   result, in cases like Mr. Diaz-Colon, when these conditions go

20   untreated, it may lead to a cycle of abuse by the individual

21   who was abused.

22        The Government ignores the fact that -- it's not a

23   matter of Mr. Diaz-Colon should know how he -- how the victims

24   feel. It's clear from the testimony of the victims' father

25   that Mr. Diaz-Colon was using his funds for substance abuse,

1    and that supports the science and the information presented in

2    mitigation that when he actively engaged in this kind of

3    conduct is when he was self-medicating with illicit substances,

4    multiple illicit substances.

5         We can't take away what happened to the victims. It

6    is beyond words, for sure. But we also have to take in the

7    nature and characteristics of an individual in this case. And

8    we provided that information to the Court so the Court can make

9    a reasoned imposition of sentence.

10        With regard to our arguments in our cases, the

11   defense always puts forth the defense and arguments that are

12   unique to the characteristics of our client. In

13   Mr. Diaz-Colon's case, we presented the mitigation as it was

14   uniquely curtailed -- or formatted to him as a defendant. This

15   is not a boilerplate argument, Your Honor. These aren't just

16   facts that we create out of the sky, out of thin air, and come

17   to this Court and throw as much possible -- as much as we can

18   against the wall in order to get the best possible outcome for

19   our client.

20        This is a very difficult case. This is not easy

21   considering the facts of the offense. But what is clear here

22   is that we have three victims that were abused in a small time

23   frame. Now, I understand the Government's argument with regard

24   to the time itself. But our argument is these -- similar type

25   of cases, the abuse goes on for a long duration of time and

1    there is much more harm.

2              We do not negate or play down the fact that the

3    children were harmed in this case.  But the reality is, is that

4    they have a very loving family.  And we've heard it from the

5    family themselves, they have the support to recover.

6    Mr. Diaz-Colon has never had that opportunity, never.  It's

7    well documented.  And when his parents were supposed to be

8    there, they weren't.  And when his grandmother was supposed to

9    be there for him, she also dropped the ball with regard to

10   treatment.

11             And so that is why we are asking for the 15 years,

12   concurrent to all five counts, and then 15 years of

13   supervision, lifetime registration as a sexual offender.

14   Mr. Diaz-Colon will not have the opportunity to do anything

15   without approval or constant monitoring by the federal

16   government and also the local government.  He needs the

17   treatment.  But I must stress that any sentence that runs

18   consecutive to the counts is effectively telling Mr. Diaz-Colon

19   he has no value to society and we're okay throwing him away.

20   And when we impose that sentence, you're not imposing it on

21   Diaz-Colon as the adult, you're imposing it on Diaz-Colon the

22   child that was molested at seven years old.  And that's what

23   we're trying to convey to the Court.

24             **THE COURT:**  I'm not, in fact, imposing it on a child.

25             **MR. KAMALZADEH:**  I understand, Your Honor.

1              **THE COURT:**  So don't say that.

2              **MR. KAMALZADEH:**  But the science supports that --

3              **THE COURT:**  The science supports that I'm imposing a

4    sentence on a child today?

5              **MR. KAMALZADEH:**  In developmental aspects, yes, Your

6    Honor.  And with regard to the psychology and the science that

7    supports it -- I understand physically he's an adult.  I'm not

8    blind to that.  I understand that.  But the science supports

9    that when an individual is abused at such an early age and they

10   do not receive that treatment --

11             **THE COURT:**  You know, just because you put "the

12   science supports" in front of your statement doesn't make it

13   accurate.

14             **MR. KAMALZADEH:**  Well, that is up to the Court to

15   determine what mitigation --

16             **THE COURT:**  I understand that.

17             **MR. KAMALZADEH:**  -- it wants to take into

18   consideration.

19             **THE COURT:**  I understand that.

20             **MR. KAMALZADEH:**  But that is why we presented so much

21   in support of that argument, Your Honor.  But the Court has

22   those 3553(a) factors it must consider, and we ask the Court to

23   take into consideration those factors.

24             **THE COURT:**  All right.  Thank you for your argument.

25             Would the Government like to respond?

1      **MS. CHANG:**  Your Honor, I think the irony in the

2  rebuttal is that the defense accuses the Government of ignoring

3  the defendant and who he is by saying, "Oh, well, look, we

4  presented all the science that supports this idea that if

5  you're abused as a child, sexually, you're going to not be able

6  to cope if you're not helped, and you're going to go abuse

7  other people."  And this science that they cite is vague.  It

8  relates to unnamed people of unknown origin.  We don't know the

9  particular circumstances of their lives.  And we put out

10  science as a whole, and then we say, "Look, this is what

11  generally happens," and, "Look, what generally happens is what

12  specifically happened to him."  That's actually -- the irony is

13  that ignores the individual.

14      The Government has put before the Court -- put before

15  the Court the defendant's actual conduct, evidence of his

16  actual sexual interest in children, evidence about the way

17  he -- this specific individual -- got access to kids, the way

18  he abused the trust of his friend, and the way he threatened

19  kids.

20      You don't need science, Your Honor, to tell you about

21  this defendant.  We already did.

22      **THE COURT:**  All right.  Thank you for your

23  impassioned arguments.

24      All right.  Just a couple of things before we move on

25  to the sentencing.

1      I would say that it's not lost on me that a pretty

2  effective defense argument -- and I think you did a good job

3  here on this, in pointing out all my prior sentences.  I would

4  argue -- and I agree that this defendant needs to be sentenced

5  as an individual based on this particular case, and that's

6  what's going to happen.  But I'd be remiss if not pointing out

7  the fact that the 15 years you're asking for, concurrent, is

8  lower than any of the sentences that you provided for the

9  purposes of arguing against sentencing disparity.  In fact, a

10  15-year sentence would be -- would fly in the face of a

11  sentencing disparity argument.  Every single sentence you cited

12  here as your -- in support of your argument that I should try

13  to avoid sentencing disparity is significantly lower -- or

14  higher than what you're asking for here today.  And I would

15  argue that if you were to put these defendants next to each

16  other, your -- this particular defendant is one of the worst.

17      I would also invite you to consider this.  During the

18  course of your argument, the defense argument, you made a

19  statement that the defendant was the fourth victim.  And I

20  understand.  And I -- I agree with you that he's been

21  victimized.  But I think when you list him right after listing

22  the three child victims in this case, it creates a false

23  equivalency in the context of the three victims in this case.

24  He's not the same victim and shouldn't be mentioned in the same

25  sentence as the other three.  But I do acknowledge that he has

1    significant mitigation in his past based on how he was

2    victimized, according to what you presented.

3           So, first of all, having said that, those are just my

4    few notes from the hearing.

5           This is really difficult subject matter.  I

6    appreciate the work of both sides on this.  There's -- no one

7    wins here today.  No matter what happens, no one wins here

8    today.  All of you have combed through much more disturbing

9    information than I've had to look at.  I've had it described

10    for me.  I've only gotten a small nugget of what both of you

11    have had to go through in preparing for this case.  So I

12    appreciate the fact that both of you gave impassioned pleas in

13    support of your position, and I certainly will take that into

14    consideration.

15           So here's what stands out to me about your client.

16    By the way, if you told him to stop angrily glaring at me

17    during the hearing, I appreciate that because that's all I saw

18    for the first half of the hearing.  He's been stoic throughout

19    the hearing.  And my observations are fair game.  The only time

20    I saw any emotion from him is when his former friend,

21    Mr. Ortiz, gave the unsworn statement.  When all the horrific

22    things that he did to these kids were being described by the

23    agent, I didn't see a single reaction.  And that doesn't weigh

24    heavily on the Court, it's just an observation.

25           So I have to make a determination.  Is this person

1    dangerous?  Well, in the context of that dangerousness

2    analysis, I can't help but notice how -- the level of cruelty

3    exhibited by the defendant towards these kids.  And that's one

4    of the things that makes him closer to some of the people at

5    the top of this sentencing list that you gave me.  He's cruel.

6    It's unspeakable what he did to these kids.  But it's not just

7    what he did.  It's how he did it.  And that's why I'm convinced

8    that he is dangerous.

9           So I take everything into consideration.  I don't

10    want to minimize the fact that the defense did an outstanding

11    job of giving me a complete background of where he's at and who

12    he is.  But who he is is a monster.  And he's going to be a

13    dangerous person.

14           And I understand -- I'm not sure I would use this

15    terminology, but I understand your concerns that if I do what

16    you don't want me to do, that I'm essentially taking his life

17    away or however you phrased it.  I'm not sure how effective an

18    argument that is.  I understand the magnitude of what the

19    Government is asking, and I don't take this lightly.  I

20    certainly don't need to be reminded repeatedly what a

21    consecutive sentence means in terms of your client.  But you're

22    right.  A consecutive sentence means that I'm abandoning any

23    chance of him ever being rehabilitated, that I am making the

24    decision that as a person I'm giving up on him.  And it's a

25    heavy decision I don't take lightly.  I do not like to have to

1   make these types of decisions, but it's my responsibility to do

2   it.

3        And after reviewing all of the evidence submitted to

4   the Court, after considering your arguments -- and I do leave

5   the courtroom to clear my head.  Because I want to make sure

6   that whatever happens here is unemotional and based solely on

7   the information provided to the Court.  I don't think he's ever

8   not going to be danger.  So I agree with you that a consecutive

9   sentence does exactly what you said it did.  And it pains me to

10  have to make decisions like this, but he's a danger.

11       What he did -- and, by the way, you mention "life

12  sentence."  There are three other life sentences involved with

13  what happened here, these little girls.  So what you described

14  he's been through, I hope they get help for it.  But I just --

15  it's just the cruelty stands out to me.

16       So if the defense and the defendant would please

17  stand.

18       Pursuant to Title 18, U.S. Code, Sections 3553 and --

19  3551 and 3553, it is the judgment of the Court that the

20  defendant is hereby committed to the custody of the Bureau of

21  Prisons to be imprisoned for a term of 1,800 months.  This

22  consists of 360 months as to Counts I, II, III, IV, and V.

23  They will all run consecutive to each other.

24       Upon release from imprisonment, you shall serve a

25  five-year term of supervised release as to each count, to run

*United States District Court*
*Middle District of Florida*

1   concurrently.  While on supervised release, you shall comply

2   with the mandatory and standard conditions adopted by the Court

3   in the Middle District of Florida.  In addition, you shall

4   comply with the following special conditions.

5        You shall participate in a substance abuse program,

6   outpatient and/or inpatient, and follow the probation officer's

7   instructions regarding the implementation of this court

8   directive.  Further, you shall contribute to the costs of these

9   services not to exceed an amount determined reasonable by the

10  probation office's sliding scale for substance abuse treatment

11  services.  During and upon completion of this program, you're

12  directed to submit to random drug testing.

13       You shall participate in a mental health treatment

14  program, outpatient and/or inpatient, and follow the probation

15  officer's instructions regarding the implementation of this

16  directive.  Further, you shall contribute to the costs of these

17  services not to exceed an amount determined reasonable by the

18  probation office's sliding scale for mental health treatment

19  services.

20       You shall participate in a mental health treatment

21  program specializing in sexual-offender treatment and submit to

22  polygraph testing for treatment and monitoring purposes.  You

23  shall follow the probation officer's instructions regarding the

24  implementation of this court directive.  Further, you shall

25  contribute to the costs of these services not to exceed an

*United States District Court*
*Middle District of Florida*

1   amount determined reasonable by the probation officer based on
2   ability to pay or availability of third-party payment and in
3   conformance with the probation office's sliding scale for
4   treatment services.
5           You shall register with the State sexual offender
6   registration agency in any state where you reside, visit, are
7   employed, carry on a vocation, or are a student, as directed by
8   probation.
9           The probation office shall provide state officials
10  with all information required under Florida sexual predator and
11  sexual offender notification registration statutes and/or the
12  Sex Offender Registration and Notification Act.  And probation
13  may direct the defendant to report to these agencies personally
14  for any required additional processing such as photographing,
15  fingerprinting, and DNA collection.
16          You shall have no contact with minors -- a minor is
17  defined as someone under the age of 18 -- without written
18  approval -- prior written approval by the probation officer,
19  and the defendant shall refrain from entering into any area
20  where children frequently congregate, including, but not
21  limited to, schools, day care centers, theme parks,
22  playgrounds.
23          You are prohibited from possessing, subscribing to,
24  or viewing any images, videos, magazines, literature, or other
25  materials depicting children in the nude and/or in sexually

*United States District Court*
*Middle District of Florida*

1   explicit positions.
2           Without prior written approval from probation, you're
3   prohibited from either possessing or using a computer,
4   including a smartphone, a hand-held computer device, a gaming
5   console or electronic device capable of connecting to an online
6   service or an internet service provider.  This prohibition
7   includes a computer at a public library, an internet cafe, your
8   place of employment, or an educational facility.  You're also
9   prohibited from possessing an electronic data storage medium,
10  including, but not limited to, a flash drive, a compact disc,
11  or a floppy disc.
12          You're also prohibited from using any data encryption
13  technique or a program.  If approved to possess or use such a
14  device, you must permit routine inspection of the device,
15  including the hard drive and any other electronic data storage
16  medium to confirm adherence to this condition.
17          The United States Probation Office must conduct an
18  inspection in a manner no more intrusive than necessary to
19  ensure compliance with this condition.  If the condition might
20  affect a third party, including your employer, you must inform
21  the third party of this restriction, including the computer
22  inspection provision.
23          You shall submit to a search of your person,
24  residence, place of business, any storage units under control,
25  computer or vehicle, conducted by the United States probation

*United States District Court*
*Middle District of Florida*

1    officer, at a reasonable time and in a reasonable manner, based

2    upon a reasonable suspicion of contraband or evidence of a

3    violation of a condition of release.  You shall inform any

4    other residents that the premises may be subject to a search

5    pursuant to this condition.  Failure to submit to a search may

6    be grounds for revocation.

7          Having been convicted of a qualifying felony, you

8    must cooperate in the collection of DNA as directed by

9    probation.  You must refrain from the unlawful use of a

10   controlled substance.  You must submit to one drug test within

11   15 days of placement on supervision and at least two periodic

12   drug tests thereafter as directed by probation.  You must

13   submit to random drug testing not to exceed 104 tests per year.

14         Based on the financial status of the defendant, the

15   Court waives the imposition of a fine.

16         Ms. Chang, are there any forfeiture matters pending?

17         **MS. CHANG:**  Yes, Your Honor.  And we would ask that

18   the Court incorporate forfeiture in the judgment.

19         **THE COURT:**  It will be.

20         It is further ordered that the defendant shall pay

21   $500 in special assessments, $100 per count, which shall be due

22   immediately.

23         After considering the advisory guidelines -- advisory

24   sentencing guidelines and all the factors identified in

25   Title 18, U.S. Code, Sections 3553(a)(1) through (7), the Court

*United States District Court*
*Middle District of Florida*

1    finds that the sentence imposed is sufficient but not greater

2    than necessary to comply with the statutory purposes of

3    sentencing.

4          The Court having pronounced sentence, does Counsel

5    for the defendant have any objection to the sentence imposed or

6    the manner in which the Court imposed sentence other than those

7    previously stated?

8          **MR. KAMALZADEH:**  Yes, Your Honor.  We would object to

9    the substantive and procedural reasonableness of the sentence.

10         And I would ask if we could enter the exhibits for

11   the presentation into the record?

12         **THE COURT:**  Any objection from the United States?

13         **MS. CHANG:**  No, Your Honor.

14         **THE COURT:**  All right.  I have the hard copies here.

15   They will be admitted and marked as defense exhibits.  And your

16   objection is preserved for the record.

17         Does the United States have any objection?

18         **MS. CHANG:**  No, Your Honor.

19         (Defense exhibits received in evidence.)

20         **THE COURT:**  The defendant is hereby remanded to the

21   custody of the U.S. Marshal to await designation by the Bureau

22   of Prisons.

23         You have the right to appeal from the judgment and

24   sentence within 14 days from entry of judgment.  Failure to

25   appeal within that 14-day period shall constitute a waiver of

*United States District Court*
*Middle District of Florida*

75

```
 1    your right to appeal.  The Government may also file an appeal

 2    from this sentence.  You're also advised that you're entitled

 3    to the assistance of counsel in taking an appeal and that if

 4    you cannot afford a lawyer, one will be provided for you.  If

 5    you cannot afford the filing fee, the Clerk of the Court will

 6    be directed to accept such notice of appeal without such fee.

 7              Is there anything further from the United States?

 8         MS. CHANG:  No, Your Honor.

 9         THE COURT:  Anything further from the defense?

10         MS. KELLY:  No, Your Honor.

11         THE COURT:  All right.  Thank you.  Have a good

12    morning.

13         (Proceedings adjourned at 11:57 a.m.)

14                   C E R T I F I C A T E

15

16         I certify that the foregoing is a correct transcript

17    from the record of proceedings in the above-entitled matter.

18

19    October 30, 2020

20

21       s\  Nikki L. Peters
         Nikki L. Peters, RPR, CRR, CRC
22       Federal Official Court Reporter
         United States District Court
23       Middle District of Florida

24

25
```

*United States District Court*
*Middle District of Florida*

# Doc. 53

### UNITED STATES DISTRICT COURT
### MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**UNITED STATES OF AMERICA**

v

**EDGAR JOHAN DIAZ-COLON**

**Case Number: 6:19-cr-260-Orl-41DCI**

**USM Number: 73194-018**

**Ali Kamalzadeh, FPD**
**Jenna N. Kelly, FPD**
**201 S Orange Ave., Ste 300**
**Orlando, FL 32801-3417**

### JUDGMENT IN A CRIMINAL CASE

The defendant pleaded guilty to Counts One, Two, Three, Four, and Five of the Indictment. The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Date Offense Concluded | Count Number(s) |
|---|---|---|---|
| 18 U.S.C. §§ 2251(a) and 2251(e) | Production of Child Pornography | July 8, 2018 | One |
| 18 U.S.C. §§ 2251(a) and 2251(e) | Production of Child Pornography | July 8, 2018 | Two |
| 18 U.S.C. §§ 2251(a) and 2251(e) | Production of Child Pornography | July 8, 2018 | Three |
| 18 U.S.C. §§ 2251(a) and 2251(e). | Production of Child Pornography | July 20, 2019 | Four |
| 18 U.S.C. §§ 2251(a) and 2251(e) | Production of Child Pornography | July 27, 2019 | Five |

The defendant is sentenced as provided in the following pages of this judgment.  The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

**IT IS ORDERED** that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs and special assessments imposed by this judgment are fully paid.  If ordered to pay restitution, the defendant shall notify the court and United States attorney of any material change in the defendant's economic circumstances.

Date of Imposition of Sentence:

September 3, 2020

CARLOS E. MENDOZA
UNITED STATES DISTRICT JUDGE

September _____ 3 _____, 2020

**Edgar Johan Diaz-Colon**
**6:19-cr-260-Orl-41DCI**

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of **EIGHTEEN HUNDRED (1800) MONTHS**. This term consists of a 360-month term as to each of Counts One, Two, Three, Four, and Five, all such terms to run **CONSECUTIVELY**.

The defendant is remanded to the custody of the United States Marshal.

## RETURN

I have executed this judgment as follows:

_____

_____

_____

_____

Defendant delivered on _____ to _____

at _____, with a certified copy of this judgment.

_____
                                                    UNITED STATES MARSHAL

                                    By: 
_____
                                                    Deputy U.S. Marshal

AO 245B (Rev. 09/19) Judgment in a Criminal Case

**Edgar Johan Diaz-Colon**
**6:19-cr-260-Orl-41DCI**

## SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term **of FIVE (5) YEARS**. This term consists of a 5-year term as to Counts One, Two, Three, Four, and Five, all such terms to run **CONCURRENTLY**.

## MANDATORY CONDITIONS

1.   You must not commit another federal, state or local crime.
2.   You must not unlawfully possess a controlled substance.
3.   You must refrain from any unlawful use of controlled substance. You must submit to one drug test within 15 days of placement on supervision and at least two periodic drug tests thereafter as directed by the probation officer. You must submit to random drug testing not to exceed 104 tests per year.

4.   You must cooperate in the collection of DNA as directed by the probation officer.

5.   You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense.


The defendant shall comply with the standard conditions that have been adopted by this court (set forth below).

The defendant shall also comply with the additional conditions as follows.

AO 245B (Rev. 09/19) Judgment in a Criminal Case

**Edgar Johan Diaz-Colon**
**6:19-cr-260-Orl-41DCI**

# STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1.   You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame. After initially reporting to the probation office, the defendant will receive instructions from the court or the probation officer about how and when the defendant must report to the probation officer, and the defendant must report to the probation officer as instructed.

2.   After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.

3.   You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.

4.   You must answer truthfully the questions asked by your probation officer

5.   You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.

6.   You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.

7.   You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so.  If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10   days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.

8.   You must not communicate or interact with someone you know is engaged in criminal activity.  If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.

9.   If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within **72 hours.**

10.   You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).

11.   You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.

12.   If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.

13.   You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.


Defendant's Signature:_____          Date:_____


AO 245B (Rev. 09/19) Judgment in a Criminal Case

Edgar Johan Diaz-Colon
6:19-cr-260-Orl-41DCI

# ADDITIONAL CONDITIONS OF SUPERVISED RELEASE

1.  The defendant shall participate in a substance abuse program (outpatient and/or inpatient) and follow the probation officer's instructions regarding the implementation of this court directive. Further, the defendant shall contribute to the costs of these services not to exceed an amount determined reasonable by the Probation Office's Sliding Scale for Substance Abuse Treatment Services. During and upon completion of this program, the defendant is directed to submit to random drug testing.

2.  The defendant shall participate in a mental health treatment program (outpatient and/or inpatient) and follow the probation officer's instructions regarding the implementation of this court directive. Further, the defendant shall contribute to the costs of these services not to exceed an amount determined reasonable by the Probation Office's Sliding Scale for Mental Health Treatment Services.

3.  The defendant shall participate in a mental health program specializing in sex offender treatment and submit to polygraph testing for treatment and monitoring purposes. The defendant shall follow the probation officer's instructions regarding the implementation of this court directive. Further, the defendant shall contribute to the costs of such treatment and/or polygraphs not to exceed an amount determined reasonable by the probation officer based on ability to pay or availability of third party payment and in conformance with the Probation Office's Sliding Scale for Treatment Services.

4.  The defendant shall register with the state sexual offender registration agency(s) in any state where he or she resides, visits, is employed, carries on a vocation, or is a student, as directed by the probation officer. The probation officer will provide state officials with all information required under Florida sexual predator and sexual offender notification and registration statutes (F.S.943.0435) and/or the Sex Offender Registration and Notification Act (Title I of the Adam Walsh Child Protection and Safety Act of 2006, Public Law 109-248), and may direct the defendant to report to these agencies personally for required additional processing, such as photographing, fingerprinting, and DNA collection.

5.  The defendant shall have no direct contact with minors (under the age of 18) without the written approval of the probation officer and shall refrain from entering into any area where children frequently congregate, including: schools, daycare centers, theme parks, playgrounds, etc.

6.  The defendant is prohibited from possessing, subscribing to, or viewing, any video, magazine, or literature depicting children in the nude and/or in sexually explicit positions.

7.  Without prior written approval of the probation officer, you are prohibited from either possessing or using a computer (including a smart phone, a hand-held computer device, a gaming console, or an electronic device) capable of connecting to an online service or an internet service provider. This prohibition includes a computer at a public library, an internet cafe, your place of employment, or an educational facility. Also, you are prohibited from possessing an electronic data storage medium (including a flash drive, a compact disk, and a floppy disk) or using any data encryption technique or program. If approved to possess or use a device, you must permit routine inspection of the device, including the hard drive and any other electronic data storage medium, to confirm adherence to this condition. The United States Probation Office must conduct the inspection in a manner no more intrusive than necessary to ensure compliance with this condition. If this condition might affect a third party, including your employer, you must inform the third party of this restriction, including the computer inspection provision.

8.  The defendant shall submit to a search of his or her person, residence, place of business, any storage units under the defendant's control, computer, or vehicle, conducted by the United States Probation Officer at a reasonable time and in a reasonable manner, based upon reasonable suspicion of contraband or evidence of a violation of a condition of release. Failure to submit to a search may be grounds for revocation. The defendant shall inform any other residents that the premises may be subject to a search pursuant to this condition.

AO 245B (Rev. 09/19) Judgment in a Criminal Case

**Edgar Johan Diaz-Colon**
**6:19-cr-260-Orl-41DCI**

## CRIMINAL MONETARY PENALTIES

The defendant must pay the following total criminal monetary penalties under the schedule of payments set forth in the Schedule of Payments.

| | Assessment | Restitution | Fine | AVAA Assessment[1] | JVTA Assessment[2] |
|---|---|---|---|---|---|
| TOTALS | $500.00 | N/A | Waived | $0.00 | $0.00 |

## SCHEDULE OF PAYMENTS

Unless the court has expressly ordered otherwise in the special instructions above, if this judgment imposes a period of imprisonment, payment of criminal monetary penalties shall be due during the period of imprisonment.  All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the Clerk, U.S. District Court, unless otherwise directed by the court, the probation officer, or the United States attorney.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.

## FORFEITURE

Defendant shall forfeit to the United States those assets previously identified in the Preliminary Order of Forfeiture (Doc. 38), that are subject to forfeiture.

The defendant shall pay interest on any fine or restitution of more than $2,500, unless the fine or restitution is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f).  All of the payment options on the Schedule of Payments may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

---

[1] Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
[2] Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.

AO 245B (Rev. 09/19) Judgment in a Criminal Case

# DOC. 57

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**UNITED STATES OF AMERICA,**

       **Plaintiff,**

**v.**                                             **Case No. 6:19-cr-260-Orl-41DCI**

**EDGAR JOHAN DIAZ-COLON,**

       **Defendant.**

_____/

## NOTICE OF APPEAL

NOTICE IS HEREBY GIVEN that Defendant, Edgar Johan Diaz-Colon, pursuant to Fed. R. App. P. 4(b), appeals to the United States Court of Appeals for the Eleventh Circuit from the district court's judgment and sentence filed in this matter on September 3, 2020.

Respectfully submitted,

JAMES T. SKUTHAN
ACTING FEDERAL DEFENDER


s/ *Jenna Kelly*_____
Jenna Kelly
Assistant Federal Defender
Florida Bar No. 0106365
201 S. Orange Avenue, Suite 300
Orlando, Florida 32801
Telephone: 407-648-6338
Facsimile: 407-648-6095
E-Mail: jenna_kelly@fd.org

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that undersigned electronically filed the foregoing *Notice of Appeal* with the Clerk of Court (CM/ECF) by using the CM/ECF system, which will send notice of the electronic filing to Emily Chang, Assistant United States Attorney, this the 16th day of September 2020.

*s/ Jenna Kelly*
Jenna Kelly
Assistant Federal Defender

2

## CERTIFICATE OF SERVICE

I certify that on February 1, 2021, the above Appendix was filed using CM/ECF which will electronically notify Assistant United States Attorney Todd B. Grandy.


*/s/ Katherine Howard*
Katherine Howard
Research and Writing Attorney